**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **DANNY WALKER**, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>**HARISH CHIDAMBARAN**, et al.,<br><br>    Defendants. | Case No.: 8:24-cv-02900-DKC<br><br>Hon. Deborah K. Chasanow |

**CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS CHIDAMBARAN'S**
**AND NAQVI'S MOTIONS TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND AND FACTUAL ALLEGATIONS ......................................................... 2

    a.    iLearningEngines' Origins ..................................................................................... 2

    b.    iLearningEngines Merges with Arrowroot to become a Public Company .................... 2

    c.    iLearningEngines Business ..................................................................................... 3

    d.    The Hindenburg Report Reveals the Undisclosed Related Party Transactions and Fraudulent Revenue and Expenses ............................................................................ 7

    e.    Hindenburg Report Aftermath – Market and iLearningEngines Response ................... 8

    f.    iLearningEngines Declares Bankruptcy .................................................................. 9

    g.    Post-Class Period Events ....................................................................................... 9

LEGAL STANDARD ..........................................................................................................11

ARGUMENT ......................................................................................................................11

I.    iLearningEngines' financial statements do not fairly present the financial conditions and results of operations of iLearningEngines and thus do not faithfully represent what they purport to represent. ............................................................................................ 11

    a.    Defendants' Statements in iLearningEngines' Financial Statements were False and Misleading because They Failed to disclosed the Related Party Transactions with Experion and Misrepresented iLearningEngines' Revenue and Expenses ......................................... 11

    b.    Falsity of iLearningEngines' Revenue and Expenses Adequately Pleaded (Naqvi) .... 14

        i.    Defendant Naqvi's Attempt to Misdirect the Court by Emphasizing the Language "largely fake" Fails Because the Amended Complaint Alleges with Particularity Events Corroborating the Hindenburg Report ................................................................. 14

        ii.    Defendants attempt to hide the falsity of their financial reporting behind iLearningEngines' bankruptcy, liquidation, and lack of restatement. ............................... 16

    c.    Round-Tripping (Chidambaran) ........................................................................... 17

    d.    Related Party Misstatements (Chidambaran) .......................................................... 18

II.    The Amended Complaint Pleads a Strong Inference of Scienter ..................................... 19

    a.    The Amended Complaint Alleges Facts Supporting a Strong Culpable Inference for Defendants Naqvi and Chidambaran ........................................................................... 20

        i.    Defendants Chidambaran's and Naqvi's background and roles belie their arguments that the GAAP related party test requires expertise. ........................................................ 20

ii.    The roles, responsibilities, and background of Defendants Chidambaran and Naqvi weigh heavily on the side of knowledge of related party transactions and therefore support a strong inference of culpability. ........................................................................... 21

iii.   The timing and circumstances of Defendants Naqvi and Chidambaran's departures supports a strong culpable inference. ................................................................................ 22

iv.   Despite Defendant Chidambaran's claims to the contrary, maximizing iLearningEngines' valuation can serve as a qualifying motive in the scienter analysis. .. 22

III.   The Amended Complaint Adequately Pleads Loss Causation. ........................................ 23

CONCLUSION ..................................................................................................................... 30

## TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|
| Ashcroft v. Iqbal, 556 U.S. 662 (2009) | 11 |
| Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) | 11 |
| In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781 (9th Cir. 2020) | *passim* |
| Carlucci v. Han, 907 F. Supp. 2d 709 (E.D. Va. 2012) | 25 |
| In re Constellation Energy Grp., Inc., 738 F. Supp. 2d 614 (D. Md. 2010) | 11 |
| Defeo v. IonQ, Inc., 134 F.4th 153 (4th Cir. 2025) | *passim* |
| Epstein v. World Acceptance Corp., 203 F. Supp. 3d 655 (D.S.C. 2016) | 30 |
| Espy v. J2 Global, Inc., 99 F.4th 527 (9th Cir. 2024) | 29 |
| Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462 (4th Cir. 2011) | 24 |
| KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th 601 (4th Cir. 2021). | 20 |
| Kiken v. Lumber Liquidators Holdings, Inc., 155 F. Supp. 3d 593 (E.D. Va. 2015) | 16 |
| Klein v. Altria Grp., Inc., 525 F. Supp. 3d 638 (E.D. Va. 2021) | 25 |
| Leacock v. IonQ, Inc., No. CV DLB-22-1306, 2024 WL 3360647 (D. Md. July 10, 2024) | 24, 28 |
| In re Lihua Int'l, Inc. Sec. Litig., No. 14-CV-5037 (RA), 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) | 16 |
| Marsh Grp. v. Prime Retail, Inc. 46 Fed App'x 140 (4th Cir. 2002) | 11 |
| Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172 (4th Cir. 2009) | 20 |
| Miller v. Asensio & Co., 364 F.3d 223 (4th Cir. 2004) | 23 |
| In re Nektar Therapeutics Sec. Litig., 34 F.4th 828 (9th Cir. 2022) | 29 |
| Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114 (2d Cir. 2012) | 30 |
| Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313 (5th Cir. 2014) | 29 |
| Singer v. Reali, 883 F.3d 425 (4th Cir. 2018) | 19, 23 |
| Teachers' Ret. Sys. of Louisiana v. Hunter, 477 F.3d 162 (4th Cir. 2007) | 14, 17 |
| Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) | 20 |
| In re Urb. Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 655–56 (E.D. Pa. 2015) | 24 |
| Wag More Dogs, LLC v. Cozart, 680 F.3d 359 (4th Cir. 2012) | 11 |
| Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597 (4th Cir. 2015) | 20 |

**Statutes**

| | |
|---|---|
| 15 U.S.C. § 77k (§ 11 of the Securities Act) | *passim* |
| 15 U.S.C. § 77l(a)(2) (§ 12(a)(2) of the Securities Act) | 30 |
| 15 U.S.C. § 78j(b) (Section 10(b) of the Exchange Act) | 23 |

**Rules**

Fed. R. Civ. P. 9(b)                                                                 11

Rule 10b-5                                                                           23

**Other Authorities**

FASB Accounting Standards Codification (ASC) 105-10-05-01                             12

FASB Accounting Standards Codification (ASC) 606-10-05-04                             13

FASB Accounting Standards Codification (ASC) 606-10-25-1                           12, 13

FASB Accounting Standards Codification (ASC) 850-10-20                          18, 19, 21

FASB Accounting Standards Codification (ASC) 850-10-20(e)                          18, 21

FASB Accounting Standards Codification (ASC) 850-10-20(f)–(g)                         18

Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, 109
Stat. 737 (1995)                                                                     11

Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)                                           12

**PRELIMINARY STATEMENT**

Defendants' Motions to Dismiss attempt to portray this case as resting solely on a short-seller's suspicions. That framing is wrong. The Amended Complaint alleges, and subsequent events confirm, far more. iLearningEngines, Inc. was simply a company that should never have gone public. It lacked any meaningful operations of its own and appeared to have existed solely to cycle revenue and expenses from its insiders' off-shore business: Experion Technologies. The Amended Complaint sets forth in painstaking detail the multiple ways that iLearningEngines improperly recorded over 90% of its revenues in its financial statements published during the Class Period. This revenue was purportedly "earned" through transactions with an undisclosed related party that had no economic substance and provided no benefit to iLearningEngines. When exposed by an independent research firm, Hindenburg Research, iLearningEngines swiftly collapsed: its own Board-appointed Special Committee declared its financial statements unreliable, its auditor retracted its audit opinions and then resigned, and iLearningEngines itself admitted in bankruptcy filings that its key counterparty, Experion, was a related party and insider. The Special Committee also required the removal of the CEO, Harish Cidambaran and CFO, Sayyed Naqvi and has referred potential violations of law to the Department of Justice, prompting parallel DOJ and SEC investigations. ILearningEngines stock, which once traded as high as $10.87 per share, is now worthless. These undisputed facts—ignored in Defendants' motions—demonstrate falsity, scienter, and loss causation. Defendants' motions to dismiss should be denied.

1

**BACKGROUND AND FACTUAL ALLEGATIONS**

### a. iLearningEngines' Origins

iLearningEngines, Inc. ("iLearningEngines") was founded in 2010 by Defendant Puthugramam "Harish" Chidambaran as iHealthEngines and was initially marketed as a "rewards-based patient education" platform. (AC ¶¶ 54 – 57). While iLearningEngines claims to be an "early pioneer in enterprise AI", it was not until 2020 that the company began portraying itself as AI Powered Learning Platform" despite owning no patents to substantiate such claims beyond a 2012 filing for a rewards system unrelated to artificial intelligence (AC ¶¶ 60–61).

### b. iLearningEngines Merges with Arrowroot to become a Public Company

iLearningEngines was a private company until April 16, 2024, when it became a wholly owned subsidiary of Arrowroot Acquisitions, Inc. ("Arrowroot"), a public special purpose acquisition company ("SPAC"), through a reverse de-SPAC merger. (AC ¶ 67). On January 25, 2023, Arrowroot's board set a proposed valuation of $1.28 billion for iLE. (AC ¶ 73). On April 27, 2023, the parties executed the merger agreement and related support agreements. Arrowroot filed a Form S-4 registration statement in September 2023, which was amended three times, with the final amendment filed on January 5, 2024. (AC ¶ 78). The merger ultimately closed on April 17, 2024. (AC ¶ 79). As a result, iLearningEngines received about $52.7 million in gross proceeds. (AC ¶ 80). With the deal complete, Arrowroot formally changed its name to iLearningEngines, Inc. (AC ¶ 81).

Although the transaction ascribed to iLearningEngines a valuation exceeding $1.2 billion, based primarily on reported revenues for 2022, at the time of the merger, iLearningEngines was in a precarious financial state: it reported only $800,000 in cash, $22 million in debt, and an accumulated deficit of $47.1 million (AC ¶¶ 6,67). Conspicuously absent from both Naqvi and

Chidambaran's arguments is any mention of iLearningEngines' financial weakness at the time of the transaction.

### c.  <u>iLearningEngines Business</u>

In SEC filings following the public offering, iLearningEngines described itself as a value-added enterprise AI company offering "AI-powered learning automation" and related software-as-a-service ("SaaS") solutions. (AC ¶ 62). iLearningEngines stated it generates revenue "primarily through user licenses" and reported that in 2023 its services generated $421 million of revenue, representing 36% growth over the prior year, with 69% gross margins. (*Id.*). The company also asserted that its proprietary AI platform serves more than 1,000 enterprise end customers with over 4.7 million licensed users across 12+ industry verticals such as education, healthcare, insurance, manufacturing, cybersecurity, and energy and utilities (AC ¶ 62).

On June 3, 2024, iLearningEngines filed a Form S-1 seeking to register up to 22,624,975 shares of its common stock issuable upon exercise of iLearningEngines warrants, up to 100,774,669 shares of iLearningEngines common by the "Selling Securityholders", and 8,250,000 warrants (the "Form S-1 Registration Statement"). (AC ¶440). The Form S-1 Registration Statement was signed by each of the Individual Defendants. (AC ¶¶ 144, 250). The Form S-1 Registration Statement was amended two times with the second amended version filed with the SEC on July 22, 2024 before it was declared effective on August 9, 2024. (AC ¶¶10, 147, 492).

On June 21, 2024, after market close, iLearningEngines filed a Form S-8 registration statement to register up to 16,208,318 shares of iLearningEngines common stock issued or issuable pursuant to various incentive and employee stock plans (the "Form S-8 Registration Statement"). (AC ¶¶ 137, 139). The Form S-8 Registration Statement was signed by Defendants Chidambaran, Naqvi, Arackal, Olivier, Barger, Davis, Mehlman, and Moe. ¶138. The Form S-8 Registration Statement was automatically effective upon its filing with the SEC. ¶¶139, 142.

The Form S-1 Registration Statement and the Form S-8 Registration Statement provided investors with its financial statements for the years 2021, 2022, and 2023 as well as the first two quarters of 2024. The financial statements purported to report iLearningEngines' revenues, expenses, and disclosed any "Related Party" and "Related Party Transactions". The annual financial statements for 2021, 2022, and 2023 were also accompanied by an audit report provided by iLearningEngines public accounting firm: Marcum LLP which certified that the financial statements were properly stated in accordance with generally accepted along with audited financial statements for the years 2021-2023 and the first two quarters of 2024. (AC ¶¶ 9–11). The incorporated financial statements, iLearningEngines reported revenue of $217.9 million, $309.2 million, and $420.6 million, for fiscal years 2021, 2022 and 2023, respectively. (AC ¶ 66).

After going public, iLearningEngines' filings with the SEC represented that it earned revenue "primarily through user licenses[,]" and contended that its "proprietary AI platform" served "more than 1,000 enterprise end customers with over 4.7 million licensed users[,]" reporting that in 2023, its services generated "$421 million of revenue, representing 36% growth over the prior year, with 69% gross margins." (AC ¶ 62). Defendants Chidambaran, Arackal, and Naqvi led iLearningEngines as CEO and founder, Chief Business Officer, and CFO and Treasurer, respectively. (AC ¶ 66). As of May 2024, iLearningEngines reported that it had 101 full-time employees and 428 contract employees worldwide. *Id.*

Most of iLearningEngines' revenue and sales are generated through its partner relationships. (AC ¶ 82). In financial statements filed with the SEC in 2023, iLearningEngines stated that it has partner relationships with value-added resellers ("VARs"), including entities iLearningEngines and Chidambaran later disclosed in their response to the Hindenburg Report: Exult Global, Techvantage, Vedhik Schools, and Experion. (AC ¶¶ 291; 515).

Apart from the disclosed VARs, one company – unnamed and not identified as a related party or affiliated entity – accounted for the majority of iLearningEngines' revenue. (AC ¶ 88). In its 2023 financial statements, iLearningEngines called this firm the "Technology Partner." (AC ¶¶ 82, 291). In iLearningEngines' Management's Discussion and Analysis for the fiscal year ended December 31, 2023 ("2023 MD&A") and the Form S-1 Registration Statement, iLearningEngines described its dealings with the Technology Partner a contractual agreement with the Technology Partner "through which the Technology Partner purchases and integrates our platform into the Technology Partner's own software solution provided to one of the Technology Partner's customers." (AC ¶ 90). iLearningEngines further disclosed that it outsourced all of its implementation services services to the Technology Partner. *Id.* In this arrangement, the Technology Partner provided a wide variety of services for which it receives fees from iLearningEngines, including research and development, sales and marketing, and implementation and support services, and that it also purchases, integrates, and resells the platform to end customers. (AC ¶ 91). In the Form S-1, iLearningEngines stated that because the Technology Partner was both a customer in some arrangements and a vendor in others, iLearningEngines evaluated the fees it paid the Technology Partner for services. (AC ¶92). It concluded the services were distinct, the consideration was equivalent to an arms-length transaction, and therefore costs paid to the Technology Partner were not netted against revenues earned from it. *Id.*

The importance of the Technology Partner to iLearningEngines' business was underscored by the fact that the term "Technology Partner" appeared 129 times in the Form S-1 and 103 times in the Form S-4. Financial statements showed that the Technology Partner collected nearly all revenue for iLearningEngines while offsetting over 90% of what it owed through costs it incurred. (AC ¶ 93). For example, the unaudited financial statements for the quarter ended March 31, 2024

incorporated in the Form S-1 disclosed that 90.9% of iLearningEngines' reported revenue was collected by the Technology Partner and over 94.62% of its costs of revenue were invoiced by the Technology Partner to iLE. (AC ¶ 94). In a November 6, 2023 letter response to SEC comments regarding Form S-4, iLearningEngines asserted that it was not dependent on any single channel partner or related contract and that no single agreement was material. (AC ¶ 95). Nevertheless, the Company's own filings showed overwhelming dependence on the Technology Partner.

Notably, iLearningEngines did not disclose that the Technology Partner was a "related party" and, as such, did not record any of its transactions with it as "related party transactions." (AC ¶ 12). In fact, in response to comments by the SEC concerning the Form S-4 issued as part of the merger, Arrowroot (now iLearningEngines) stated that "the Technology Partner is not a related party and they do not hold any financial interest in iLearningEngines." (AC ¶¶ 12, 403).

As alleged in the Complaint, under the applicable accounting standards, recognition of revenue by iLearningEngines from transactions run through the Technology Partner was improper because it was a related party.  (AC ¶¶ 111-133). The Technology Partner, later revealed to be Experion technologies, shared offices, management, directors and financial interests with iLearningEngines. (AC ¶¶ 111-133; 298-300; 226-40). The transactions between the two were improperly recorded because they do not meet GAAP's definitions of proper revenues and expenses and because they had no commercial substance. (AC ¶¶ 305-307). Specifically, because most of iLearningEngines' revenue and expenses were subject to netting-off provisions and flowed through the Technology Partner, the Technology Partner facilitated the falsification of iLearningEngines' financials and revenue. (¶ AC 162). iLearningEngines' financial statements showed that it earned $420.6 million in revenue in 2023, 92.6% of the total revenue amount, or $389.4 million, was "Collections by the Technology Partner." (AC ¶ 164). In 2023, of the $389.4

million in revenue collected for iLearningEngines by the Technology Partner, iLearningEngines would receive only $1.2 million after the Technology Partner netted the $388.2 million payable for "[c]osts of services by [the] Technology Partner[.]" (AC ¶ 165). None of this revenue was real or properly recorded in accordance with GAAP and iLearningEngines' own accounting policies.

   d.   **The Hindenburg Report Reveals the Undisclosed Related Party Transactions and Fraudulent Revenue and Expenses**

On August 29, 2024, before the market opened, an independent, well-respected investment research firm known for its short positions in companies, Hindenburg Research, published a report detailing its investigation into iLearningEngines titled "An Artificial Intelligence SPAC With Artificial Partners And Artificial Revenue" (previously defined as the "Hindenburg Report"). (AC ¶ 159).

Hindenburg Research supported the conclusions reached in the Hindenburg Report with evidence uncovered in its investigation, and provides citations, along with links to its sources, including SEC filings, Indian corporate records, international court filings, other documents, and archived captures of the Technology Partner's and iLearningEngines' websites. (AC ¶ 160).

Based on its research, the Hindenburg Report concluded that iLearningEngines had undisclosed related party transactions with the "Technology Partner" and that "the vast majority" of iLearningEngines' revenue was fake. (AC ¶ 160). Hindenburg disclosed for the first time that the "Technology Partner" was called Experion technologies with multiple relationships between it and iLearningEngines, including common employees, offices, and management. (AC ¶ 160-76).

Hindenburg Research concluded most of iLearningEngines' revenue is fake, enabled by an Experion "netting off" arrangement that inflates gross figures while reporting only a small net in an opaque jurisdiction, and the circular structure facilitates the inflation of revenue and cost while netting out a minimal difference. (AC ¶ 177). Following publication of the Hindenburg Report on

August 29, 2024, shares fell 53.3% in a day—from $3.19 to $1.49—on unusually heavy volume (AC ¶ 179).

  **e.** **Hindenburg Report Aftermath – Market and iLearningEngines Response**

  On September 5, 2024, iLearningEngines issued a press release announcing that the iLearningEngines Board of Directors formed a special committee of the board (the "Special Committee"), to investigate the Hindenburg Report's allegations. (AC ¶ 186). The September 5, 2024 press release quoted Defendant Chidambaran, who represented that iLearningEngines was "proud of the AI platform that we've built[,] [t]he company I founded has real products, contracts, and revenue," and reiterated his previous statements accusing the Hindenburg Report of being misleading. (AC ¶ 187).

  On November 18, 2024, iLearningEngines issued a issued a Form 8-K disclosing that: (i) based on the Special Committee's investigation into the Hindenburg Report's allegations, the Audit Committee had concluded that essentially all of iLearningEngines' financial statements since 2020 should "no longer be relied upon"; (ii) Marcum had withdrawn its prior opinions; (iii) that iLearningEngines received a subpoena from the SEC on October 17, 2024; and (iv) that Defendant Naqvi was placed on administrative leave from his position as CFO on November 12, 2024. (AC ¶ 196-97). Further, the November 18, 2024 Form 8-K disclosed that Marcum informed the Audit Committee that its reports, dated April 22, 2024 and September 1, 2023 should no longer be relied upon. (AC ¶ 199).

  The market reacted decisively to these disclosures; the price of iLearningEngines decreased by $0.405 per share from its previous closing price of $1.50 per share on Friday, November 15, 2024, to close at $1.095 per share on November 18, 2024, on an abnormally large volume of over 5.965 million shares. (AC ¶ 202). In a sole trading session, iLearningEngines' stock price fell 27%. *Id*.

On December 10, 2024, iLearningEngines issued a press release disclosing that based on the Special Committee's recommendation, Defendants Chidambaran, Naqvi and Arackal on administrative leave. This disclosure caused the price of iLearningEngines stock to decrease by $0.17 per share from its previous closing price of $1.20 per share on Monday, December 9, 2024, to close at $1.03 per share on December 10, 2024, on large volume of over 1.015 million shares. (AC ¶ 207). In a sole trading session, iLearningEngines' share price fell 14.17%. *Id.*

### f.  iLearningEngines Declares Bankruptcy

On December 23, 2024, iLearningEngines issued a press release announcing that on December 20, 2024, it had voluntarily initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware. (AC ¶ 208). The market responded quickly and decisively. In response to this disclosure, the price of iLearningEngines stock decreased by $0.695 per share from its previous closing price of $0.885 per share on Friday, December 20, 2024 to close at $0.19 per share on December 23, 2024, on exceptionally large volume of over 29.7 million shares. (AC ¶ 209). In a sole trading session, iLearningEngines' share price fell 78.5%. *Id.*

### g.  Post-Class Period Events

On December 27, 2024, iLearningEngines filed a Form 8-K announcing that Defendants Chidambaran, Naqvi, and Arackal had resigned from their positions of employment and any other offices of employment held at iLearningEngines, effective immediately. (AC ¶ 214). The December 27, 2024 Form 8-K also disclosed that the Special Committee had reported "potential violations of law to the Department of Justice[,]"and that the Special Committee was cooperating with the SEC's and DOJ's investigations of iLE. (AC ¶ 215).

On February 19, 2025, iLearningEngines filed a Form 8-K that disclosed that on February 13, 2025, Marcum had resigned as iLearningEngines independent registered public accounting firm, and that Marcum had advised that its audit of the consolidated financial statements for the

year ended December 31, 2023 revealed material weaknesses in iLearningEngines' internal control over corporate governance, statutory compliance, and information technology controls (AC ¶ 217). The February 19, 2025 Form 8-K also disclosed that Marcum had informed iLearningEngines that its reports, dated April 22, 2024 and September 1, 2023, on the Company's previously issued consolidated financial statements could no longer be relied upon. (AC ¶ 218).

On March 28, 2025, AAI Solutions, Inc., a company for which Defendant Thomas Olivier serves as President, entered into an agreement with the iLearningEngines trustee to acquire the assets of iLearningEngines for $1,500,000 (AC ¶ 222). As part of the bankruptcy process, iLearningEngines' former interim CEO and CFO, Gerety, submitted filings on behalf of each of the iLearningEngines entities disclosing their payments within one year of the filing of bankruptcy petitions to "insiders" as defined by the Bankruptcy Code (AC ¶ 224). The filings were signed by Gerety. The list identified Experion MEA Corporation in Dubai, UAE, as both an "insider" and as a "Related Party" that received payments totaling $87.425 million from iLearningEngines (AC ¶ 227). The filings reveal that of the $87.425 million transferred to Experion MEA Corporation by iLearningEngines within one year of iLearningEngines' commencing its voluntary bankruptcy proceedings, $83.6 million was transferred via wire transfers following the IPO and that the pace of the payments accelerated in close proximity to the publication of the Hindenburg Report on August 29, 2024, with $63.2 million transferred between August 20, 2024, and November 8, 2024, of which $55.7 million was transferred after the publication of the Hindenburg Report (AC ¶ 230). These payments do not match the "Net cash transfers between Company and Technology Partner" disclosed in the notes to the financial statements for 2023, in the 1Q2024 Financial Statements, or the 2Q2024 Form 10-Q, respectively, and are in addition to the funds Experion kept due to netting of charges for costs of services purportedly provided by the Technology Partner. (AC ¶ 231-232).

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012). Securities fraud allegations must be pleaded with particularity to comply with Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In evaluating a complaint's allegations, all "reasonable factual inferences" must be drawn in the plaintiff's favor and all well-pled allegations must be accepted as true. "It is well settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim which would entitle [the plaintiff] to relief." *Marsh Grp. v. Prime Retail, Inc.*, 46 Fed. App'x. 140, 144 (4th Cir. 2002). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 614, 623 (D. Md. 2010).

## ARGUMENT

I.    **iLearningEngines' financial statements do not fairly present the financial conditions and results of operations of iLearningEngines and thus do not faithfully represent what they purport to represent.**

   a.    **<u>Defendants' Statements in iLearningEngines' Financial Statements were False and Misleading because They Failed to disclosed the Related Party Transactions with Experion and Misrepresented iLearningEngines' Revenue and Expenses</u>**

During the Class Period, iLearningEngines made materially false and misleading statements regarding virtually all reported revenue and costs – which flowed through an undisclosed related-party "Technology Partner", later revealed to be Experion. iLearningEngines failed to make required GAAP and related-party disclosures in its S-8 and S-1/prospectus and in repeated public statements. Despite Experion being a related party under GAAP, iLearningEngines

repeatedly omitted to disclose to the market the fact that there was significant overlap between Experion and iLearningEngines management, ownership, and executives. Once these misrepresentations were revealed to the market, the resultant auditor withdrawal, executive suspensions, government investigations, and bankruptcy confirmed the materially false and misleading nature of iLearningEngines' statements and omissions.

The relationship between iLearningEngines and Experion allowed iLearningEngines to record fake expenses and revenues without the need to cycle through cash. iLearningEngines' recording of transactions between it and Experion constitutes a GAAP violation because the reported amounts do not meet the definitions of revenues and expenses, and financial statements that do not comport with GAAP are presumed to be misleading.

Generally Accepted Accounting Principles ("GAAP") comprise the conventions, rules, and procedures U.S. companies use to prepare financial statements. AC ¶ 254. The SEC has statutory authority to issue GAAP to public companies and has delegated that authority to the Financial Authority Standards Board ("FASB").  (AC ¶ 255). For SEC registrants, the SEC Rules and the FASB Accounting Standards Codification ("ASC") are sources of authoritative GAAP. ASC 105-10-05-01. Financial statements not prepared in compliance with GAAP and filed with the SEC are presumed to be misleading and inaccurate in spite of other disclosures. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)).

The Complaint sets forth at length the relevant GAAP provisions and explains why the revenues recognized by iLearningEngines were improper. (AC ¶¶ 264-313). Fundamentally, iLearningEngines recognition of revenue violated ASC 606-10-25-1 because its arrangements with Experion lacked "commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract)." Further issues were that (a) the

transaction price is nil or non-existent because any revenues recognized are the result of the round-tripping transactions and no consideration is expected to be received, (b) no goods or services are transferred to a customer, (c) the seller does not have any performance obligations because there is no actual transfer of goods or services to a customer, or (d) no allocation of transaction price to performance obligations could be made due to the non-existence of either element. ASC 606-10-05-04 and ASC 606-10-25-1. This improperly recognized revenue amounted to 94% of total revenue in 2021, 96.3% in 2022, and 92.6% in 2023. (AC ¶ 303). In total, iLearningEngines claimed nearly $900 million in revenue over three years from Experion. *Id*. None of it was properly recognized under GAAP. (AC ¶ 307).

This violation was made more egregious by masking the identity of the Technology Partner. Although iLearningEngines disclosed that it had a long-term relationship with a Technology Partner, it did not disclose that the Technology Partner was a related party. iLearningEngines did not formally disclose this until after it had filed for bankruptcy. iLearningEngines' disclosures stating that it "determined the services it received from the Technology Partner were distinct and the consideration paid to the Technology Partner was equivalent to an arms-length transaction" are false because iLearningEngines and Experion were related parties, and GAAP prohibits representing transactions between them as "arms-length." (AC ¶ 309.) This failure to disclose was itself a violation of GAAP rendering iLearningEngines' financial statements misleading independent of the improper recognition of revenue.

The payments made to Experian MEA Corporation between December 22, 2023 and November 8, 2024, disclosed by iLearningEngines as part of the bankruptcy process were large round amounts – an attribute of a financial transaction without economic substance. AC ¶ 310. The reason provided for each payment is marked as "Outgoing wire transfer" instead of a

legitimate business purpose. *Id*. Thus, these payments do not appear to be made for distinct goods or services, lacking a legitimate business purpose, and therefore should have been recorded as either a reduction of revenue earned by iLearningEngines from Experion or an expense. Therefore, iLearningEngines' revenue and net revenue is overstated by the amount of these payments, over $87.4 million. AC ¶ 311. Thus, the revenue reported in iLearningEngines' financial statements for 2023, the first quarter 2024, and the second quarter 2024 were misstated by at least $2.0 million, $1.75 million, and $12.225 million, respectively. AC ¶ 311.

Additionally, the non-Experion iLearningEngines transactions appear not to have cost of sales, despite showing sizeable revenues. In summary, due to the lack of related party transactions and the suspicious characteristics of the reported amounts, iLearningEngines' financial statements for the relevant periods do not provide financial information about the reporting entity that is useful to financial statement users and do not faithfully represent iLearningEngines' results of operations and financial condition. AC ¶ 312.

### b.   Falsity of iLearningEngines' Revenue and Expenses Adequately Pleaded (Naqvi)

#### i.   Defendant Naqvi's Attempt to Misdirect the Court by Emphasizing the Language "largely fake" Fails Because the Amended Complaint Alleges with Particularity Events Corroborating the Hindenburg Report

In the Fourth Circuit, Rule 9(b) requires securities fraud pleadings to state "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162 (4th Cir. 2007) (internal citations omitted). Here, Defendant Naqvi's contention that the amended complaint does not plead with requisite particularity why the misrepresentations were false when made (Naqvi MTD at 9) is directly contradicted by the facts alleged in the amended complaint showing the identity of the speaker, the contents of the

14

misrepresentation, and what was obtained. Specifically, the amended complaint contains factual allegations showing that the contents of iLearningEngines' financial statements reported revenues and expenses from transactions with an undisclosed related party and lacking commercial substance (AC ¶ 310), violating GAAP (AC ¶¶ 332, 337, 346, 357 386), iLearningEngines failed to report related party transactions in its disclosures, and from this failure to report accurately its financial condition gained the ability inflate its revenue and expenses without any exchange of cash or other real consideration. AC ¶ 177.

Defendant Naqvi's Motion to Dismiss misleadingly casts the Amended Complaint's allegations regarding iLearningEngines' revenue and expenses as overly reliant on a short-seller's report, and lacking specificity, but this is misleading. Naqvi's argument reduces the amended complaint's falsity arguments to the phrase "largely fake" while ignoring that the Amended Complaint goes beyond merely repackaging the Hindenburg Report's claims; it specifically pleads that iLearningEngines' revenue and expenses were misstated because they do not comply with GAAP. The Amended Complaint contains over eighty paragraphs of detailed allegations explaining why the revenue was improperly recognized. (AC ¶111-33, 254-313). The bankruptcy disclosures further revealed the scope of iLearningEngines' transactions with Experion; fifty wire transfers transferring $87.425 million (AC ¶ 532), as well as revealing the extent of the related party relationships between Experion and iLearningEngines and iLearningEngines' admission of related party relationships. AC ¶¶ 297-302.

Naqvi also fails to address iLearningEngines' admission of the falsity of its financial statements through its on November 18, 2024, announcement that its financial statements from 2020 through the second quarter 2024 should no longer be relied upon – a revelation that occurred as a result of iLearningEngines' own investigation of the Hindenburg Report's allegations. AC ¶

15

17. The amended complaint's allegations that iLearningEngines made repeated misstatements in its financial statements and then later admitted those allegations is sufficient to show falsity. *See Kiken v. Lumber Liquidators Holdings, Inc*., 155 F. Supp. 3d 593, 604–05 (E.D. Va. 2015) (finding that allegations that defendants repeatedly assuring investors of continued margin growth and later admitting that these assurances were not in compliance with statutory law is enough to show falsity); *see also In re Lihua Int'l, Inc. Sec. Litig*., No. 14-CV-5037 (RA), 2016 WL 1312104, at *11 (S.D.N.Y. Mar. 31, 2016) ("Because Lihua itself acknowledges that the financial information in its 2013 First Quarter 10-Q is unreliable, Plaintiffs have adequately pled its falsity.")

### ii. Defendants attempt to hide the falsity of their financial reporting behind iLearningEngines' bankruptcy, liquidation, and lack of restatement.

Naqvi points to the fact that iLearningEngines has not restated its financial statements to misleadingly suggest that the amended complaint's allegations that iLearningEngines' financial statements are false are merely conclusory. Naqvi MTD, at 10. It is only because of its bankruptcy and subsequent liquidation that iLearningEngines was not required to restate its financial statements. This should not be used as shield for its fraud.  iLearningEngines' November 18, 2024 announcement confirmed the falsity of its reported revenue and expenses, and it must not be permitted to contend that because there was no restatement, that the amended complaint fails to allege "the *size* of the supposed distortion of iLearningEngines' finances." Naqvi Mem., at 10. The bankruptcy disclosures confirm that particular claim made by Naqvi is misleading; the size of the "distortion", at least with respect to the 50 payments to Experion MEA without economic substance revealed *after* the Hindenburg Report, is specifically alleged in ¶ 532 of the amended complaint, and the amended complaint adequately details why revenue and expenses flowing through a related party and netted from amounts owed the related party does not comply with GAAP for reporting revenue and is therefore materially misleading. Further corroboration of the

16

falsity of iLearningEngines' reported finances comes from the actions of iLearningEngines following the publication of the Hindenburg Report, including the formation of the Special Committee, its withdrawal of iLearningEngines' financial statements, the self-referral to the SEC and the DOJ. There is no doubt that iLearningEngines' financial statements are false, and the lack of a restatement indicates only that iLearningEngines was not required to restate its finances, not that the financial statements it made were true.

In contending that the amended complaint offers only "formulas and conclusions" (Naqvi MTD, at 9), Naqvi is not only contradicted by the facts alleged, but also applies an impermissible standard to the amended complaint's contentions. *See Kiken*, 155 F. Supp. 3d at 601, "[it] is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage." (internal citation omitted).

### c. Round-Tripping (Chidambaran)

Chidambaran's focus on round-tripping is an attempt to distract from the core of the amended complaint's allegations: that iLearningEngines' arrangement with Experion allowed iLearningEngines to grossly inflate revenues while transferring cash and cash equivalents to Experion. The transactions between Experion and iLearningEngines lacked economic substance, regardless whether the round-trip constituted a 100% offset of revenue. The round-tripping arrangement discussed in *Hunter*, 477 F.3d at 178 is a "typical" round-tripping arrangement, as confirmed by Defendants' but does not represent the only way to round-trip, as confirmed by Chidambaran attempts to escape on a technicality, while ignoring the accounting and economic substance components of a round-tripping arrangement. This is not merely a short seller report case. Here iLearningEngines not only issued non-reliance on its financial statements, but it also launched a special committee and self-reported potential violations of law to the DOJ with the DOJ and SEC both launching investigations. *See e.g.* ¶¶ 196-200. Chidambaran completely

17

disregards the withdrawl of the financial statements, the resignation of auditors, the special investigation's focus on him, and his departure under highly suspicious circumstances in the midst of the Special Committee's investigation. These independent factual allegations not only support scienter, but the falsity of his statements.

### d. Related Party Misstatements (Chidambaran)

Chidambaran cherry-picks from within ASC 850-10-20(f) and (g), to misleadingly argue that iLearningEngines officers and family members with overlapping ownership and control at Experion do not possess the requisite "level of influence and control required by ASC 850." Chidambaran MTD at 10. This argument is attempts to misdirect the Court and is clearly contradicted by ASC 850-10-20(e), which defines as a related party "[m]anagement of the entity and members of their immediate families[,]" and the facts asserted in the Amended Complaint. ASC 850-10-20. "Management" is defined as "[p]ersons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which objectives are to be pursued[,] [m]anagement normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions."

iLearningEngines' President and Chief Business Officer, Defendant Arackal, was Experion India's director from November 2017 through April 2022 while also serving as a managing director of Experion MEA through at least 2019, and while at Experion India and Experion MEA, was appointed as a director of iLearningEngines India Private Limited. AC ¶ 299. Jojo Philip, the brother of iLearningEngines' Head of Channel Partnerships (AC ¶ 300), owns 35% of Experion India, and 45% of Experion MEA, and is presently the Chief Operating Officer of Synergy Technologies AI, a "gold partner" of iLE. AC ¶¶ 131-133. Ratish Nair is

18

iLearningEngines' AVP of Sales & Business Development, and in 2023, and was director of Experion India and shareholder. AC ¶¶ 119-120. Tom Thomas, iLearningEngines' Senior Project Manager and iLearningEngines' Director of Service Delivery is also an Experion India director and shareholder. AC ¶¶ 119 – 122. Apart from the definition of management including "members of the board of directors" and the "chief operating officer", the roles of Defendant Chidambaran, Defendant Arackal, Ratish Nair, and Jojo Philip make them "[o]ther parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the management or operating policies" of Experion India, Experion MEA, and Synergy Technologies AI, and "can significantly influence" iLE.

Chidambaran attempts to confuse the court in arguing that the related party allegations have not plead with requisite specificity the authority "actually exerted by the identified iLearningEngines officers and family members[.]" Chidambaran MTD at 11. However, as outlined above, to meet the definition of a related party under ASC 850-10-20, no actual control is required. ASC 850-10-20. Merely being a director is to make a person "[m]anagement of the entity" and thus a related party under ASC 850-10-20(e), and only *the ability* to control or significantly influence management or operational policies is required under ASC 850-10-20 (f) and (g). Further, iLearningEngines subsequently admitted that Experion was a related party.

## II.    The Amended Complaint Pleads a Strong Inference of Scienter

In stark contravention to Defendants' argument that the amended complaint does not sufficiently allege facts supporting a strong inference of scienter, the amended complaint alleges a holistic set of facts creating an overwhelmingly cogent and compelling inference of scienter.

To adequately allege scienter, a plaintiff must show "that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Singer v. Reali*, 883 F.3d 425

19

(4th Cir. 2018) (internal citations omitted). A complaint may defeat a motion to dismiss by alleging reckless conduct. *Id.* (*citing Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)). Reckless conduct sufficient to plead a strong inference of scienter must be so unreasonable as to present a danger of misleading a plaintiff to the extent that the danger was either known by the defendant, or so obvious the defendant must have been aware of it. *Id.* (*citing Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)).

### a.   <u>The Amended Complaint Alleges Facts Supporting a Strong Culpable Inference for Defendants Naqvi and Chidambaran</u>

In analyzing scienter, courts must analyze all pleaded facts collectively and compare competing inferences to determine if a strong inference of scienter has been pleaded. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Core-operations allegations are relevant to a court's holistic analysis of scienter, but bare allegations of scienter, without more, are not enough to support a strong inference of scienter. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 614–15 (4th Cir. 2021). Here, the amended complaint is replete with factual allegations demonstrating Defendants' knowledge or reckless disregard of the risk of misleading plaintiffs, of the misleading nature of iLearningEngines' financial reporting and failure to disclose related party transactions and transactions without economic substance.

The significance of the Experion-iLearningEngines relationship, comprising over 90% of revenues and costs of sales (AC ¶ 521), weighs heavily on the side of culpability, as nearly all of iLearningEngines' reported revenues and expenses flowed through Experion, rendering it a critical part of iLearningEngines' business.

### i.   **Defendants Chidambaran's and Naqvi's background and roles belie their arguments that the GAAP related party test requires expertise.**

Defendants attempt to deflect the great weight of facts demonstrating, at a minimum, Defendants' knowledge or recklessness by contending that the GAAP related party test is

somehow complex enough that only accounting professionals could have determined whether Experion was a related party, or that failing to disclose Experion transactions was simple error. Chidambaran MTD, at 18; Naqvi MTD, at 20. Not so. The GAAP test is simple, and ASC 850-10-20(e), defining a related party as "[m]anagement of the entity and members of their immediate families" requires no complicated analysis and leaves no room for subjective judgment. AC ¶ 282. Several high-level iLearningEngines executives meet this test. AC ¶ 298. Moreover, Defendant Chidambaran's address was listed as the American headquarters for Experion. *Id*. Defendant Naqvi, as the CFO of iLE, also worked at Ernst & Young as a "Transaction Advisor[.]" AC ¶ 32. To claim that a CFO with a background at well-known accounting firm and the CEO, who is listed as the contact and shares an address with the Experion entity made a simple error in judgement in failing to disclose related party transactions beggars belief.

> **ii.    The roles, responsibilities, and background of Defendants Chidambaran and Naqvi weigh heavily on the side of knowledge of related party transactions and therefore support a strong inference of culpability.**

Chidambaran does not address the undisclosed wire transfers to Experion. While Defendant Naqvi attempts to argue that the large, undisclosed wire transfers to Experion revealed by the bankruptcy disclosures do not weigh on the side of culpability (Naqvi MTD, at 21), because Experion was a "counterparty" rather than a related party, other factual allegations surrounding these transfers support a cogent and compelling inference of culpability. First, it is highly implausible a CEO and CFO unaware of 50 transactions totaling $87.425 million to an entity at which several iLearningEngines executives served as directors, executives, or shareholders. AC ¶ 532. It is even more implausible that a CEO and CFO would be unaware of the lack of economic substance for such transactions, and why those transactions occurred and in round amounts without It is also highly improbable that a CFO would be unaware of these undisclosed transactions failing

to match disclosed net cash transfers between iLearningEngines and Experion". AC ¶ 331. Finally, neither Defendant Naqvi nor Defendant Chidambaran address the allegation that the "pace of the payments accelerated in close proximity to the publication of the Hindenburg Report on August 29, 2024, with $63.2 million transferred between August 20, 2024, and November 8, 2024, of which $55.7 million was transferred after the publication of the Hindenburg Report. AC ¶ 230. This fact weighs strongly in favor of culpability, as it appears that Defendants Naqvi and Chidambaran rushed to move money out of iLearningEngines and into Experion in anticipation of regulatory and investor scrutiny.

### iii. The timing and circumstances of Defendants Naqvi and Chidambaran's departures supports a strong culpable inference.

While Naqvi and Chidambaran contend that the resignations of Defendants Naqvi and Chidambaran are "uninformative" (Naqvi MTD, at 20), and "not helpful" (Chidambaran MTD, at 22) to the scienter analysis, the particular context and timing of both defendants' departure lends weight to the culpable inference. Both defendants were placed on leave pending the conclusion of the Special Committee's investigation to the allegations of the Hindenburg Report. AC ¶ 527. Both defendants resigned on December 23, 2024, while the investigation was still ongoing (AC ¶ 528); the Special Committee announced it was self-reporting potential violations of law to the DOJ on December 27, 2024. AC ¶ 215. The timing of the departures lends further weight to the inference that Defendants Naqvi and Chidambaran resigned in lieu of termination for cause. AC ¶ 530.

### iv. Despite Defendant Chidambaran's claims to the contrary, maximizing iLearningEngines' valuation can serve as a qualifying motive in the scienter analysis.

While only Chidambaran argues that there is no motive to defraud, for an "AI company" without any real AI products and seeking to go public, there is a clear incentive to maximize the company's perceived value prior to a public offering. One obvious way to maximize valuation

22

without any products is to manipulate revenue and expenses to create the illusion that mirage that the company's product has buyers, and running nearly all revenue and costs of revenue through a related party with a netting arrangement allowed iLearningEngines to input whatever revenue and expenses it wanted without any need for cash. The fact that when liquidated, iLearningEngines was sold for $1.5 million, in April 2025 after having been valued at over $1.2 billion prior to its de-SPAC in April 2024 shows that, for a year, iLearningEngines' valuation fraud was successful. (AC ¶ 22). While Chidambaran attempts to defend against scienter by questioning why iLearningEngines would disclose its relationship with Experion in its public filings but not disclose that Experion was a related party, it seems readily apparent that if iLearningEngines disclosed that over 90% of its revenue and cost of revenue were running through a related party, investors would almost certainly value the company very differently.

## III.    The Amended Complaint Adequately Pleads Loss Causation.

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Miller v. Asensio & Co.,* 364 F.3d 223, 232 (4th Cir.2004). The Fourth Circuit has recognized this may be adequately pleaded through "corrective disclosures", "materialization of the risk", or an "amalgam" of these two. *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025)(*quoting Singer v. Reali*, 883 F.3d 425, 445-47 (4th Cir. 2018))(citations omitted)."The ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Singer*, 883 F.3d at 446 (*quoting In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016)).

The disclosure of the alleged fraud need not be the sole reason for the depreciation of the stock price; rather, plaintiff must allege facts that indicate the misrepresentation inflated the stock

23

price, and the truth had a proximate and negative impact on the value of stock. *Id.* at 447. Although a corrective disclosure must be related to the same subject as the misrepresentation, there is no requirement that the disclosure exactly mirror the earlier misrepresentation. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011). The information newly disclosed "must reveal to the market in some sense the fraudulent nature of" the alleged misrepresentation or omission, and "must at least relate back to the misrepresentation [or omission] and not to some other negative information about the company." *Id.* Moreover, the "exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure"; instead, the truth can be revealed through a series of partial corrective disclosures. with the "entire series of partial disclosures [prompting] the stock price deflation." *Id.*; *see also Singer*, 883 F.3d at 445–46 Further, the market may learn the truth regarding the misrepresentation from "whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals," and other informers who are otherwise not representatives of the company or the company itself. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655–56 (E.D. Pa. 2015).

"Because loss causation is fact-dependent, the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." *Katyle*, 637 F.3d at 472. Relevant factors include the source of the new information entering the market, its credibility, its relationship to the alleged misrepresentation or omission, any reaction of the company's stock price to the news, and the temporal proximity of that reaction to the new information. *See Singer*, 883 F.3d at 447 (stock price drop immediately following analyst report sufficient to plead loss causation); *Leacock v. IonQ, Inc.*, No. CV DLB-22-1306, 2024 WL 3360647, at *11–13 (D. Md. July 10, 2024), *aff'd sub nom. Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025) (assessing source

and credibility of news); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020)(motive of source is "just one factor among many that market participants would have weighed in deciding how much credence his claims deserved."). Due to the fact-intensive nature of the inquiry, loss causation is usually reserved to the trier of fact. *Carlucci v. Han*, 907 F. Supp. 2d 709, 724 (E.D. Va. 2012). "So long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings where the plaintiff's case can be rejected on evidentiary grounds." *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 669 (E.D. Va. 2021) (citations omitted).

The Amended Complaint's allegations of loss causation are more than sufficient under this standard. Plaintiffs allege that the stock price of iLearningEngines' common stock was artificially and fraudulently inflated throughout the Class Period, from April 20, 2024 to December 20, 2024. ¶ 554. The artificial inflation first began to come out of the stock price on August 29, 2024, when the stock price declined by $1.70 per share, a 53.3% from its former closing price, on a single day on abnormally large volume of over 12.568 million shares. ¶ 179. This stock price decline immediately followed the publication of an investigative report from Hindenburg Research. ¶ 159. This report was based on Hindenburg's painstaking investigation using domestic and foreign corporate records, including India and the United Arab Emirates, Indian court records, patent records, archived internet webpages going back ten years, social media postings, and a report from "corporate intelligence firm Diligencia". *See* ¶ 160; *see also* Chidambaran Mem. Ex. 1. It is extensively sourced with thirty footnotes. *Id*. None of the sources are anonymous. *Id*. Hindenburg represented that "to the best of Hindenburg's ability and belief, all information contained herein is accurate and reliable." *Id*. at 23.

The new information disclosed by Hindenburg that had not previously been disclosed by iLearningEngines was that the vast majority of its revenue came from related party transactions and the revenue was largely if not entirely improperly recognized under relevant accounting policies. Hindenburg used the terms "fake" and "false". In particular, Hindenburg identified the anonymous Technology Partner referred to in iLearningEngines' SEC filings and offering documents as Experion Technologies and then set forth in detail the extensive and longstanding relationship between Experion and iLearningEngines, based on its international research.

On August 29, 2024, several reputable news sources, such as Bloomberg, Reuters, and Fortune attributed iLearningEngines' stock price decline to the market reaction to the Hindenburg Report. ¶¶ 180-82. 185. On September 5, 2024, iLearningEngines announced that it had formed a Special Committee to investigate allegations raised by the Hindenburg Report. ¶ 186. As the Special Committee investigation continued, iLearningEngines made disclosures confirming material aspects of the Hindenburg Report. First, on November 18, 2024, iLearningEngines announced that, as a result of the Special Committee's investigation of the Hindenburg Report's allegations, it was withdrawing its prior published financial statements and Marcum was withdrawing its previously published audit reports. ¶¶ 196-200. iLearningEngines also announced Defendant Naqvi had been replaced as iLearningEngines' CFO. ¶201. iLearningEngines' stock price immediately declined on this news by a further 27%, to $1.095 per share on heavy volume of 5.965 million shares. ¶ 202.

The end for iLearningEngines then came rapidly. On December 10, 2024, just three weeks later, iLearningEngines, based on the recommendations of the Special Committee, placed numerous senior executives, including Chidambaran and Naqvi on administrative leave. ¶ 206. In response, iLearningEngines' stock price dropped another 14%. ¶ 207. Finally, on December 23,

26

2024, iLearningEngines announced it had filed for bankruptcy. ¶ 208. Before its delisting by Nasdaq, iLearningEngines' stock price had declined further to $0.19 per share. ¶209. On December 27, 2024, Chidambaran and Naqvi resigned from iLearningEngines and it disclosed that it had "self-reported potential violations of law to the Department of Justice." ¶¶ 214-5.

The demolition of iLearningEngines as a public company, the mass forced resignations of management, and the self-report of violations of the law all stemmed from the Hindenburg Report and the Special Committee's investigation into its allegations. The stock price declines and related investor losses resulted from Defendants' fraudulent misrepresentations during the Class Period and their subsequent exposure by the Hindenburg Report and related Special Committee investigation.

Chidambaran and Naqvi, however, argue that the Amended Complaint fails to adequately plead loss causation. Both principally base their argument on the fact that Hindenburg Research were short iLearningEngines' stock when it published its report and that much of the information used by Hindenburg in drafting the report came from public sources. *See* Chidambaran Mem. 24-27; Naqvi Mem. 27-30. Both advocate for a bright-line rule precluding any information derived from short-seller reports or public information, relying on *Defeo*, 134 F.4th 153. *Defeo*, however, expressly refused to impose such a bright-line prohibition. "We, like the Ninth Circuit, do not impose a categorical ban on using short-seller reports to plead loss causation." 134 F.4th at 163. "In appropriate circumstances, a short-seller's report's financial motivation may not disqualify it from use in litigation as alleging that it exposed a company's fraud to the market." *Id*. at 163-64; *see also BofI*, 977 F.3d at 792 ("Erhart's motivations for coming forward may not have been entirely pure, as he lodged his allegations in a lawsuit seeking money from BofI."). "What matters is whether the plaintiffs allege enough additional facts to turn the otherwise implausible claim that

27

this sort of short-seller report exposed the truth to investors into a claim plausible enough to survive a motion to dismiss." *Leacock*, 2024 WL 3360647, at *11.

The Amended Complaint contains exactly the additional facts that establish the Hindenburg Report has sufficient indicia of reliability that it is appropriate to treat it as a corrective disclosure of Defendants' fraud. The sources are not anonymous but are named in the Hindenburg Report and include corporate and court records from India and the United Arab Emirates as well as archived web pages. *Id*., at *13 (report based on Chinese court records had indicia of reliability). The immediate and severe stock price reaction to the Hindenburg Report indicates that the market treated its investigation "as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements is dissipated as a result". *Id*., at *11 (*quoting BofI*, 977 F.3d at 792). Indeed, "A price drop of that magnitude would not be expected in response to whistleblower allegations perceived as unworthy of belief, and the drop is not readily attributable to non-fraud-related factors that might have moved BofI's stock price that day." *BofI*, 977 F.3d at 792.

Finally, the fact that the new information disclosed by the Hindenberg Report was subsequently corroborated by iLearningEngines and its Special Committee further bolsters the reliability and credibility of the Hindenberg Report. The accounting irregularities identified by Hindenburg are confirmed by the subsequent withdrawal of iLearningEngines' financial statements, the removal of its CFO, and the self-report of law violations to the Department of Justice. Furthermore, in its bankruptcy filings, iLearningEngines' new CFO has confirmed the main finding of Hindenburg's investigation, that Experion was a related party. ¶¶ 224-40.

Chidambaran and Naqvi's arguments based on public information fare no better. Courts adopt a flexible approach to this evaluation.  Analysis based on public information can form a

28

corrective disclosure if it is plausible that the information was not already incorporated into a company's stock price. Factors such as the complexity of the data and its relationship to the alleged misstatements and "the great effort needed to locate and analyze it" can plausibly establish that the analysis conveyed new information to the market. *BofI*, 977 F.3d at 795. "If the report 'required extensive and tedious research involving the analysis of far-flung bits and pieces of data,' then '[t]he time and effort it took to compiLearningEngines this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available.'" *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022)(*quoting BofI*, 977 F.3d at 797); *see also Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014)("it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace.").

This is exactly what Hindenburg has done here in preparing its Report, compiled far-flung pieces of data and put them together for the market to understand their meaning for iLearningEngines. Furthermore, not all the data relied on Hindenburg is public as it also includes information obtained from "corporate intelligence firm Diligencia". The disclosure of the results of Hindenburg;s work immediately resulted in a 50% drop in iLearningEngines' stock price. The allegations here are thus very different from the allegations presented in *Espy v. J2 Global, Inc.*, 99 F.4th 527 (9th Cir. 2024), where the short-seller report required "no expertise or specialized skills beyond what a typical market participant would possess to uncover and disseminate" its information and there was no significant stock market reaction. *Id*. at 542.

Chadimabaran and Naqvi argue that the subsequent disclosures between the Hindenburg Report and iLearningEngines' bankruptcy filing are also insufficient to establish loss causation because they do not attribute any of the disclosed events to allegations of fraud made in the

Hindenburg Report. Chadimabaran Mem. at 27, Naqvi Mem. at 30. The withdrawal of financial statements, resignations of management, and ultimate bankruptcy are all attributed to the Special Committee which is directly related to the allegations in the Hindenburg Report. *See Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 675 (D.S.C. 2016)( *"courts have held resignation announcements can be corrective disclosures where they are viewed collectively with other disclosures."*) Thus, there is sufficient proximity between the continued stock price declines suffered by iLearningsEngines' investors in November and December 2024 and the alleged fraud in the offering documents and throughout the Class Period.[1]

Accordingly, Plaintiffs have adequately alleged that Defendants' fraudulent misrepresentations and omissions caused their losses.[2]

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the motions to dismiss be denied in their entirety. Alternatively, Plaintiffs respectfully request leave to amend their complaint to cure any pleading defects.

---

[1] The fact that these corrective disclosures occurred after the initial complaint was filed in this action is irrelevant. The current Class Period runs through December 20, 2024 and Plaintiffs do not allege that the Hindenburg Report was a complete corrective disclosure. *See Singer*, 883 F.3d at 446 ("the truth may have "gradually emerged through a series of partial disclosures," with the "entire series of partial disclosures [prompting] the stock price deflation.")

[2] Naqvi also argues that Plaintiffs' § 11 claims should be dismissed for failure to plead loss causation. Naqvi Mem. at 27, n.6. No authority is cited for this legal argument which is contrary to settled law. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (" Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims.").

Dated: September 18, 2025                    Respectfully submitted,


                                            **LEVI & KORSINSKY, LLP**


                                            _/ s / Nicholas I. Porritt_

                                            Nicholas I. Porritt (Bar No. 17078)
                                            Alexander A. Krot III (_attorney admission
                                            application forthcoming_).
                                            1101 Vermont Ave, NW Suite 800
                                            Washington, DC 20005
                                            Tel: (202)-524-4290
                                            Fax: (212) 363-7171
                                            Email: nporritt@zlk.com
                                            Email: akrot@zlk.com

                                            _Counsel for Lead Plaintiff Louis Leveque,
                                            Plaintiff Iqbal Al Hamid, and Lead
                                            Counsel for the Class_

31

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2025, I electronically filed the foregoing Plaintiffs' Memorandum Of Law  In Opposition To Defendants Chidambaran and Naqvi's Motions To Dismiss The Amended Class Action Complaint by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.


*/s/ Nicholas Porritt*

Nicholas I. Porritt