## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| DANNY WALKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ILEARNINGENGINES, INC., Harish Chidambaran, and Sayyed Farhan Naqvi,<br><br>Defendants. | Civil Action No.  24-2900-DKC |

## DEFENDANT HARISH CHIDAMBARAN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Date: October 22, 2025

Laura G. Ferguson
Katherine E. Pappas
Bradley E. Markano (*admitted pro hac vice*)
MILLER & CHEVALIER CHARTERED
900 16th St., NW
Washington, DC  20006
P: (202) 626-5567
F: (202) 626-5801
lferguson@milchev.com

*Attorneys for Defendant Harish Chidambaran*

**TABLE OF CONTENTS**

**Page**

I.    THE EXCHANGE ACT CLAIMS MUST BE DISMISSED BECAUSE THE AMENDED COMPLAINT FAILS TO ALLEGE WITH SUFFICIENT PARTICULARITY ANY MATERIAL MISSTATEMENTS BY MR. CHIDAMABARAN ............................................................................................. 1

    A.    The Amended Complaint Does Not Allege with Particularity That the Non-Disclosure of the Technology Partner as a Related Party Was a Material Misstatement ............................................................................... 2

    B.    The Amended Complaint Does Not Allege with Particularity That Mr. Chidambaran Made a Material Misstatement Regarding iLE's Revenues from the Technology Partner, Experion Technologies ........................................... 5

II.    THE EXCHANGE ACT CLAIMS MUST BE DISMISSED BECAUSE THE AMENDED COMPLAINT FAILS TO PLEAD WITH PARTICULARITY FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER .......................... 7

    A.    Mr. Chidambaran's "Background and Role" Do Not Support a Strong Inference of Intent to Defraud .................................................................. 8

    B.    The Timing of Mr. Chidambaran's Resignation Does Not Support a Strong Inference of Scienter ................................................................. 10

    C.    Plaintiffs Fail to Plead a Qualifying Motive to Defraud ..................................... 11

III.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD LOSS CAUSATION ............................................................................................... 12

CONCLUSION............................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................................13

*Defeo v. IonQ, Inc.*,
  134 F.4th 153 (4th Cir. 2025) ................................................................................12, 13

*Epstein v. World Acceptance Corp.*,
  203 F.Supp.3d 655 (D.S.C. 2016) ..............................................................................15

*In re Hebron Tech. Co. Sec. Litig.*,
  No. 20-cv-4420, 2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) ..................................4

*In re ILearningEngines, Inc.*,
  No. 24-12826 (Bank. D. Del. Apr. 11, 2025) ...............................................................5

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ................................................................................12, 14

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ......................................................................................10

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .......................................................................................13

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ......................................................................................11

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
  75 F.4th 232 (4th Cir. 2023) ..................................................................................10, 11

*Sherman v. Abengoa, S.A.*,
  No. 22-2438 (2d Cir. Oct. 6, 2025) ...............................................................................7

*Stenlund v. Marriott Int'l, Inc.*,
  172 F.Supp.3d 874 (D. Md. 2016) .................................................................................1

*In re Triangle Cap. Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) ......................................................................................11

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370 (4th Cir. 2008) ........................................................................................6

*Yates v. Mun. Mortg. & Equity*, LLC,
   744 F.3d 874 (4th Cir. 2014) ...............................................................................................11

**Statutes**

15 U.S.C. § 78u-4(b)(2) .........................................................................................................10

This reply responds to Plaintiffs' "Consolidated Memorandum of Law in Opposition to Defendants Chidambaran's and Naqvi's Motions to Dismiss the Amended Complaint," ECF No. 92 ("Opp."). To avoid duplication, Mr. Chidambaran adopts and incorporates by reference the other Defendants' reply briefs, including their arguments for dismissing the Securities Act claims.

## I.    The Exchange Act Claims Must Be Dismissed Because the Amended Complaint Fails to Allege with Sufficient Particularity Any Material Misstatements by Mr. Chidamabaran

Plaintiffs contend that financial statements submitted with iLE's offering documents constitute material misstatements because they allegedly (1) failed to disclose transactions with iLE's "Technology Partner" as related party transactions, and (2) misstated iLE's revenues and expenses related to transactions with the Technology Partner. Opp. at 11-14. As explained below, Plaintiffs fail to identify any alleged facts that, if true, would establish that the Technology Partner was a related party or that iLE materially misstated its revenues or expenses.

Plaintiffs previously alleged Mr. Chidambaran also made material misstatements in press releases dated September 5 and 10, 2024, Amended Complaint ("AC"), ECF No. 41 ¶¶ 512-517, but provide no opposition to Mr. Chidambaran's argument that those statements cannot be deemed material misstatements as a matter of law. *See* Memorandum of Law in Support of Defendant Harish Chidambaran's Motion to Dismiss Amended Class Action Complaint, ("Mot."), ECF No. 83-1 at 16-17. Plaintiffs have thus conceded that the September 5 and 10 press releases are not material misstatements. *Stenlund v. Marriott Int'l, Inc.*, 172 F.Supp.3d 874, 887 (D. Md. 2016) (concluding that where a plaintiff "failed to respond to Defendant's argument," the "Plaintiff concedes the point.").

1

A.    **The Amended Complaint Does Not Allege with Particularity That the Non-Disclosure of the Technology Partner as a Related Party Was a Material Misstatement**

iLE's financial statements disclosed that iLE had a five-year contract with a "Technology Partner" and further disclosed that this partner "contributed a material part of iLeaningEngines' revenues and its expenses." Mot. at 3 (citing AC ¶ 12). The Hindenburg Report identified Dubai-based Experion Technologies, FZ LLC ("Experion Technologies" or "Experion"), as the "Technology Partner." AC ¶ 167; *see also* AC Ex. B (Master Agreement between iLE and Experion Technologies). Plaintiffs allege that Experion Technologies was a "related party" to iLE as defined under Financial Accounting Standards Board Accounting Standards Codification ("ASC") 850, *Related Party Disclosures*, *see* AC ¶¶ 282-283, and that iLE made a material misstatement when it did not disclose this related party relationship.

The Amended Complaint alleged that Experion Technologies falls within one or more of three categories of related parties as defined by ASC 850: (1) "***Management of the entity and members of their immediate families***," ASC 850-10-20(e); (2) "Other parties with which the entity may deal if one party controls or can ***significantly influence*** the management or operating policies of the other to an extent that one of the transacting parties ***might be prevented from fully pursuing its own separate interests***," ASC 850-10-20(f); and (3) "Other parties that ***can significantly influence*** the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties ***might be prevented from fully pursuing its own separate interests***," ASC 850-10-20(g). AC ¶ 283 (quoting ASC 850-10-20) (emphasis added by Amended Complaint).

Plaintiffs largely disclaim their past reliance on ASC 850-10-20(f) and (g), arguing instead that related party status is established under ASC 850-10-20(e). Opp. at 18, 21. Plaintiffs cannot,

however, articulate how Experion Technologies conceivably could be "management" of the reporting entity (iLE) or an "immediate family member" of iLE management. Plaintiffs allege that three iLE executives (Bala Arackal, Ratish Nair, and Tom Thomas) served as directors of Experion India. Opp. at 18-19. Plaintiffs also note that Nair and Thomas were Experion India shareholders and Jojo Philip, brother of iLE's Head of Channel Partnerships, was a shareholder of Experion India and Experion MEA. *Id.* But these allegations cannot show related party status under ASC 850-10-20(e) for at least two reasons.

*First*, neither Experion India nor Experion MEA is the same legal entity as the alleged related party — Experion Technologies — and Plaintiffs allege no basis for disregarding corporate form. *Second*, simply alleging that an individual serving in management of the reporting entity is also a director or minority shareholder of another company does not, standing alone, make the reporting entity and the company related parties. Even assuming that Arackal, Nair, and Thomas are members of "management" of iLE and Philip is an immediate family member of an iLE manager (*see* Opp. at 18-10), those facts would, at most, make those individuals related parties *to iLE* under ASC 850-10-20(e). There is no basis for imputing their status as related parties to iLE to Experion India, Experion MEA, or Experion Technologies. Plaintiffs' assertion that parties are related for GAAP purposes simply because an individual who is in management of the reporting entity is on the board of directors or is a shareholder of an affiliate or subsidiary of another party runs counter to the plain meaning of ASC 850-10-20(e)'s "related party" definition. Moreover, Plaintiffs cite no cases that support their novel claim.

Plaintiffs also argue briefly, and without support, that ASC 850-10-20 (f) and (g) can be satisfied simply where someone in "management" at iLE has also served as director (or shareholder) of an entity owned by or affiliated with Experion Technologies. Opp. at 19. Plaintiffs

simply ignore the cases cited by Mr. Chidambaran, which establish what constitutes sufficient allegations of control as to related party status. Mot. at 11-12. As is set out in those cases, more must be alleged regarding control and significant influence to establish related party status. *See, e.g.*, *In re Hebron Tech. Co. Sec. Litig.*, No. 20-cv-4420, 2021 WL 4341500, at *14 (S.D.N.Y. Sept. 22, 2021) (complaint failed to allege controlling shareholder of the reporting entity had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of" the alleged related party (citation modified)). The Amended Complaint does not allege facts that meet either the ASC 850-10-20(f) or (g) standard.

Improperly conflating ASC 850-10-20(e) and (g), Plaintiffs next assert that "the roles of" Chidambaran, Arackal, Nair, and Philip "make them '[o]ther parties that can significantly influence the management or operating policies'" of Experion India and Experion MEA and "'can significantly influence' iLE." Opp. at 19 (quoting ASC 850-10-20(g)). But is not clear what roles at which entity Plaintiffs are referencing, because Mr. Chidambaran is not alleged to have any role at any Experion entity and Mr. Philip is not alleged to have any role at iLE. In any event, the Amended Complaint does not allege that any of these four individuals could "significantly influence" Experion Technologies "to an extent that [it] might be prevented from fully pursuing its own separate interests," as ASC 850-10-20(g) requires.

Unable to allege facts that would, if true, make Experion Technologies a related party, Plaintiffs point to a Statement of Financial Affairs submitted in the bankruptcy proceeding by the "iLearningEngines Debtors," which lists "insiders" who received payments from iLE within one year of iLE filing for bankruptcy. The Statement identifies Experion MEA as an "insider" and characterizes its relationship to the debtor as "related party." AC ¶¶ 224-40; *see also* Opp. at 10. Plaintiffs contend that this statement is an admission by iLE that Experion Technologies was a

4

related party under ASC 850-10-20. Opp. at 1, 19. But as Mr. Chidambaran has already explained, the bankruptcy disclosure of Experion MEA as an "insider" for bankruptcy purposes cannot be deemed an admission that Experion Technologies is a "related party" for GAAP purposes. Mot. at 12-13. Plaintiffs do not respond to those arguments.

Plaintiffs further ignore that the "Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs" preclude treating any characterization in the Statement of Financial Affairs of iLE's relationship with Experion MEA as an admission. The Global Notes state: "Persons listed as 'insiders' have been included *for informational purposes only* and the inclusion of them in the Schedules and Statements, *shall not constitute an admission* that those persons are insiders for purposes of section 101(31) of the Bankruptcy Code." *In re ILearningEngines, Inc.*, No. 24-12826, ECF No. 184 at 5 (Bank. D. Del. Apr. 11, 2025 (emphasis added). The Global Notes also state:

> [T]he Debtors do not take any position with respect to: (a) any insider's influence over the control of the Debtors; (b) the management responsibilities or functions of any such insider; (c) the decision making or corporate authority of any such insider; or (d) whether the Debtors or any such insider could successfully argue that he or she is not an "insider" under applicable law or with respect to any theories of liability or for any other purpose.

*Id.* Plaintiffs thus have no basis for treating the bankruptcy filing as an admission even of Experion MEA's status as an insider, let alone Experion Technologies' status as a related party for GAAP purposes.

**B.    The Amended Complaint Does Not Allege with Particularity That Mr. Chidambaran Made a Material Misstatement Regarding iLE's Revenues from the Technology Partner, Experion Technologies**

Plaintiffs' claims about material misstatements concerning iLE's revenues are based almost exclusively on the Hindenburg Report's speculations that "the vast majority of iLearning Engines' revenue is fake." *See* Mot. at 13. This inference by the Hindenburg Report's authors, in

turn, was based on "netting off" provisions in the Experion Technologies-iLE Master Agreement, which allowed Experion to "offset the revenue it owed to [iLE] by the costs of the services it incurred." AC ¶¶ 159, 162-63; *see also id.* ¶¶ 297-307 (captioned "iLearningEngines Fake Revenue and Round-Trips"); Mot. at 13-16. Distancing themselves from their "round-trip" allegations, Plaintiffs now contend that Mr. Chidambaran is "focus[ed] on round-tripping i[n] an attempt to distract from the core of the amended complaint's allegations" that the "transactions between Experion and iLearningEngines lacked economic substance, regardless whether the round-trip constituted a 100% offset of revenue." Opp. at 17. But, contrary to Plaintiffs' assertion, Mr. Chidambaran addressed the inadequacy of the Amended Complaint's allegations that the transactions with Experion lacked economic substance. Mot. at 14-15. Plaintiffs ignore those arguments. Opp at 17.

Now attempting to de-emphasize their reliance on the Hindenburg Report, Plaintiffs insist "[t]his is not merely a short seller report case." *Id.* As to Mr. Chidambaran, Plaintiffs now maintain that it is "the withdrawal of the financial statements, the resignation of auditors, the special investigation's focus on [Mr. Chidambaran], and his departure under highly suspicious circumstances in the midst of the Special Committee's investigation" that support "the falsity of his statements." *Id.* at 18.

As an initial matter, the Amended Complaint does not allege that the Special Committee's investigation focused on Mr. Chidambaran. In any event, these alleged developments, which followed in the wake of the publication of the Hindenburg Report, do not satisfy the requirement that Plaintiffs plead "the who, what, when, where and how" of the alleged fake revenue scheme. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (citation modified). Tellingly, the Opposition cites no cases holding that allegations regarding

6

withdrawal of financial statements, resignation of an accounting firm, an internal investigation, or resignation of senior executives satisfy the PSLRA requirement for pleading a material misstatement with particularity. In their Notice of Supplemental Authority, Plaintiffs cite *Sherman v. Abengoa, S.A.*, No. 22-2438 (2d Cir. Oct. 6, 2025), for the proposition that, "at the pleading stage, courts should credit detailed factual allegations drawn from internal audits and government regulatory or criminal proceedings." ECF No. 97 at 1. *Abengoa* involved findings from an internal audit and a ruling from a Spanish criminal court which relied on an expert report prepared by an auditing firm, an investigation report from Spain's financial accounting regulator, and a forensic report completed by two financial-consulting firms. ECF No. 97-1 at 11-13. Here, in contrast, Plaintiffs merely point to the existence of an internal investigation; they allege no findings from any internal audit, government regulatory, or criminal proceedings, making *Abengoa* entirely inapposite.

## II.    The Exchange Act Claims Must Be Dismissed Because the Amended Complaint Fails to Plead with Particularity Facts Giving Rise to a Strong Inference of Scienter

Plaintiffs wrongly contend they meet the demanding PSLRA pleading standard because the Amended Complaint "alleges a holistic set of facts" supposedly creating a strong inference of scienter. Opp. at 19. The Opposition, however, fails to identify specific allegations, either taken alone or collectively, that adequately plead Mr. Chidambaran acted with the requisite intent to deceive, manipulate, or defraud. Plaintiffs' principal argument boils down to this: Because Mr. Chidambaran was a CEO of iLE, he (1) would have known Experion Technologies was a related party, and (2) would have known that there was no economic substance to iLE's transactions with Experion Technologies. *Id.* at 20-22. Plaintiffs also claim that Mr. Chidambaran's resignation supports a strong inference of culpable scienter. *Id.* at 22. As explained below, neither Mr. Chidambaran's status as CEO, nor his resignation, supports a strong inference of intent to defraud.

7

In addition, Plaintiffs fail to adequately address Mr. Chidambaran's argument that they did not adequately plead a qualifying motive to defraud.

### A. Mr. Chidambaran's "Background and Role" Do Not Support a Strong Inference of Intent to Defraud

In his motion to dismiss, Mr. Chidambaran cited several cases holding that failure to observe GAAP and other accounting guidelines is not enough, standing alone, to satisfy the PSLRA's heightened pleading standards for scienter. Mot. at 18-19. This is especially true where, as here, the defendant is not an accounting professional and the accounting question is complex. *Id.* at 19. In response, Plaintiffs ignore the cases cited by Mr. Chidambaran. Opp. at 20-21. Remarkably, Plaintiffs assert that the "GAAP test is simple, and ASC 850-10-20(e), defining a related party as '[m]anagement of the entity and members of their immediate families,' requires no complicated analysis and leaves no room for subjective judgment." Opp. at 21 (citation omitted). As discussed in Part I.A., applying the plain meaning of ASC 850-10-20(e), Experion Technologies is not a related party to iLE because it is not "[m]anagement of the entity and members of their immediate families." Plaintiffs' assertion that Experion Technologies is a related party to iLE is based on a tortured interpretation of ASC 850-10-20. Plaintiffs draw undue inferences about an individual's ability to significantly control an entity simply by being a director or shareholder, and ignore corporate form by treating relationships with Experion affiliates or subsidiaries as relationships with Experion Technologies itself. There is nothing simple about Plaintiffs' interpretation of the related party test, and it is implausible that Mr. Chidambaran could be expected to (1) be familiar with ASC 850-10-20, and (2) interpret it in the counter-textual manner that Plaintiffs do.

Although Plaintiffs vaguely refer to Mr. Chidambaran's "background" as supporting a strong inference of culpable scienter (Opp. at 20), the Amended Complaint does not allege that

Mr. Chidambaran has any accounting background. As argued in the motion to dismiss (Mot. at 23-24), the substantially more plausible inference is that Mr. Chidambaran relied on the certification from independent registered public accounting firm Marcum LLP that "the financial statements were properly stated in accordance with generally accepted accounting principles." AC ¶ 11.

Plaintiffs next argue that Mr. Chidambaran's role as CEO supports a strong inference of culpable scienter because, as CEO, he would have been aware of 50 wire transfers from iLE to Experion MEA Corporation between December 22, 2023, and November 8, 2024, totaling $87.425 million. Opp. at 21 (citing AC ¶ 532). The Amended Complaint alleges that iLE's CFO, not Mr. Chidambaran, would have known or recklessly disregarded, based on these wire transfers, that Experion Technologies was a related party. AC ¶ 533. In any event, wire transfers from iLE to another entity do not, standing alone, establish a related party relationship under GAAP principles. Moreover, Plaintiffs again disregard corporate form by treating Experion Technologies as the same legal entity as Experion MEA. There is no basis for any inference that Mr. Chidambaran knew that Experion Technologies was a related party to iLE because iLE made a series of wire transfers to Experion MEA.

Even though they did not allege the wire transfers as supporting an inference of scienter as to the alleged material misstatement of revenue from the Technology Parter, Plaintiffs now assert in their opposition that it is "implausible that a CEO and CFO would be unaware of the lack of economic substance for such transactions." Opp. at 21. The Amended Complaint, however, asserts that the reporting of revenue *from* Experion constitutes the material misstatement. AC ¶¶ 297-307. Accordingly, Plaintiffs must establish Mr. Chidambaran's scienter as to those alleged misstatements. Knowledge of the wire transfers *to* Experion does not lead to a strong inference of culpable scienter as to "fake revenue" *from* Experion, especially where the Amended Complaint

9

does not adequately plead that the revenue from Experion was "fake," or that Mr. Chidambaran knew that the revenue was fake. Absent allegations of facts that would support treating the iLE-Experion relationship as lacking economic substance and Mr. Chidambaran's scienter as to the same, the wire transfers do not support a strong inference of culpable scienter but rather are consistent with iLE's disclosure in its Form S-1 Registration Statement that the "Technology Partner is a customer in some arrangements and a vendor in other arrangements." AC ¶ 92.

More fundamentally, "[a] plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017). A securities fraud plaintiff must "state with particularity *facts* giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In *Maguire*, the plaintiff "allege[d] facts that permit[ted] an inference that [the defendant] knew his statement was false, and then ask[ed] [the court] to *infer from that inference* that [the defendant] acted with scienter." 876 F.3d at 548. The Court of Appeals "decline[d] to do so because stacking inference upon inference in this manner violates the statute's mandate that the strong inference of scienter be supported by facts, not other inferences." *Id.* Similarly, here Plaintiffs may not ask the court to infer from an inference that Mr. Chidambaran knew about wire transfers to Experion, a further inference that he acted with the required state of mind when signing off on financial statements reporting iLE's revenue from Experion.

**B.      The Timing of Mr. Chidambaran's Resignation Does Not Support a Strong Inference of Scienter**

In his motion to dismiss, Mr. Chidambaran argued that his resignation from iLE in December 2024 does not support a strong inference of culpable scienter. Mot. at 22. Mr. Chidambaran cited *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 244 (4th Cir. 2023), which held that "executive departures are, at best, weak evidence of scienter,"

10

because there are other more plausible non-culpable inferences. Plaintiffs ignore *San Antonio Fire* and instead simply assert that the timing of Mr. Chidambaran's departure "lends further weight to the inference" that he "resigned in lieu of termination for cause." Opp. at 22. Such an inference is not, however, the inference required to adequately plead scienter for securities fraud. There must be a strong inference that the resignation demonstrates Mr. Chidambaran's intent to deceive investors with respect to the alleged material misstatements.

Plaintiffs are again impermissibly stacking inferences by inferring that Mr. Chidambaran would have been removed for cause, further inferring that he would have been removed for cause for engaging in material misstatements, and further inferring that Mr. Chidambaran engaged in those material misstatements with the requisite intent. Even if stacking inferences were permitted — and it is not — Mr. Chidambaran's resignation does not support an inference as to his state of mind about the alleged material misstatements. *See, e.g.*, *Yates v. Mun. Mortg. & Equity*, LLC, 744 F.3d 874, 889 (4th Cir. 2014) ("While [CFO]'s resignation is evidence of the substantial accounting challenges the Company then faced, it does not compel an inference that she and the other individual defendants were bent on committing fraud").

### C.    Plaintiffs Fail to Plead a Qualifying Motive to Defraud

In his motion to dismiss, Mr. Chidambaran explained that Plaintiffs failed to allege that Mr. Chidambaran would realize "'concrete benefits . . . by one or more of the false statements and wrongful non-disclosures alleged' that were not shared by shareholders at large." Mot. at 22 (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003)). Generalized motives to raise capital, make the corporation appear profitable, and keep share prices high are insufficient to plead scienter under the PSLRA because the same motives are shared by all corporations. *Id.*; *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 754 (4th Cir. 2021).

11

In response, Plaintiffs again ignore the cases cited by Mr. Chidambaran, cite no cases supporting their position, and instead simply assert that Mr. Chidambaran had an incentive to maximize the company's valuation. Opp. at 22. Plaintiffs' response is deficient in two respects. First, they fail to cite any allegations that Mr. Chidambaran sought to artificially inflate the value of iLE. *Id.* at 22-23. Second, this claim of generalized motive is the very sort of allegation the Fourth Circuit has deemed insufficient to plead scienter under the PSLRA.

## III.    The Amended Complaint Fails to Adequately Plead Loss Causation

Loss causation is an essential element of Plaintiffs' Exchange Act claims. *See* Mot. at 23. Allegations of loss causation are reviewed for "sufficient specificity," a "standard largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). As the Fourth Circuit recently explained, "if a plaintiff fails to plausibly and with sufficient specificity allege that any new truth was exposed to the market, he fails to plead loss causation." *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025).

In response to Mr. Chidambaran's argument that the Amended Complaint fails to adequately plead loss causation, Mot. at 24-27, Plaintiffs first contend that loss causation is usually reserved for the trier of fact. Opp. at 24-25. But two of the Fourth Circuit cases that Plaintiffs cite—*Defeo*, 134 F.4th 153, and *Katyle*, 637 F.3d 462—affirmed dismissal of Exchange Act Section 10(b) claims on motions to dismiss.

The Amended Complaint identified four disclosures that supposedly revealed a "new truth" to the market: (1) the August 28, 2024, publication of the Hindenburg Report; (2) iLE's November 18, 2024, Form 8-K; (3) iLE's December 10, 2024, Form 8-K, and (4) iLE's December 23, 2024, press release. AC ¶ 535; *id.* ¶¶ 200, 206, 208; *see also* Opp. at 25-27. As to the Hindenburg Report, Mr. Chidambaran argued that *Defeo*, 134 F.4th 134, supports dismissal here because, as in *Defeo*,

12

the short-seller report was prepared by unnamed individuals who disclaimed the accuracy of the report. Mot. at 25-26.

Despite *Defeo* being a recent Fourth Circuit case on the pleading standard for loss causation based on short-seller reports, Plaintiffs are largely silent about the case. The most they can say is that *Defeo* did not impose a "categorical ban" on using short-seller reports to plead loss causation. Opp. at 27. Plaintiffs ignore that the Hindenburg Report contained disclaimer language similar to that in *Defeo*. Instead, they assert that the Report has sufficient indicia of reliability because its publication resulted in a drop in iLE's stock price (Opp. at 28), but that is also true in *Defeo*, where the company's stock price dropped substantially within days of the publication of the short seller report. 134 F.4th at 159.

Plaintiffs also claim that the Report has indicia of reliability because it identified sources of the information. Opp. at 28. But it is the anonymity and self-interest of the short-sellers that sets the high bar plaintiffs must meet when relying on short-seller reports to plead loss causation. *Defeo*, 134 F.4th at 163 ("It is appropriately a high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers when attempting to plead loss causation.") (internal quotation omitted); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022) (when authors of a report are "anonymous and self-interested short-sellers who disavowed any accuracy," their reports are "rendered . . . inadequate" for purposes of pleading loss causation); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794-95 (9th Cir. 2020) (holding that, where blog posts were "authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article,'" the posts could not constitute corrective disclosures for purposes of pleading loss causation).

Mr. Chidambaran also argued that Plaintiffs could not rely on the Hindenburg Report to establish loss causation because it was based on publicly available information and thus did not reveal new information to the market. Mot. at 26-27. In response, Plaintiffs assert that "not all the data relied on [by] Hindenburg is public as it also includes information obtained from 'corporate intelligence firm Diligencia.'" Opp. at 29. But the Amended Complaint references Diligencia only once, as the source for Hindenburg's claim that Jojo Philip, the brother of an iLE employee, held a minority interest in Experion MEA. AC ¶ 132. It is implausible that the disclosure of this entirely irrelevant fact was a substantial cause for the decline in value of Plaintiffs' iLE shares. *See Katyle*, 637 F.3d at 472 ("What we do require the alleged facts to show is that the misrepresentation or omission was one substantial cause of the investment's decline in value." (internal quotation omitted).

As to the publicly available information that forms the basis for the Hindenburg Report, Plaintiffs claim it constitutes "new facts" because Hindenburg "compiled far-flung pieces of data and put them together for the market to understand their meaning for iLearningEngines." Opp. at 29. The Amended Complaint does not allege facts that would support that conclusion. To the extent the Hindenburg Report could be said to have compiled "far-flung pieces of data," the "data" relates to trying to connect employees of iLE with various Experion affiliates or subsidiaries. But these attenuated connections are not evidence of any material misrepresentation so their disclosure cannot establish loss causation. As to the Report's claim that iLE's revenue was "largely fake," the Amended Complaint does not allege facts showing that Hindenburg relied on far-flung pieces of data that took substantial effort to compile.

With regard to the Form 8-Ks and the December 23, 2024 press release, which addressed the internal investigation, withdrawal of the financial statements, and the initiation of Chapter 11

14

bankruptcy proceedings, Mr. Chidambaran argued that these statements did not disclose any new facts to the market regarding any alleged material misrepresentations.  Mot. at 27. In response, Plaintiffs fail to identify any facts in these three statements that disclosed new facts to the market. Opp. at 29-20. Instead, they cite *Epstein v. World Acceptance Corp.*, 203 F.Supp.3d 655, 675 (D.S.C. 2016), for the proposition that "courts have held resignation announcements can be corrective disclosures where they are viewed collectively with other disclosures." Opp. at 30. But the announcement of the resignation of Mr. Chidambaran and others was not disclosed in the November 18 or December 10 Form 8-Ks or in the December 23 press release.  The resignations were disclosed in a December 27, 2024 Form 8-K (AC ¶ 214), which Plaintiffs did not allege as a corrective disclosure. *See* AC ¶¶ 535, 537. In any event, *Epstein* involved several other corrective disclosures found to be qualifying, including a quarterly earnings call that "revealed specifics surrounding the nature and impact of the material weakness and disclosed the significance of the portion of the Company's loan renewal portfolio this weakness would affect." 203 F. Supp. 3d at 674 (internal quotation omitted). Here, in contrast, the two Form 8-Ks and the December 23 press release did not disclose any specific facts about the alleged material misstatements.

## CONCLUSION

For the foregoing reasons and for the reasons stated in the motion to dismiss, Plaintiffs' claims against Defendant Chidambaran should be dismissed in their entirety with prejudice.

DATED: Oct. 22, 2025

Respectfully Submitted:


/s/ Laura G. Ferguson
Laura G. Ferguson (Bar No. 20828)
Katherine E. Pappas (Bar No. 31788)
Bradley E. Markano (*admitted pro hac vice*)
Miller & Chevalier Chartered
900 16th St., NW
Washington, DC  20006
P: (202) 626-5567
F: (202) 626-5801
lferguson@milchev.com
kpappas@milchev.com
bmarkano@milchev.com

*Attorneys for Defendant Harish*
*Chidambaran*

16