**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Southern Division)

| | |
|---|---|
| **DANNY WALKER,** Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. **ILEARNINGENGINES, INC.,** *et al.* Defendants. | Civil No. 8:24-cv-24-02900 |

**DEFENDANT SAYYED FARHAN NAQVI'S
REPLY MEMORANDUM IN FURTHER SUPPORT OF HIS
MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I. The Amended Complaint Fails to Allege Facts That, If Proved, Would Show That Any of the Challenged Statements Were Actionably False. ............................................... 1

  A. The PSLRA Requires More Than Conclusory Allegations of Falsity. (Opp'n at 14-15.) ................................................................................ 2

  B. Possibility Is Not Plausibility. (Opp'n at 11-14.) .................................................. 2

  C. The Disconnect Between Plaintiffs' Allegations About "Fake" Revenues and Expenses and His Allegations About Violations Of GAAP. (Opp'n at 14-16.) ................................................................................ 4

  D. Plaintiffs Did Not Do the Work, And Nobody Did It for Them. (Opp'n at 16-17.) ................................................................................ 7

II. The Amended Complaint Does Not Allege Facts That, If Proved, Would Support the Strong Inference of Scienter Required by the PSLRA. ............................................... 8

III. The Amended Complaint Does Not Adequately Allege Loss Causation. ......................... 9

IV. Plaintiffs Have Waived Any Argument That They Have Standing to Pursue a Section 11 Claim Against Mr. Naqvi. ............................................................................ 12

CONCLUSION……………………………………………………………………………..13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................2, 3

*Cupat v. Palantir Techs., Inc.*,
  2025 U.S. Dist. LEXIS 75800 (D. Colo. Apr. 4, 2025).............................................3

*GBR Grp., Ltd. v. Biogen Inc. (In re Biogen Inc. Sec. Litig.)*,
  857 F.3d 34 (1st Cir. 2017)....................................................................................13

*Harris v. Amtrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015)....................................................................2, 7

*Heck v. Orion Group Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tex. 2020) .....................................................................2

*Lambertus v Nuvo Sols., Inc.*,
  2025 U.S. Dist. LEXIS 191793 (E.D.N.C. Sept. 29, 2025).....................................12

*Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .............................................................................11, 12

*Parkman v. Elam*,
  2009 U.S. Dist. LEXIS 21578 (E.D. Va. Mar. 17, 2009) ..........................................2

*Pension Plan v. KE Holdings, Inc.*,
  718 F. Supp. 3d 344 (S.D.N.Y. 2024).......................................................................5

*Pub. Emps. Ret. Sys. of Mississippi v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ............................................................................10, 11

*Teachers' Ret. Sys. of Louisiana v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ....................................................................................2

**Statutes**

15 U.S.C. § 78u-4(b)(1) .............................................................................................2, 6

I.    **The Amended Complaint Fails to Allege Facts That, If Proved, Would Show That Any of the Challenged Statements Were Actionably False.**

Plaintiffs' theory of falsity rests entirely on two oft-repeated allegations: (1) that iLearningEngines ("iLE") reported "largely fake" revenues and expenses in its financial statements,[1] and (2) that while iLE disclosed both the substance and extent of its interactions with the Technology Partner—which the Amended Complaint alleges was an entity known as Experion—the company nonetheless violated GAAP by failing to designate the Technology Partner as a "related party."[2]

As Mr. Naqvi explained in his *Memorandum in Support of His Motion to Dismiss the Amended Complaint* [ECF No. 84] ("Opening Br."), these allegations fail to satisfy Plaintiffs' pleading burden under the Private Securities Litigation Reform Act of 1995 ("PSLRA") for two related reasons. First, the "largely fake" accusation is conclusory: like the Hindenburg Report (the short-seller's attack piece that Plaintiffs largely copied and pasted into the Amended Complaint), the operative pleading alleges no objective facts describing either the "how" or the "how much" of the supposed financial fraud. Second, the allegations about an alleged GAAP violation do not fill the substantive void because the failure to label iLE's Technology Partner as a "related party" says nothing about whether, how, or to what extent the Company supposedly falsified its revenues and expenses. Plaintiffs instead ask the Court to take a speculative leap and assume—again, in the absence of any allegations about how the alleged financial fraud was accomplished—that some unspecified portion of iLE's transactions with the Technology Partner ***must have*** been fraudulent because, given the relationship between the entities, they ***could have*** been fraudulent.

---

[1]    Am. Comp. ¶¶ 322, 336, 344, 355, 384, 395, 463, 467, 473, 476, 480, 483, 486, 489, 494, 499, 501, 506, 509, 513, 516.

[2]    Am. Comp. ¶¶ 322, 330, 332, 336, 337, 344, 346, 355, 357, 384, 386, 395, 397, 467, 469, 473, 476, 478, 480, 489, 491, 494, 496, 499, 501, 503, 506, 509, 513.

Nothing in Plaintiffs' *Consolidated Memorandum of Law In Opposition to Defendants Chidambaran's and Naqvi's Motions to Dismiss the Amended Complaint* [ECF No. 92] ("Opp'n") cures these defects or gives the Court reason to ignore them.

### A.      The PSLRA Requires More Than Conclusory Allegations of Falsity. (Opp'n at 14-15.)

Plaintiffs try to excuse the factual paucity of the Amended Complaint by arguing that Rule 9(b) requires them to plead only "the time, place, and contents of the false representations." Opp'n at 14.[3] But Plaintiffs fail to mention, much less account for, the impact of the PSLRA in a case like this one. The PSLRA requires not just the superficial particulars of "each statement alleged to have been misleading," but also the underlying "reason or reasons ***why*** the statement is misleading..." 15 USC 78u-4(b)(1) (emphasis added). To satisfy this deeper explanatory element of the statutory pleading burden, a securities fraud plaintiff must do more than simply allege the time, place, and contents of the alleged misstatements; he must supply "objective facts," *Harris v. Amtrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), indicating both "the amount of revenue falsely booked and reported" and "why that amount was false." *Heck v. Orion Group Holdings, Inc.*, 468 F. Supp. 3d 828, 851 (S.D. Tex. 2020). This is precisely the flaw that Mr. Naqvi identified in his opening memorandum, Opening Br. at 5, and precisely the flaw that Plaintiffs ignore in their opposition.

### B.      Possibility Is Not Plausibility. (Opp'n at 11-14.)

The pleading standard in federal court "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion

---

[3]      To support this argument, Plaintiffs cite *Teachers' Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162 (4th Cir. 2007). Opp'n at 14. *Hunter* was decided before the Supreme Court issued its landmark decisions in *Iqbal* and *Twombly*, and its validity with respect to pleading standards has therefore been questioned. *Parkman v. Elam*, 2009 U.S. Dist. LEXIS 21578, at *7, n. 4 (E.D. Va. Mar. 17, 2009).

to dismiss, a complaint must contain sufficient factual matters to "state a claim for relief that is plausible on its face." *Id.* A complaint which pleads facts that are "merely consistent" with a defendant's liability "stops short of the line between possibility and plausibility," *id.*, and it follows that allegations which simply suggest that a defendant ***could have*** done something—for example, that a company could have used a commercial relationship as a vehicle for financial fraud—do not plausibly establish, even for pleading purposes, that the defendant actually did so. *See, e.g.*, *Cupat v. Palantir Techs., Inc.*, 2025 U.S. Dist. LEXIS 75800, at * 29 (D. Colo. Apr. 4, 2025) ("Simply because Defendants could have accessed data that contradicted their statements ... does not mean Defendants knew what the data reflected...").

But "could haves" are all that the Amended Complaint offers when it comes to the supposed misstatement of iLE's revenues and expenses. The only disclosed source of Plaintiffs' allegations was the hit piece published by Hindenburg Research, and the only disclosed basis for the short-seller's "suspicion" that iLE had reported "fake" revenues and expenses was the nature of iLE's relationship with its Technology Partner—in particular, the counterparties' practice of "netting" offsetting payment obligations. According to Hindenburg, such a practice could have been "an elegant solution" for a corporation looking to "hid[e] a fake revenue scheme." *See Declaration of John F. Sylvia* [ECF No. 84-2] ("Sylvia Decl."), Exhibit A [ECF No. 84-3] ("Hindenburg Report") at 18. Thus, in their Opposition, Plaintiffs can say no more than that "[t]he relationship between iLearningEngines and Experion ***allowed*** iLearningEngines to record fake expenses and revenues. . . ." Opp'n at 12 (emphasis added). Under *Iqbal* and *Twombly,* this is not enough. The allegation that iLE's relationship with Experion made it *possible* for iLE to record "fake" revenues and expenses does not make it *plausible* that iLE did so.[4]

---

[4]    Thus, Plaintiffs simply and improperly assume an unsupported conclusion—that every dollar of revenue obtained from the Technology Partner was fictitious—when they assert that "this improperly recognized revenue

3

**C.    The Disconnect Between Plaintiffs' Allegations About "Fake" Revenues and Expenses and His Allegations About Violations Of GAAP. (Opp'n at 14-16.)**

In his opening memorandum of law, Mr. Naqvi not only documented the Amended Complaint's virtually exclusive reliance on the Hindenburg Report for its allegations, but also described the caution with which federal courts approach claims based on such self-interested polemics. Opening Br.  at 1-2, 9-14. Plaintiffs cannot, and do not, dispute the inherent weakness of a short-seller's report as a source in securities-fraud cases; instead, they attempt to distance themselves and their claims from the Hindenburg Report, contending that "the Amended Complaint goes beyond merely repackaging the Hindenburg Report's claims. . . ." Opp'n at 15. But the effort fails. Plaintiffs can identify only a single way in which the Amended Complaint supposedly went "beyond" the short-seller's claims: they say that "it specifically pleads that iLearningEngines' revenues and expenses were misstated because they do not comply with GAAP." *Id.*

This does not "go[] beyond" the Hindenburg Report, which likewise claimed that the Technology Partner was "an undisclosed related party." Sylvia Decl., Ex. A at 1 (fourth bullet point). The Hindenburg Report identified four purported "signs" that "Experion Is An Undisclosed Related Party"— (1) that iLE served as the American "contact" for Experion, (2) that some iLE employees are directors and shareholders of Experion India, (3) that another Experion shareholder is the brother of an iLE employee, and (4) that iLE's president and another iLE employee previously worked for Experion. *Id.* at 9-17. The Amended Complaint echoes the Hindenburg Report in every particular, alleging that iLE and Experion were "related parties" for exactly the

---

amounted to 94% of total revenue in 2021, 96.3% in 2022, and 92.6% in 2023," simply because those percentages reflected the amount of revenue iLE received in its transactions with Experion. Opp'n at 13; *see also id.* at 15 (claiming that bankruptcy filings "explain[ed] why the revenue was improperly recognized" because they detailed the receipt of $87.425 million from Experion).

same reasons. Am. Comp. ¶¶ 113-114, 121, 124, 127, 129. Here as elsewhere, therefore, Plaintiffs cannot escape the consequences of their dependence on the short-seller's self-interested report, and these allegations, too, must be "viewed with caution." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings, Inc.*, 718 F. Supp. 3d 344, 381 (S.D.N.Y. 2024).

Apart from their reliance on the Hindenburg Report, Plaintiffs' argument is defective because even if iLE did not "comply with GAAP" by labeling Experion as a "related party," nothing in either the Amended Complaint or the Opposition explains how this alleged violation of GAAP caused iLE's revenues and expenses to be misstated. Again, the Amended Complaint fails basic logic: the fact that a balloon *can be* circular does not mean that every balloon *is* circular (in skilled hands, a balloon can look more like a dog than a ball). Likewise, the (alleged) fact that related party transactions *can be* a vehicle for fraud does not mean that every related party transaction *is* fraudulent in intent or outcome. (If that were so, then GAAP would *ban* related party transactions, not merely require their designation as such.) And it is simply untrue that the "Amended Complaint contains over eighty paragraphs of detailed allegations explaining why the revenue was improperly recognized." Opp'n at 15, citing Am. Comp. ¶¶ 111-133, 254-313. The cited allegations speak for themselves: they merely parrot the Hindenburg Report's putative "signs" that Experion was a related party, Am. Comp. ¶¶111-133, summarizing the accounting guidance about related parties, Am. Comp. ¶¶ 254-290, summarizing iLE's own disclosures about the dual customer-vendor nature of its commercial relationship with the Technology Partner, Am. Comp. ¶¶ 291-297, and concluding that the "netting of amounts due to and from Experion presents a method [that is, an opportunity] for recording both fake revenues and fake expenses. . . ." Am. Comp. ¶ 305.

Nowhere, however, does the Amended Complaint supply what the statute requires: facts demonstrating "why" any particular item was misstated, much less explaining why iLE's revenues and expenses were "largely fake." 15 U.S.C. § 78u-4(b)(1). Plaintiffs simply claim that "revenue and expenses flowing through a related party and netted from amounts owed the related party does not comply with GAAP for reporting revenue and is therefore materially misleading." Opp'n at 16. But this misstates GAAP, which only requires that "related party" transactions be designated as such; nothing in the accounting guidance says that such transactions themselves "do[] not comply with GAAP." Plaintiffs do not and cannot cite any case law or accounting guidance for the notion that whenever an entity fails to attach the "related party" label to a transaction, the revenues and expenses associated with the transaction are *ipso facto* fraudulent (or as Plaintiffs put it, are "therefore materially misleading"). Indeed, one can imagine a number of reasons (e.g., lack of knowledge, simple oversight) why a reporting entity might not attach the "related party" label to an otherwise legitimate and properly recorded transaction.

Nor can Plaintiffs rescue their failed pleading by pointing to iLE's supposed "admission of the falsity of its financial statements through its on [sic] November 18, 2024 announcement that its financial statements from 2020 through the second quarter should no longer be relied upon – a revelation that occurred as a result of iLearningEngines' own investigation of the Hindenburg Report's allegations." Opp'n at 15-16. This contention is misleading in two ways. First, the statement that iLE made on November 18, 2024 did not—because it could not—concern the ***result*** of the company's investigation: the November 18 announcement made clear that "[t]he Investigation is ongoing and no conclusions have been reached at this time." Am. Comp. ¶ 200 (quoting iLE's November 18, 2024 Form 8-K). Second, because the investigation was ongoing and had not produced any results, the statement that iLE's previous financial statements "should

6

no longer be relied upon" was explicitly provisional: "At this time, the Company is unable to determine whether it must correct financial statements for the Non-Reliance Period, or if such corrections are necessary, the quantification of such corrections." *Id.* The fact that Plaintiffs have to misrepresent the record in order to conjure up an alleged "admission" of falsity speaks loudly to the weakness of their pleading.

D.   **Plaintiffs Did Not Do the Work, And Nobody Did It for Them. (Opp'n at 16-17.)**

Finally, Plaintiffs have accused Mr. Naqvi of "misleadingly" pointing out that because iLE's financial statements have never been restated, there is no external support for an allegation that the reported revenues and expenses were materially false. Opp'n at 16, citing Opening Br. at 10. The accusation itself is misleading. In noting the absence of a restatement, Mr. Naqvi was simply following the case law, cited in his brief and not mentioned (much less refuted) by Plaintiffs, applying the commonsense proposition that, "[i]n the absence of a restatement or allegations pointing to objective facts," claims that a defendant violated GAAP do "not permit the Court to infer that Defendants committed accounting fraud." *Harris*, 135 F. Supp. 3d at 172 (cited in Opening Br. at 10, 15, 19). The courts recognize, in other words, that the facts demonstrating why a challenged statement is misleading must come from *somewhere*; in a case like this one, for example, where an essential element is "objective facts" demonstrating why a company's reported revenues and expenses are "largely fake," *someone* must have done the digging and the math needed to develop such facts, and if the plaintiff has not done the work himself, and if he hasn't gotten the facts from either a corporate insider with relevant knowledge, *see* Opening Br. at 11 (noting that Amended Complaint does not attribute any factual allegations to "confidential witnesses"), or from an outsider who has examined the company's finances in the course of performing an audit or a restatement, then there is no basis for an inference of accounting fraud.

**II.**    **The Amended Complaint Does Not Allege Facts That, If Proved, Would Support the Strong Inference of Scienter Required by the PSLRA.**

With respect to scienter, the Opposition is most notable for what it does not say: Plaintiffs fail entirely to address, much less to refute, a core element of Mr. Naqvi's motion: that the inference of scienter—that is, the inference that iLE failed to identify Experion as a "related party" because it wanted to hide the fact that the relationship was the vehicle for accounting fraud—is not just weakened, but rendered nonsensical, by the fact that iLE repeatedly and conspicuously disclosed to investors the existence, terms (including the "netting" arrangement) and financial scope of that relationship, mentioning the Technology Partner 129 times in the Form S-1 Registration Statement and 103 times in the Form S-4. Opening Br. at 19. Why would iLE have disclosed all of the substantive details about a relationship it supposedly wanted to conceal? Why isn't the far more compelling inference the non-culpable conclusion that there was no subterfuge, and that the failure to designate Experion as a "related party" was at most an honest mistake? Plaintiffs simply ignore these essential questions, and their inability to even attempt an answer— instead devoting this section of the Opposition to nit-picking objections about Mr. Naqvi's role in and departure from the company—should be dispositive of the scienter issue.

Mr. Naqvi also argued that the alleged GAAP violation is at best weakly indicative of scienter because financial accounting is not a science; it's an arena in which judgment calls are made and mistakes can happen without any fraudulent intent. Opening Br. at 19. Plaintiffs do attempt a counter-argument, but trip over their own shoelaces in doing so. According to them, "[t]he GAAP test is simple" because one provision of the related party guidance—the subparagraph that defines related parties to include managers of the reporting entity and members of their immediate families—"requires no complicated analysis and leaves no room for subjective judgment." Opp'n at 21, citing GAAP Accounting Standards Codification ("ASC") 850-10-20(e).

8

Plaintiffs are half-right: that particular subparagraph *is* simple and does *not* leave room for subjective judgment. But Section 850-10-20(e), by its simple and objective terms, also leaves no room for the conclusion that iLE and Experion were related parties. iLE was the reporting entity here. The question, then, is whether, in its transactions with Experion, iLE did business with either (i) its own managers, or (ii) members of their immediate families. The answer is clear: it did not. Messrs. Nair, Thomas, and Arackal may have served as directors of Experion entities while employed by iLE, Am. Comp. ¶¶298-299, but iLE did not do any business with its putative managers: the transactions in question were strictly at the corporate level.

The attenuated connection precludes application of ASC 850-10-20(e), and means that the answer to the related party question must be found in subparagraphs 850-10-20(f) and (g). These provisions, however, are not "simple" and do leave room for subjective judgment. Both provide that another party may be related to the reporting entity only if one party has such control or influence over the other that it might be "prevented from fully pursuing its own separate interests." ASC 850-10-20(f) and (g). Again, Plaintiffs have studiously ignored the real issue, and their silence is telling.

III.     **The Amended Complaint Does Not Adequately Allege Loss Causation.**

In his opening memorandum, Mr. Naqvi demonstrated that the Amended Complaint failed to adequately allege the essential element of loss causation because of the combined impact of three shortcomings: (1) the alleged corrective disclosure was the Hindenburg Report; (2) the information in the Hindenburg Report had been obtained from public sources, and therefore had already been incorporated into iLE's stock price; and (3) the Hindenburg Report was a self-interested screed by an admitted short seller who had disclaimed any intention to cause investors to rely thereon.

9

Plaintiffs do not deny the factual predicates of Mr. Naqvi's argument. Opp'n at 25 ("This stock price decline immediately followed the publication of an investigative report from Hindenburg Research"), *id.* (the Report was based on "domestic and foreign corporate records ..., court records, patent records, archived internet pages..., social media postings, and a report from 'corporate intelligence firm Diligencia"); *Id.* at 27 ("Hindenburg Research were [sic] short iLearningEngines' stock when it published its report"); *id.* ("the information used by Hindenburg in drafting the report came from public sources").[5] They argue, however, that the Hindenburg Report nonetheless qualifies as a corrective disclosure because: (1) "[a]nalysis based on public information can form a corrective disclosure if it is plausible that the information was not already incorporated into a company's stock price," Opp'n at 29; and (2) that no "bright-line rule" precludes a short seller's report from functioning as a corrective disclosure. Opp'n at 27.

Neither contention passes muster under the circumstances. First, nothing in the Amended Complaint or the Hindenburg Report itself suggests that Hindenburg's conclusions were based on "complex economic data understandable only through expert analysis...." Opp'n at 29, quoting *Pub. Emps. Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014). In *Amedisys*, however, the public disclosures included a Wall Street Journal analysis based on Medicare data. Although the raw data was "technically available to the public" in its raw form, it "had little to no probative value in its native state," and a supporting affidavit from the expert who analyzed it established that the data "was difficult to obtain and that his analysis required significant professional expertise to accomplish." *Id.* at 323 and n. 3. Under these circumstances,

---

[5] Plaintiff omits one other significant source for the Hindenburg Report: iLE's own financial statements and other SEC filings, which provided all of the information in the Report about (1) iLE's reported financials, and (2) the terms and extent of its relationship with the Technology Partner. *See* Sylvia Decl., Ex. A at 7. Plaintiffs' contention that the information Hindenburg gleaned from Diligencia was not publicly available, Opp'n at 29, is belied by Hindenburg's own assertion that "***all*** information contained herein . . . has been obtained from public sources." Sylvia Decl., Ex. A at 30 (emphasis added).

10

the Fifth Circuit concluded that "it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." *Id.*

This case is nothing like *Amedisys*. The only economic data "analyzed" by Hindenburg Research was the information in iLE's own financial statements, and the Amended Complaint conveyed Plaintiffs' own admission that such data *was* "readily digestible by the marketplace." Am. Compl. ¶¶ 159-178. In the section entitled "Applicability of Presumption of Reliance—Fraud on the Marketplace," the Amended Complaint alleges that "the market for iLearningEngines securities promptly digested current information regarding iLearningEngines from publicly available sources and reflected such information in [the price of] iLearningEngines securities." Am. Comp. ¶ 544. Plaintiffs cannot have it both ways. Either (1) the data in iLE's financial statements *was* digestible by the market (and therefore could not have been the basis for a corrective disclosure), or (2) it was not digestible by the market (and therefore could not justify Plaintiffs' reliance on a fraud-on-the-market theory). Either way, the Amended Complaint fails to state a viable claim for securities fraud.

Second, Plaintiffs once again cannot escape the implications of their reliance on the Hindenburg Report. They admit that the "relevant factors" for loss-causation analysis include both "the source of the new information entering the market" and "its credibility," Opp'n at 24, citing *Katyle v. Penn Nat. Gaming, Inc.*, 637 F3d 462, 472 (4th Cir. 2011), and the case law cited in the Opposition itself undermines their contention that the market may plausibly have relied on a "report" published by an admittedly self-interested short seller, whose authors took pains to disclaim any warranty of accuracy and to warn readers to "do your own research and due diligence" rather than rely on their analysis and opinion. Sylvia Decl., Ex. A. at 30. In *Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022) (cited in Opp'n at 29), the panel affirmed dismissal on

11

loss-causation grounds, emphasizing "the high bar that plaintiffs must meet in relying on self-interested and anonymous short sellers." *Id.* at 839-40. Acknowledging that the short seller had "pulled together disparate sources and connected data in ways that were not plainly obvious," and thus, in that narrow sense, might "[p]erhaps" have "provide[d] new information to the market," the Ninth Circuit concluded that it was still "not plausible that the market would perceive the [short seller's report] as revealing false statements...." *Id.* at 840. Given the author's "financial incentive to convince others to sell," as well as the short seller's disclaimers that it made "no representation as to the accuracy or completeness of the information set forth in this article," investors "would have taken its 'contents with a healthy grain of salt.'" *Id.*, quoting *In re Bofl Holding Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020).

The most that can be said about the relationship between the Amended Complaint and the Hindenburg Report is that it mirrors the relationship between the complaint and the short-seller's article in *Nektar Therapeutics*. In this case as in that one, therefore, the Court should dismiss for failure to plead loss causation.

## IV.    Plaintiffs Have Waived Any Argument That They Have Standing to Pursue a Section 11 Claim Against Mr. Naqvi.

In his opening memorandum, Mr. Naqvi also argued that Plaintiffs lacked standing to pursue the Section 11 claim against him. Opening Br. at 21-27. The Opposition does not respond to that argument, nor does it incorporate by reference arguments that Plaintiffs have made elsewhere on the standing element. *See, e.g.,* [ECF No. 90] at 9-22. Plaintiffs have therefore waived the issue. *Lambertus v Nuvo Sols., Inc.*, 2025 U.S. Dist. LEXIS 191793, at *19, n. 2 (E.D.N.C. Sept. 29, 2025). In any event, Mr. Naqvi adopts and incorporates by reference the arguments made by co-defendants as to whom Plaintiffs **have** addressed the standing issue.

12

## CONCLUSION

For the foregoing reasons, and those contained in movant's opening brief, Mr. Naqvi respectfully requests that the Court dismiss the Amended Complaint in its entirety with prejudice. *GBR Grp., Ltd. v. Biogen Inc. (In re Biogen Inc. Sec. Litig.)*, 857 F.3d 34, 46 (1st Cir. 2017) (denying plaintiff's second motion to amend where "the district court gave the plaintiffs the full time they requested in order to file the initial amendment and allowed that amended complaint, and the plaintiffs had the motion to dismiss in hand for nearly four months before the district court ruled.") (citing *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) (denying leave to replead, as plaintiffs are in no way entitled to "leisurely repeated bites at the apple.")).

Date:  October 22, 2025                    Respectfully submitted,

                                           **MINTZ, LEVIN, COHN, FERRIS,**
                                           **GLOVSKY and POPEO, P.C.**

                                           /s/ *Castell Abner, III*
                                           Castell Abner, III
                                           Federal Bar No. 22328
                                           555 12th Street, NW
                                           11th Floor
                                           Washington, DC 20004
                                           (202) 434-7300
                                           CAbner@Mintz.com

                                           John F. Sylvia (pro hac vice)
                                           One Financial Center
                                           Boston, MA 02111
                                           (617) 542-6000
                                           JFSylvia@Mintz.com

                                           *Attorneys for Defendant Sayyed Farhan*
                                           *Naqvi*

13