**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES EVERETT HUNT; JUAN RODRIGUEZ; KURT VOUTAZ; JOEL WHITE; ANDREW AUSTIN; SCOTT KLINE; RYAN FISHMAN, | No. 24-3568 D.C. No. 4:19-cv-02935-HSG |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| PRICEWATERHOUSECOOPERS LLP (PWC), | |
| *Defendant - Appellee*, | |
| and | |
| BLOOM ENERGY CORPORATION, JP MORGAN SECURITIES, LLC, MORGAN STANLEY SMITH BARNEY, LLC, CREDIT SUISSE SECURITIES (USA) LLC, KEYBANC CAPITAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, ROBERT W. BAIRD & CO. INCORPORATED, COWEN AND COMPANY, LLC, HSBC | |

2          HUNT V. PRICEWATERHOUSECOOPERS LLP

SECURITIES (USA) INC.,
OPPENHEIMER & CO. INC.,
RAYMOND JAMES &
ASSOCIATES, INC.,

*Defendants*.

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted June 11, 2025
San Francisco, California

Filed November 10, 2025

Before: Milan D. Smith, Jr. and N. Randy Smith, Circuit
Judges, and Douglas L. Rayes, District Judge.[*]

Opinion by Judge N. Randy Smith

---

[*] The Honorable Douglas L. Rayes, United States District Judge for the
District of Arizona, sitting by designation.

# SUMMARY[**]

## Securities Law

The panel affirmed the district court's dismissal of claims under § 11 of the Securities Act of 1933 against PriceWaterhouseCoopers LLP (PwC), an outside accountant for Bloom Energy Corp., based on an audit opinion on Bloom Energy's financial statements included with its registration statement for an initial public stock offering.

At issue was the manner in which Bloom Energy, a designer, manufacturer, and seller of fuel-cell servers that converted natural gas or biogas into electricity for on-site power generation, accounted for Managed Services Agreements (MSAs), a type of sale-leaseback arrangement. On appeal, plaintiffs challenged the alleged incorrect statements of revenue, net loss, and net loss per share in Bloom Energy's 2017 financial statement, due to the improper treatment of MSAs as operating rather than capital leases.

The panel held that under § 11, an independent accountant is not strictly liable for the information in a registration statement or a client's financial statements simply because the accountant certified the financial statements prepared by the issuer. Instead, under 15 U.S.C. § 77k(b)(3)(B)(i), an independent accountant certifies the underlying statements without liability if, "after reasonable investigation, [the accountant has a] reasonable ground to believe and did believe, at the time such part of the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4          HUNT V. PRICEWATERHOUSECOOPERS LLP

registration because effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), an independent accountant is also protected from liability for its opinions (not factual statements) made about those underlying documents as long as the opinion was sincerely held.

The panel held that PwC was not liable as a preparer of Bloom Energy's financial statements. PwC also was not liable as a certifier of Bloom Energy's financial statements because PwC's audit opinion did not make any material misstatements of fact or omissions but rather was merely a statement of opinion based upon the subjective judgment of the MSA classification. The panel held that the district court's decision also must be affirmed because, under *Omnicare*, Bloom Energy's financial statements regarding classification of the MSAs were opinions.

HUNT V. PRICEWATERHOUSECOOPERS LLP          5

## COUNSEL

Nicholas I. Porritt (argued), Levi & Korsinsky LLP, Washington, D.C.; Adam M. Apton, Levi & Korsinsky LLP, San Francisco, California; Reed R. Kathrein and Lucas Gilmore, Hagens Berman Sobol Shapiro LLP, Berkeley, California; Kevin K. Green, Hagens Berman Sobol Shapiro LLP, San Diego, California; for Plaintiffs-Appellants.

E. Joshua Rosenkranz (argued), Eliza Lehner, and Jodie C. Liu, Orrick Herrington & Sutcliffe LLP, New York, New York; Edward H. Williams II, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Lisa Bugni, King & Spalding LLP, San Francisco, California; for Defendant-Appellee.

Linda T. Coberly, Winston & Strawn LLP, Chicago, Illinois; Lauren Gailey, Winston & Strawn LLP, Washington, D.C.; Janet Galeria and Tyler S. Badgley, U.S. Chamber Litigation Center, Washington, D.C.; Kevin Carroll, Securities Industry and Financial Markets Association, Washington, D.C.; for Amici Curiae the Chamber of Commerce of the United States of America and the Securities Industry and Financial Markets Association.

David M. Parker and Elizabeth K. Brightwell, Hunton Andrews Kurth LLP, Richmond, Virginia; Matthew P. Bosher, Hunton Andrews Kurth LLP, Washington, D.C.; for Amicus Curiae American Institute of Certified Public Accountants.

## OPINION

N.R. SMITH, Circuit Judge:

Under § 11 of the Securities Act of 1933, an independent accountant is not strictly liable for the information in a Registration Statement or a client's financial statements simply because the accountant certified the financial statements prepared by the issuer. Instead, an independent accountant certifies the underlying statements without liability if, "after reasonable investigation, [the accountant has a] reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(B)(i). Moreover, an independent accountant is also protected from liability for its opinions (not factual statements) made about those underlying documents as long as the opinion was sincerely held. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187–88 (2015).

## FACTUAL BACKGROUND

Bloom Energy designs, manufactures, sells, and (in some instances) installs fuel-cell servers (Energy Servers) that convert natural gas or biogas into electricity for on-site power generation.

This case arises because of the manner in which Bloom Energy accounted for a type of contract that it used in connection with these Energy Servers; such contracts are known as Managed Services Agreements (MSA). MSAs are a type of sale-leaseback arrangement, where Bloom Energy

first sells the Energy Server to a bank and then leases it back from the bank. Bloom Energy then subleases the Energy Server to a customer, whereby Bloom Energy becomes the lessee (from the bank) and the lessor (to the customer) of the Energy Server. At the time of the lease to the customer, Bloom Energy also enters into another contract with the customer to service the Energy Server (from which customer payment for the service, Bloom Energy pays its lease to the bank and generates income for servicing the Energy Server).

Bloom Energy can account for these types of sale-leaseback arrangements in either of two ways: (1) as an "operating lease," accounting for the revenue it earns when it sells the Energy Server to the bank; or (2) as a "capital lease," accounting for the revenue it earns when it gets the payment from the customer over the course of the service agreement with the customer. MSAs are classified as either an operating lease or a capital lease based on specific criteria. A capital lease is recognized if it meets any of the following criteria: (1) ownership is transferred to the lessee by the end of the lease term; (2) the lease contains a bargain purchase option; (3) the lease term is at least 75% of the property's estimated remaining economic life; or (4) the present value of the minimum lease payments is 90% or more of the fair value of the leased property. *See* Accounting Standards Codification (ASC) 840-10-25-1[1]. If none of these

---

[1] ASC 840-10-25-1 was superseded by Topic 842 in the Accounting Standards Update 2016-02. *See* https://asc.fasb.org/1943274/1855311/GUID-4073757B-B23C-4931-ABE0-8A1DF61EAFEA ((last visited Oct. 29, 2025). Lease classification, as of February 25, 2016, can be found at ASC 842-10-25-2. This section does not use 75% as a benchmark but rather a majority standard (ASC 842-10-25-2(c): "[t]he lease term is for the major part of the remaining economic life of the underlying asset"). However, the

criteria are met, the MSA is classified as an operating lease. Under an operating lease, an Energy Server would not be recognized as an asset on Bloom Energy's books (because the Energy Server was sold to the bank); instead, lease payments to the bank would be recorded as an expense and payments from the customer would be recorded as revenue. In contrast, a capital lease would be recorded on Bloom Energy's balance sheet by recognizing the Energy Server as an asset with a corresponding liability to the bank.

Initially, Bloom Energy accounted for MSAs as operating leases. Bloom Energy determined that the MSAs were best classified as operating leases because the Energy Servers were not "integral equipment," as the cost to remove and relocate an Energy Server would not exceed 10% of its original installation value. Bloom Energy also determined that its MSAs failed to meet the capital lease criteria because Bloom Energy determined that Energy Servers had useful lives of 15–21 years, with typical MSAs for each Energy Server having a lease term of 6–10 years—less than 75% of the estimated life, thus not triggering capital lease treatment.

In 2018 (after more than 15 years as a private company), Bloom Energy decided to go public. To go public, it had to conduct an initial public stock offering (IPO) and file a Registration Statement with the Securities and Exchange Commission (SEC). To prepare the materials for the IPO and Registration Statement, Bloom Energy had already prepared

---

February 2016 amendments were not effective for public business entities until fiscal years beginning after December 15, 2018, and the parties and the district court relied upon ASC 840-10-25-1. Moreover, the district court did not find the ASC to be dispositive: "ASC 840-10-10-1 merely states the 'objectives' underlying the more detailed provisions that follow," and "[d]espite Plaintiffs' urging, it does not appear to provide the definitive method for classifying a lease."

its own financial statements for 2016, 2017, and the first quarter of 2018. It also retained responsibility for preparing all other financial statements for the IPO and Statement. However, Bloom Energy engaged PricewaterhouseCoopers LLP (PwC), as an outside accountant, to audit its 2016 and 2017 financial statements, so it could include that audit opinion with the Registration Statement.

PwC was hired to express an opinion on Bloom Energy's 2016 and 2017 financial statements based on audits. In its audits, PwC would investigate the business, operations, financial statements, and accounting of Bloom Energy. Those audits included "performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks" and "examining, on a test basis, evidence regarding the amounts and disclosure of consolidated financial statements." It also "conducted [its] audits of the[] consolidated financial statements in accordance with standards of the" Public Company Accounting Oversight Board (PCAOB).[2]

Following the audit, PwC concluded:

> In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and December 31, 2016, and the result of its operations and its cash flows for each of the two years in the period ended December 31, 2017 in conformity with accounting

---

[2] Again, PwC did not prepare the 2016 and 2017 financial statements because Bloom Energy's management had prepared them.

principles generally accepted in the United States of America.

PwC's audit did not identify any issue with Bloom Energy classifying the MSAs as operating leases under Generally Accepted Accounting Principles (GAAP) or Generally Accepted Auditing Standards (GAAS).

When Bloom Energy prepared the Registration Statement, it included the PwC audit opinion. The Registration Statement also described an MSA and how the sale-leaseback arrangement operated. The Statement expressly stated an MSA may be "classified as a capital lease or an operating lease"; that Bloom Energy "[d]etermine[d] if the leaseback [was] classified as a capital lease or an operating lease," and stated that its MSA "are classified as operating leases"; and it explained that this classification affected Bloom Energy's recognition of revenue and liabilities.

Its Registration Statement registered over 20.7 million Bloom Energy shares for sale. These shares were sold in the IPO at $15 per share and began trading on July 25, 2018. Bloom Energy received proceeds of $284.3 million, net of underwriting discounts, commissions, and estimated offering costs.

In 2019, Bloom Energy reviewed the accounting for an MSA that had "closed on November 27, 2019 under an MSA financing . . . , [wherein] PwC identified an issue it had not previously identified related to the accounting for the Impacted MSA transactions." Based upon this review, Bloom Energy reevaluated its MSAs and determined the MSAs should be treated as capital leases (loans from the bank rather than sales). Thus, Bloom Energy (with the

advice of its Audit Committee and PwC) reclassified certain MSAs as capital leases. To reflect these new classifications, Bloom Energy revised its 2016 and 2017 financial statements, and restated its 2018 and 2019 financial statements.[3] The next day, the price of Bloom Energy stock dropped by 13.8%.

## PROCEDURAL BACKGROUND

In 2019, Plaintiffs (consisting of former and current stockholders) filed a class action against Bloom Energy, nine of its officers and directors, and ten underwriters of the IPO. PwC was not a named defendant in the class action complaint. The complaint asserted claims under § 10(b) and § 11 of the Securities Exchange Act of 1934, based on alleged misstatements Bloom Energy made from 2018 to 2019 and alleged misstatements in the Registration Statement. None of the allegations involved PwC or the classification of MSAs.

A year into the litigation, Bloom Energy announced the restatements of the 2018 and 2019 financial statements that it deemed material and revisions of the 2016 and 2017 financial statements that it deemed immaterial. After the amendment, Plaintiffs amended their complaint to add allegations, under § 10(b) and § 11, regarding the classifications of the MSAs. As a part of that amendment, PwC was added as a defendant. Plaintiffs alleged that PwC was liable under § 11 for the actionable statements and omissions in the Registration Statement because it purported to have "conducted an adequate and reasonable investigation

---

[3] A restatement corrects a material error in prior financial statements, whereas a revision corrects an error that is "immaterial to the prior year financial statements." SEC Staff Accounting Bulletin No. 108, 71 Fed. Reg. 54,580, 54,582 (Sept. 18, 2006).

into the business, operations, financial statements, and accounting of Bloom Energy."

All Defendants moved to dismiss all claims against them. PwC moved to dismiss the § 11 claims against it. The district court partially dismissed the claims against the other defendants and dismissed the claims against PwC.

As to PwC, the court found that PwC's audit opinion was an inactionable opinion under *Omnicare*; that the PwC opinion said only that the financial statements "present fairly, in all material respects, the financial position of the Company . . . in conformity [with GAAP]"; that "the financial statements are the responsibility of [Bloom Energy's] management"; that PwC only had the responsibility "to express an opinion on [Bloom Energy's] consolidated financial statements based on [its] audits"; that the classification of "MSAs are complex"; and thus, PwC was not liable. The district court also rejected Plaintiffs' argument that PwC's opinions contained within them, as "embedded statements of fact," the financial statements prepared by Bloom Energy. Lastly, the district court held that PwC's certification of the financial statements was not a guarantee that they were accurate but rather was limited to the conclusions of the audit opinion.

After the district court ruled on Defendants' motions to dismiss, Plaintiffs settled their claims with all Defendants except PwC. Following the settlement, the district court entered a final judgment, dismissing all claims against PwC. However, the district court granted Plaintiffs leave to amend as to PwC, but Plaintiffs conceded that an amendment would be futile.

Instead, Plaintiffs filed this timely appeal, challenging the alleged incorrect statements of revenue, net loss, and net

loss per share in Bloom Energy's 2017 financial statement (due to the improper treatment of the MSAs as operating rather than capital leases).[4]

## STANDARD OF REVIEW

We review de novo a district court's order granting a motion to dismiss for failure to state a claim. *Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010). We must accept sufficient factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## ANALYSIS

Under *Omnicare*, an accountant's opinion is actionable under § 11 if: (1) "the speaker did not hold the belief she professed" and the supporting fact she supplied is objectively untrue; (2) the opinion contains false "embedded statements of fact"; or (3) the opinion omits facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 185–86, 194. Before the district court, Plaintiffs focused their arguments primarily on the assertion that PwC's audit opinion contained material

---

[4] In their opening brief, Plaintiffs admit that they do not challenge the dismissal of claims arising from their allegations concerning: (1) the alleged incorrect disclosure in Bloom Energy's 2017 financial statements of contingent liabilities arising from MSAs; or (2) the alleged misrepresentations contained in PwC's audit opinion on Bloom Energy 2017 financial statements, meaning they do not challenge the district court's dismissal of claims that the audit opinion itself was false or misleading apart from its certification of the financial statements. Accordingly, those issues are waived. *See McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

misrepresentations or omissions that met one or more of the three exceptions under *Omnicare*. Because Plaintiffs' allegations did not meet any of the *Omnicare* exceptions, the district court dismissed their case.

On appeal, Plaintiffs have abandoned those arguments. Plaintiffs do not deny that Bloom Energy prepared its own financial statements or that PwC neither prepared the statements nor repeated those statements in its opinion. Instead, they ask us to adopt the position that PwC is strictly liable under § 11(a)(4) for Bloom Energy's 2017 financial statement.

## I. Section 11 of the Securities Exchange Act does not provide for strict liability for accountants.

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides a private cause of action for investors who purchase securities pursuant to a registration statement containing "an untrue statement of a material fact" or a registration statement that omits "to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.* § 77k(a). Section 11 allows purchasers to file an action against anyone who signed or helped prepare the registration statement, including the issuer, underwriter, director, partner, accountant, engineer, or appraiser. *See id.* However, § 11 does not impose the same type of liability on all of these potential defendants.

Section 11 is a strict liability statute with respect to issuers of securities, company directors, and partners of issuers, without requiring proof of intent, negligence, or scienter. *Id.* § 77k(a). However, the statute provides defenses for other non-issuer defendants, such as experts, based on their reasonable investigation and belief in the accuracy of

the registration statement. *Id.* § 77k(b). We have also said that only "issuers are held strictly liable under § 11 for damages resulting from misrepresentations in a registration statement." *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994).

Relevant here, § 11(a)(4) imposes liability on an accountant "who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him." [5] However, the statute allows accountants to raise a defense to liability if they employed due diligence in preparing or certifying statements the registration statement, by showing that they "had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[6] *Id.* § 77k(b)(3)(B)(i). Courts have interpreted § 77k(b)(3)(B)(i) to require accountants "to investigate, to various degrees, facts supporting and contradicting inclusions in registration statements. They must undertake that investigation which a reasonably prudent man in that position would conduct." *Endo v. Albertine*, 863 F. Supp.

---

[5] "The term certified, when used in regard to financial statements, means examined and reported upon with an opinion expressed by an independent public or certified public accountant." 17 C.F.R. § 230.405.

[6] PwC did not raise a due diligence defense in this case because Plaintiffs did not identify any statements of fact made by PwC.

16          HUNT V. PRICEWATERHOUSECOOPERS LLP

708, 728 (N.D. Ill. 1994) (citation omitted); *see* 15 U.S.C. § 77k(c) (defining "standard of reasonableness" as "that required of a prudent man in the management of his own property"). In other words, accountants must exercise due diligence in investigating the materials provided to them using the accepted practices of their profession.

However, "[a]ccountants cannot be held liable under Section 11 unless the misleading information can be expressly attributed to them." *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1434 (N.D. Cal. 1988). Thus, while, § 11(a)(4) outlines that investors may sue accountants for materially false registration statements, accountants are only subject to suit "with respect to the statement in such registration statement . . . , which purports to have been prepared or certified by [that accountant]." *Id.* § 77k(a)(4). The statute distinguishes between "prepar[ing]" and "certif[ying]." This distinction limits liability for certifiers and expands it for preparers, who may be subject to more general liability for the content they create. *See id.*

Nevertheless, the statute does not impose strict liability on accountants for the statements or omissions regardless of whether they prepared or certified them. § 77k(b)(3)(B)(i). Instead, because "an accountant has a due diligence defense; § 11 therefore imposes a negligence standard for an accountant's liability." *Monroe*, 31 F.3d at 774 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976)); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) ("[A]lthough issuers are subject to virtually absolute liability under Section 11, experts such as accountants who have prepared portions of the registration statement are accorded a due diligence defense." (cleaned up)).

As the Second Circuit correctly explained, strict liability is limited to those persons involved in "enumerated distributional activities." *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 181 (2d Cir. 2011). "This approach avoids the implausible result of transforming every lawyer, accountant, and other professional whose work is theoretically 'necessary' to bringing a security to market into an 'underwriter' subject to strict liability under § 11, a dramatic outcome that Congress provided no sign of intending." *Id.*

This approach is consistent with *Omnicare* and extending its holding to accountants does not negate the due diligence defense. In *Omnicare*, the Supreme Court examined § 11 and addressed an issuer's liability for statements of opinion, because "Congress effectively incorporated . . . [a] distinction [between facts and opinions] in § 11's first part by exposing issuers to liability not for 'untrue statement[s]' . . . (which would have included ones of opinion), but only for 'untrue statement[s] *of fact*.'" 575 U.S. at 183 (quoting § 77k(a)) (alterations in original). Focusing on the language of the statute, the Supreme Court excluded statements of opinions from liability. Under the Supreme Court's reasoning, accountants may be liable for statements of fact if they did not act with due diligence; however, accountants will not be liable for statements of opinion, even if they reflect a subjective belief that admits there is a possibility of error, as long as the statement of opinion was sincerely held. *See id.* As the Supreme Court aptly explained:

> A fact is "a thing done or existing" or "[a]n actual happening." Webster's New International Dictionary 782 (1927). An

> opinion is "a belief[,] a view," or a "sentiment which the mind forms of persons or things." Most important, a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not. . . . Indeed, that difference between the two is so ingrained in our everyday ways of speaking and thinking as to make resort to old dictionaries seem a mite silly. And Congress effectively incorporated just that distinction in § 11's first part by exposing issuers to liability not for "untrue statement[s]" full stop (which would have included ones of opinion), but only for "untrue statement[s] of . . . fact."

*Id.* (citations omitted). The Supreme Court further explained a statement of opinion is not an "untrue statement of a *material fact*" simply because it is later determined to be incorrect (as here). *Id.* at 186–88.

That said, *Omnicare* did not insulate accountants from liability. Accountants may instead be challenged based on their audit opinion as *Omnicare* outlines. The opinion can still be subject to liability under § 11 as a material misstatement, where (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] [the speaker] supplied were untrue"; or (3) the opinion omits facts "whose omission makes the opinion statement at issue misleading." *See id.* at 186, 194. In the district court, Plaintiffs attempted to establish liability for PwC under these standards and failed. Rather than appeal that decision, they abandon those arguments.

Simply stated, an accountant's liability is limited to "statement[s] in such registration statement, report, or valuation, which purports to have been prepared or certified by him." § 77k(a)(4). Here, the PwC audit report did not incorporate the alleged misstatements or untrue facts, and clearly stated, in relevant part, that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of [Bloom Energy] as of December 31, 2017 and December 31, 2016, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America."

Thus, in order for Plaintiffs to prevail, they must establish that PwC did not have a "reasonable ground to believe and did [not] believe, at the time such part of the registration statement became effective, that the statements therein were true." § 77(k)(b)(3)(A). As explained below, PwC made statements of opinion protected under *Omnicare*. PwC did not make or prepare any statements of material fact or omit any material statements.

## A.  *PwC is not liable as a preparer.*

In this case, Plaintiffs argue that, because PwC certified Bloom Energy's financial statements, it became liable for any misstatements contained therein. However, no one disputes that PwC did not prepare the financial statements for 2017, or that Bloom Energy was responsible for preparing the consolidated financial statements. Frankly, PwC was not permitted (under the regulations) to prepare the financial statements. The regulations make clear that an accountant, who prepares the financial statements, is

disqualified from being the independent accountant authorized to certify it. *See* 17 C.F.R. § 230.405.

Although PwC expressed an opinion in its audit with regard to Bloom Energy's 2016–2017 financial statements, there is no evidence that PwC *prepared* materially false statements. Accountants do not, "by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein." *Deephaven Priv. Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1174 (10th Cir. 2006). Instead, PwC merely affirmed that, in its opinion, Bloom Energy followed the proper accounting principles, and those statements of opinions are protected under *Omnicare*.

## B.  *PwC is not liable as a certifier.*

Plaintiffs also seek to have us impose strict liability for PwC for Bloom Energy's financial statements that they certified in their audit opinion. We decline to interpret the term "certify" so broadly.

Bloom Energy prepared "consolidated financial statements," which included the "accompanying consolidated balance sheets of Bloom Energy Corporation and its subsidiaries as of December 31, 2016 and December 31, 2017, and the related consolidated statements of operations, of comprehensive loss, of convertible redeemable preferred stock and stockholders' deficit and of cash flows for each of the two years in the period ended December 31, 2017, including the related notes." PwC certified the "consolidated financial statements" using audit procedures aimed to obtain reasonable assurance. Section 11 does not require that PwC, by certifying the financial statements, guarantee that the documents provided by Bloom Energy were free from error. Instead, PwC was

required to act in compliance with GAAP and GAAS, by performing a reasonable investigation and having reasonable grounds to believe, and did believe, that the statements provided by Bloom Energy were true and that there were no omissions that made the statement misleading. *See* 15 U.S.C. § 77k(b)(3). It was not the job of PwC to "guarantee or insure" the financial statements. *Deephaven Priv. Placement Trading, Ltd.*, 454 F.3d at 1174 (internal quotation marks omitted); *see also Dronsejko v. Thornton*, 632 F.3d 658, 663 (10th Cir. 2011) ("A company's management—not the auditor—is responsible for the information contained in its financial statements and the propriety of its underlying accounting policies, including compliance with GAAP."); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 910 (7th Cir. 2007) ("The purpose of an audit report is to make sure the audited company's financial statements—which are prepared by the company, not by the auditor, . . .—correspond to reality, lest they either have been doctored by a defalcating employee or innocently misrepresent the company's financial situation.").

An accountant "is in a position to express an unqualified opinion on the financial statements when the auditor conducted an audit in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework." AS 3101.02.[7] "Misstatements arising from fraudulent financial

---

[7] AS references the Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1, § 150 (American Inst. of Certified Pub. Accountants 2001). Relevant here, the PCAOB auditing standards were reorganized and went into effect after Dec. 30, 2016, and were applicable to audits of financial statements for fiscal

reporting are intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users where the effect causes the financial statements not to be presented, in all material respects, in conformity with [GAAP]." AS 2401.06. The independent accountant's objective is to express "an opinion on the fairness with which [he or she] present[s], in all material respects, [the company's] financial position, results of operations, and its cash flows in conformity with [GAAP]." AS 1001.01. However, "[e]ven with good faith and integrity, mistakes and errors in judgment can be made." AS 1015.11. "[A]ccounting presentations contain accounting estimates, the measurement of which is inherently uncertain and depends on the outcome of future events. The auditor exercises professional judgment in evaluating the reasonableness of accounting estimates based on information that could reasonably be expected to be available prior to the completion of field work." *Id.* To be sure, the division of responsibility is based on practical realities: Bloom Energy "operate[s] the business daily" and has superior knowledge of transactions, assets, and liabilities, whereas PwC's function was confined to reasonable assurance through its audit. These limits placed on accountants to assess a company's financial statements

years ending before Dec. 15, 2017. *See* https://pcaobus.org/oversight/standards/auditing-standards (last visited Oct. 29, 2025). Other revisions occurred after December 15, 2017. However, the reorganized standards are substantially the same and would not alter PwC's review of the 2016 or 2017 financial statements.

preclude its ability to ensure that there are no misstatements, and thus, accountants should consider risk factors such as:

> conditions in the company's industry and environment, and company-specific factors, such as the nature of the company, its activities, and internal control over financial reporting. For example, external or company-specific factors can affect the judgments involved in determining accounting estimates or create pressures to manipulate the financial statements to achieve certain financial targets. Also, risks of material misstatement may relate to, e.g., personnel who lack the necessary financial reporting competencies, information systems that fail to accurately capture business transactions, or financial reporting processes that are not adequately aligned with the requirements in the applicable financial reporting framework.

AS 2110.05.

Again, "an accountant is not a guarantor of the reports he prepares and is only duty bound to act honestly, in good faith and with reasonable care in the discharge of his professional obligations." *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 (9th Cir. 1979) (citation omitted). Nor does § 11 make accountants guarantors of every statement made by the issuer; to make such a holding would turn the whole accounting world upside down. Holding accountants strictly liable as if they were preparers would transform audits, making them prohibitively expensive. This was not Congress's goal. When Congress enacted the statute,

Congress was clear that it was limiting the liability of accountants by only requiring a "reasonable investigation and reasonable ground for belief, [for which] the standard of reasonableness shall be that required of a prudent man in the management of his own property." § 77k(c).

Moreover, an accountant's certification of financial statements is nothing more than an opinion. The term "certify" has been defined to mean that an independent public or certified public accountant has "examined and reported upon [the financial statements] with an opinion." 17 C.F.R. § 230.405. *Omnicare* protects opinions from liability unless one of the three exceptions is met. *Omnicare* made clear that "whether a statement is 'misleading' depends on the perspective of a reasonable investor." 575 U.S. at 186. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90; *see also Deephaven Priv. Placement Trading, Ltd.*, 454 F.3d at 1175 (explaining that "the phrase 'in our opinion' indicates that there may be some information risk associated with the [reviewed] financial statements, even though the statements have been audited").

In this case, PwC did just that. It conveyed its opinion as to Bloom Energy's financial statements. There may have been some differing opinions with regard to the Energy Server's useful life, but "[a] reasonable investor does not expect that every fact known to an [accountant] supports its opinion statement." *Omnicare*, 575 U.S. at 176. And in this case, the classification and reasons for classification were provided to the investor. Thus, PwC's "statement of opinion [was not] viewed in a vacuum," but rather allowed each investor to "read[] each statement within such a document,

whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* at 190.

In summary, Plaintiffs' attempts to hold PwC liable fail. PwC's audit opinion did not make any material misstatements of *fact* or omissions but rather was merely a statement of opinion based, again, upon the subjective judgment of the MSA classification. Plaintiffs made no allegation that PwC did not sincerely believe that Bloom Energy's classification of the MSAs aligned with proper accounting principles based on the evidence available at that time. *See id.* at 186.

Accordingly, PwC is not liable for the statements in its audit opinion.

## II. The district court's decision should also be affirmed because Bloom Energy's financial statements regarding classification of the MSAs were opinions.

In this appeal, Plaintiffs challenge only the three line items referenced in the Registration Statement that related to whether MSAs should be classified as operating or capital leases. These line items in Bloom Energy's financial report were based on Bloom Energy's subjective judgments (not statements of fact) concerning the actual useful life of the Energy Server. Under ASC 840-10-25-1, an MSA qualifies as a capital lease if "[t]he lease term is at least 75% of the property's [i.e., the Energy Servers'] estimated remaining economic life." Plaintiffs allege that the lease terms were 6 to 10 years; that Bloom Energy improperly estimated that the Energy Servers' useful lives were 15-21 years. However, there is no dispute that Bloom Energy was basing its estimates on newly designed Energy Servers whose useful

life was unknown. Nevertheless, Plaintiffs allege that the actual useful lives of these Energy Servers were "much shorter." With that shorter lease term, Plaintiffs claim that the 75% rule required a capital lease classification.

However, the district court correctly concluded that Plaintiffs failed to allege sufficient facts to establish that Bloom Energy's judgments were untrue. Throughout the district court opinion, it properly outlines that Bloom Energy's classification of its MSAs was based on an exercise of judgment related to its information about its Energy Servers, which Bloom Energy used to classify MSAs as operating or capital leases. For example, the district court highlighted that "Plaintiffs contend that the service contracts '*typically* last[] from 10 to 21 years and can last as long as 25 years,' in total, and are renewed each year at the customer's option," but failed "to explain how Defendants could meaningfully estimate the length of future contracts from such a large range." "Plaintiffs also suggest that Bloom knew the estimated life of its Energy Servers and fuel cells because it had to replace some of its earlier generation systems," but "acknowledge[d], Bloom also had newer systems in place, and Plaintiffs [did] not explain how Defendants could extrapolate to determine the life or replacement schedule for all its Energy Servers."

Thus, the district court correctly concluded that Plaintiffs failed to adequately plead that the challenged line items were statements of fact. Instead, the district court recognized that Bloom Energy's classification of the MSAs was the product of accounting judgments; it determined that those judgments "involve[d] complex consideration[]" of various GAAP provisions in determining how to evaluate the term of the MSAs and the value of the Energy Servers. Thus, the district court found those three line items to be opinions. Then,

HUNT V. PRICEWATERHOUSECOOPERS LLP          27

because Plaintiff failed to plead nor argue any of the *Omnicare* exceptions to establish liability, the district court concluded that those three line items were not actionable. We agree.

On appeal Plaintiffs argue that "statements of revenue, net loss, and net loss per share contained within a company's financial statements" cannot be opinions because they are always statements of fact. However, again Plaintiffs ignore the language in *Omnicare.*

*Omnicare* does not limit an opinion to words over figures. To be sure, the language of the statute is limited to *facts*, not *opinions.* Thus, as long as Bloom Energy's statements were opinions and not facts, it is irrelevant whether the subject matter being opined about were words or figures. Instead, we need only determine whether Bloom Energy had a "sincere statement of pure opinion." *Omnicare*, 575 U.S. at 186. If it did, then it does not qualify as an "'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Id.*

An "untrue statement of a material fact," 15 U.S. C § 77k(a), "limited as it is to *factual* statements, does not allow investors to second-guess inherently subjective and uncertain assessments." *Omnicare*, 575 U.S. at 186 (emphasis added). Although figures, by themselves, do not clearly convey whether it is an opinion or a fact, "an investor [should] read[] each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information[,] . . . tak[ing] into account the customs and practices of the relevant industry." *Id.* at 190. "Section 11's omissions clause, as applied to statements of both opinion and fact, necessarily brings the reasonable

person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning." *Id.* at 193–94.

The district court correctly applied *Omnicare*'s reasoning to conclude that numbers can sometimes be facts and other times be opinions, depending on whether "the considerations underlying the figures—such as which GAAP provisions apply and how to apply them— . . . require the exercise of judgment."

Plaintiffs do not explain what additional actions PwC should have taken in its audit, nor do they allege any facts that establish that PwC overlooked or disregarded warning signs about the Energy Server's useful life or Bloom Energy's MSA accounting.

Because Plaintiffs failed to show that Bloom Energy's subjective opinions were based on untrue facts or information that it did not believe, *see Omnicare*, 575 U.S. at 187, Plaintiffs cannot demonstrate that PwC certified untrue facts or information. Accordingly, Plaintiffs have failed to establish liability for PwC's opinion. The record demonstrates that the classification of MSAs was a judgment call, and the Registration Statement thoroughly explained how it reached the classification. PwC was reasonable under the circumstances to certify Bloom Energy's classification based on the evidence at that time.[8]

**AFFIRMED.**

---

[8] Based on the foregoing, we need not decide whether the line item errors were material.