IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOUIS LEVEQUE, individually and :
on behalf of all others
similarly situated                :

    v.                             :   Civil Action No. DKC 24-2900

                              :

ILEARNINGENGINES, INC., et al.

                              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this putative securities class action are five motions to dismiss for failure to state a claim filed by Defendants Marcum LLP, (ECF No. 80); Thomas Olivier, (ECF No. 82); Harish Chidambaran, (ECF No. 83); Sayyed Farhan Naqvi, (ECF No. 84); and Matthew Barger, Ian Davis, Bruce Mehlman, and Michael Moe, (ECF No. 85); as well as the motion to partially lift the discovery stay filed by Louis Leveque and Iqbal Al Hamid (collectively, "Plaintiffs"), (ECF No. 93).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the five motions to dismiss will be granted and the motion to partially lift the discovery stay will be denied.

## I.   Background

### A.   Factual Background[1]

### 1.   iLearningEngines' Origin

Mr. Chidambaran founded a company named iHealthEngines in 2010, before changing its name to iLearningEngines ("iLE") in 2018. (ECF No. 41 ¶¶ 54-55).  Through at least 2018, iLE described itself as a "Learning as a Service platform" for the healthcare industry. (*Id.* ¶¶ 56-59).  In August 2020, iLE began describing itself as an "[Artificial  Intelligence  ("AI")]  Powered  Learning  Platform." (*Id.* ¶ 60).   It  explained  that  its  platform  has  three  main components:  (1)  "Knowledge  Clouds,"  which  consist  of  "data retrieved  from  both  internal  institutional  data  and  external sources" such as Salesforce and Microsoft Teams; (2) its "Out-of-the-Box  AI  Engine"  and  associated  proprietary  AI  algorithms trained on the data sets; and (3) its "no-Code Work Flow and AI Canvas," which "integrate[s] an organization['s] systems using AI .  .  .  to  optimize  the  organization's  workflows,  including  by creating chat bots with subject matter expertise and 'providing smart  decision  making'  that  will  'unlock'  a  company's institutional  knowledge."   (*Id.* ¶ 63).   More  specifically,  iLE

---

[1] The facts herein are as alleged in the overly long, at times redundant, amended complaint or drawn from documents integral to the  complaint.   Counsel did not seek leave to file a pleading exceeding the permitted length of 40 pages (by an extra 200 pages), in violation of Local Rule 103.1.d.

"offers two solutions to enterprises: Learning Automation and Information Intelligence." (*Id.* ¶ 65). Its Learning Automation solution uses AI "to create real time learning solutions to assist in developing an organization's personnel through" learning modules, whereas its Information Intelligence solution "use[s] its AI Assistant to integrate enterprise systems" to assist with company decision-making and cost savings. (*Id.*).

Mr. Chidambaran served as President and Chief Executive Officer ("CEO") of iLE during the time it was private. (*Id.* ¶ 31). Balakrishnan Arackal joined the company in 2014 as Chief Business Officer ("CBO"), (*Id.* ¶ 34), and Mr. Naqvi joined as Chief Financial Officer ("CFO") in 2019, (*Id.* ¶ 32).

### 2. iLE Goes Public

Arrowroot Acquisitions, Inc. ("Arrowroot") was formed in 2020 as a special purpose acquisition company ("SPAC"), meaning it was a shell company with the express purpose of merging with another company or effecting some other form of business combination. (*Id.* ¶ 68). Arrowroot held an initial public offering ("IPO") in March 2021, which raised $287.5 million. (*Id.* ¶ 69). In 2022, Arrowroot identified iLE as its target. (*Id.* ¶ 71). In January 2023, Arrowroot's Board discussed a proposed valuation of iLE of $1.28 billion. (*Id.* ¶ 73). In May 2023, Arrowroot and iLE jointly announced the execution of a reverse merger agreement, upon the

3

closing of which the combined entity would retain the iLE name and continue to be headed by Mr. Chidambaran. (*Id.* ¶¶ 67, 77). The merger would take iLE public on the NASDAQ stock exchange. (*Id.* ¶ 76). According to its later public filings, iLE tallied revenue of "$217.9 million, $309.2 million, and $420.6 million, for fiscal years 2021, 2022 and 2023, respectively." (*Id.* ¶ 66). In March 2024, though, just prior to the closing of the merger, iLE "was in a dire financial state, reporting just $800,000 in cash, $22 million in debt, and an accumulated deficit of $47.1 million." (*Id.* ¶ 67).

On April 17, 2024, the merger closed and iLE went public. (*Id.* ¶ 79). Mr. Chidambaran remained CEO, Mr. Naqvi remained CFO, Mr. Arackal remained CBO and took on the role of President, and the following individuals were appointed to the Board: Mr. Barger, Mr. Davis, Mr. Mehlman, Mr. Moe, and Mr. Olivier. (*Id.* ¶¶ 31–39). At the time of closing, Arrowroot's funds had declined from $287.5 million to $5.9 million, because "most [Arrowroot] stockholders elect[ed] to redeem their shares for cash instead of becoming investors in [iLE]." (*Id.* ¶ 79). Upon closing, iLE received around $52.7 million in gross proceeds. (*Id.* ¶ 80). After going public, iLE had 134,313,494 shares of common stock outstanding, (*Id.* ¶ 46), of which roughly 76.9% were subject to a one-year lock-up provision, (*Id.* ¶¶ 417, 419).

### 3.   iLE's Registration Statements

Once it went public, iLE decided to register several tranches of shares with the Securities & Exchange Commission ("SEC"). (*Id.* ¶¶ 9–10). Effective June 21, 2024, iLE registered up to 16,208,318 shares pursuant to a Form S-8 Registration Statement ("S-8 Registration Statement"). (*Id.* ¶¶ 137, 139, 142). Those shares were issued or issuable to employees pursuant to various employee equity incentive and stock purchase plans. (*Id.* ¶¶ 137, 139). Effective August 9, 2024, iLE registered up to an additional 100,774,669 shares of iLE common stock pursuant to a Form S-1 Registration Statement ("S-1 Registration Statement"). (*Id.* ¶¶ 247, 250). These shares were either issued or issuable to a variety of parties. (*Id.* ¶ 248). The S-1 Registration Statement additionally registered over 22 million shares issuable upon exercise of iLE warrants. (*Id.* ¶ 247). Both Registration Statements were signed by Mr. Chidambaran, Mr. Naqvi, Mr. Arackal, Mr. Olivier, Mr. Barger, Mr. Davis, Mr. Mehlman, and Mr. Moe. (*Id.* ¶¶ 138, 250). Incorporated into both Registration Statements were iLE's financial statements for 2021, 2022, and 2023, (*see id.* ¶¶ 134, 140, 145), as well as iLE's independent accounting firm Marcum's April 22, 2024, audit report that these financial statements presented the financial position of iLE "fairly, in all

material respects, . . . in conformity with" generally accepted accounting principles ("GAAP"), (*id.* ¶¶ 141, 146, 246).

The content of those financial statements is central to this case.  As previously mentioned, iLE reported therein that it had earned "revenue of $217.9 million, $309.2 million, and $420.6 million, for fiscal years 2021, 2022 and 2023, respectively." (*Id.* ¶ 66).  It further reported that "most of the revenue and sales comes from [iLE's] partner relationships . . . with a 'Technology Partner' and value added resellers." (*Id.* ¶ 82).  iLE never stated the identity of the Technology Partner in its public filings. (*Id.* ¶ 96).

Plaintiffs focus on the Technology Partner, by far the largest partner relationship iLE manages.  iLE management explained that iLE "enter[s] contracts with the Technology Partner through which the Technology Partner purchases and integrates [iLE's] platform into the Technology Partner's own software solution provided to one of the Technology Partner's customers." (*Id.* ¶ 90 (emphasis omitted)).  Furthermore, iLE "has outsourced [implementation] services to its . . . Technology Partner . . . who has been trained to provide the implementation services." (*Id.* (emphasis omitted)).  Accordingly, iLE treats the Technology Partner as "a customer in some arrangements and a vendor in other arrangements." (*Id.* ¶ 92).  iLE had entered into a Master Agreement with the

Technology Partner in 2019 and renewed that contract for another ten years in 2024. (*Id.* ¶¶ 97, 157). That agreement "provide[d] for the quarterly netting of amounts collected by the Technology Partner from end-users[] against the cost of the Technology Partner's services rendered and billable to [iLE]." (*Id.* ¶¶ 97, 157). iLE clarified in the S-1 Registration Statement that it "determined the services it received from the Technology Partner were distinct and the consideration paid to the Technology Partner was equivalent to an arms-length transaction. As a result, no costs incurred by [iLE] related to services provided by the Technology Partner have been netted against revenues earned from the Technology Partner." (*Id.* ¶ 92).

iLE did not describe the Technology Partner as a related party in its SEC filings. (*Id.* ¶ 12). Prior to the closing of the merger, the SEC inquired as to "whether the Technology Partner is a related party." (*Id.* ¶ 402). In response, iLE represented that "the Technology Partner is not a related party and they do not hold any financial interest in [iLE]." (*Id.* ¶ 403).

### 4.   Mr. Leveque and Mr. Al Hamid Purchase Shares

On July 25, 2024, just over a month after the S-8 Registration Statement and several weeks before the S-1 Registration Statement, Mr. Leveque purchased 5,000 shares of iLE common stock. (*Id.* ¶ 423). Starting eleven days after the August 9 S-1 Registration

7

Statement, Mr. Al Hamid made a series of purchases of iLE common stock: 500 shares on August 20, 500 shares on August 23, 1,000 shares on August 27, 1,000 shares on August 30, and 1,500 shares on September 16.  (ECF Nos. 41-1, at 3; 41 ¶ 424).  The final two purchases occurred after an August 29 short-seller report described below and were followed nearly immediately by sales of the same number of shares.  (ECF No. 41-1, at 3).

     **5.    The Hindenburg Report**

On August 29, 2024, the short-seller firm Hindenburg Research published an investigative research report about iLE titled "An Artificial Intelligence SPAC With Artificial Partners And Artificial Revenue" (the "Hindenburg Report" or "Report").[2]  (ECF No. 41 ¶ 159).  The Report identified the Technology Partner as Experion Technologies, FZ LLC ("Experion").  (*Id.* ¶ 167).  Its authors made two principal claims: Experion was an undisclosed related party, and "the vast majority of [iLE's] revenue is fake." (*Id.* ¶ 159).  The Report stated that "all information contained [t]herein . . . ha[d] been obtained from public sources" and it "ma[de] no representation, express or implied, as to the accuracy,

---

[2] Mr. Barger notified iLE of his intention to resign as iLE director on August 28, the day before the release of the Hindenburg Report.  (ECF No. 41 ¶ 184).  His resignation was effective August 29, the day of the Report's release.  (*Id.*).

timeliness, or completeness of any such information." (ECF No. 83-2, at 24).[3]

Regarding its contention that Experion was an undisclosed related party, the Hindenburg Report provided the following evidence:

> (i) [Mr.] Chidambaran was listed as the American contact for [the] "Technology Partner" on Experion's website and listed his personal residence as the location of "Experion Americas"; (ii) per Indian corporate records and LinkedIn, iLearningEngines' Senior Project Manager, Tom Thomas and AVP of Sales & Business Development Director, Ratish Nair, were directors and shareholders of Experion's India affiliate, Experion Technologies, FZ LLC [sic, should be Experion Infosystems]; (iii) Experion India and Experion [Middle East & Africa ("MEA")] are partially owned by Jojo Philip, the brother of iLearningEngines' Senior Director Channel Partnerships, Cherian K. Philip; and (iv) Experion MEA was headed and partially owned by iLearningEngines' President and Chief Business Officer, Arackal, and iLearningEngines' AVP of Sales & Business Development, Ratish Nair.

(ECF No. 41 ¶ 169). More specifically, Mr. Chidambaran's listing as the contact person for Experion Americas is from February 2020. (*Id.* ¶¶ 113-14). The listing of Tom Thomas and Ratish Nair as

---

[3] The court may consider the Hindenburg Report on a motion to dismiss because Plaintiffs do not dispute its authenticity, and it is integral to the complaint. *See Faulkenberry v. U.S. Dep't of Def.*, 670 F.Supp.3d 234, 249 (D.Md. 2023) (quoting *Reamer v. State Auto. Mut. Ins. Co.*, 556 F.Supp.3d 544, 549 (D.Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022)).

directors of an Experion India affiliate is from March 2023. (*Id.* ¶ 119). Mr. Nair was also listed as the contact person for Experion MEA and a shareholder of Experion MEA. (*Id.* ¶¶ 123, 125, 126). Both Mr. Thomas and Mr. Nair were senior employees at iLE while they held their positions at Experion. (*Id.* ¶ 121). 2024 Indian corporate records reflect that Jojo Philip at that time owned a 35% stake in Experion India, and records from a corporate intelligence firm around the same time show that he had a 45% stake in Experion MEA. (*Id.* ¶¶ 131–32). Cherian Philip was a senior employee of iLE at the time. (*Id.* ¶ 129). Indian court orders show that Jojo Philip is the brother of Cherian Philip. (*Id.* ¶ 130). As for Mr. Arackal, public records reveal that he is a shareholder of Experion MEA and was a director of Experion India from 2017–2022, an Experion MEA Advisory Board member in 2019, and CEO of Experion MEA in 2015. (*Id.* ¶¶ 126–28). He was a senior employee of iLE during that period. (*Id.* ¶ 34). The Report authors and Plaintiffs point to this web of connections as proof that Experion was a related party of iLE. (*Id.* ¶ 168). They also note a "peculiar aspect of the Master Agreement" with Experion: iLE did not need to repay the nearly $50 million outstanding balance it owed to Experion until "10 years after the Master Agreement was terminated." (*Id.* ¶¶ 165–66). Such an arrangement, they contend, makes "no rational business sense" and "rais[es]

questions of whether [there] is an arms-length relationship." (*Id.* ¶ 166).

Regarding its claim that iLE's revenues were largely fake, the Hindenburg Report emphasized the considerable revenues, minimal net income, and the netting arrangement. In 2023, iLE earned $389.4 million of its $420.6 million total revenue from and/or through the Technology Partner, and incurred $388.2 million in costs to the Technology Partner, for a net income from the Technology Partner of $1.2 million, which the Report authors believed would be paid toward the large outstanding balance iLE owed to Experion. (*Id.* ¶¶ 164–65). For the quarter ending March 31, 2024, the Technology Partner collected 90% of iLE's revenue and invoiced 94.62% of iLE's costs associated with that revenue. (*Id.* ¶ 94). Likewise, through the second quarter of 2024, iLE reported $238,961,000 in revenue and $237,553,000 in costs from the Technology Partner, for a net income of roughly $1.4 million. (*Id.* ¶ 157). The Report authors described the hypothesized scheme as follows: By "claiming that virtually all business takes place through Experion, [iLE] can put a layer between it and the suspect transactions in an offshore, opaque jurisdiction," and the "unusual circular structure makes it easy to inflate both revenue and cost figures while only netting out a minimal difference." (*Id.* ¶ 177).

11

The Report authors buttressed their fake-revenue theory with several additional allegations.  They asserted that iLE's revenue in India was 99.4% lower than claimed based on a review of its Indian subsidiary's records, (*Id.* ¶ 170), and that when they visited iLE's Indian location, they "found no signage to indicate [iLE] had any presence in the building," (*Id.* ¶ 171).  They noted another "circular" deal generating $50 million in annual revenue and $30 million in annual costs, which was "highly suspicious" and purportedly indicative of the revenue and expenses being "largely fake."  (*Id.* ¶ 172).  Next, they questioned iLE's $722,000 acquisition of In2vate, which had only $60,000 in accounts receivable, and its supposed contribution of more than two million of iLE's 4.9 million total users.  (*Id.* ¶ 173).  Running their own math, the Report authors argued that those two million users did "not add up to [a] significant portion of [iLE's] revenue."  (*Id.* ¶ 174).  Finally, they investigated iLE's "Key Customer in India," Vedhik Schools, which reported only $649,000 in revenue in 2023 and thus was "unlikely to be a major source of revenue."  (*Id.* ¶ 176).  Plaintiffs included Mr. Chidambaran's rebuttal of these allegations in the amended complaint, (*Id.* ¶ 515), and they neither discuss nor rely on these allegations in their motion papers.

They contended that the fake-revenue scheme could persist because iLE's accountant, Marcum, failed "to uphold basic auditing

12

standards," as evidenced by the $13 million in total fines it received from the Public Company Accounting Oversight Board ("PCAOB") and the SEC in 2023 for "widespread audit deficiencies in connection with SPAC audits." (*Id.* ¶ 178).

The market reaction to the Hindenburg Report was swift. The day it was released, iLE's stock price fell 53.3%. (*Id.* ¶ 179). The media outlets Fortune, Bloomberg, and Reuters all published articles about the Report and the stock price decline. (*Id.* ¶¶ 180–82, 185).

### 6.   iLE's Response

iLE issued an immediate response on August 29, 2024, denouncing the report as a scheme to profit at the expense of iLE's investors, declaring that it "contain[ed] misleading statements, speculations and innuendos," and announcing that it would respond further in the days ahead. (*Id.* ¶ 183). On September 5, 2024, iLE issued a press release and Form 8-K announcing that the Board had formed a special committee ("Special Committee") to investigate the Hindenburg Report's allegations. (*Id.* ¶ 186). They explained that an investigation was "in the best interest of shareholders" even though iLE's "independent auditors conduct[ed] periodic audits in accordance with PCAOB standards and ha[d] issued clean audit opinions." (*Id.*). In the press release, Mr. Chidambaran asserted that iLE "has real products, contracts, and

13

revenue" and reaffirmed that the Hindenburg Report contained "misleading statements, speculations and innuendoes." (*Id.* ¶ 187).

On September 10, 2024, iLE issued another press release titled "iLearningEngines CEO Sets the Record Straight," in which Mr. Chidambaran stated the need to "correct the egregious misstatements" in the Hindenburg Report and directed readers to a longer rebuttal posted to the iLE website. (*Id.* ¶¶ 188–89). Plaintiffs allege that Mr. Chidambaran did not address all of the Hindenburg Report's claims. (*Id.* ¶ 189). Instead, he appeared to acknowledge that Experion was the Technology Partner, (*Id.* ¶ 190), although he simultaneously announced that as of September 10, 2024, "a majority of iLE revenue comes from partnerships outside of Experion," (*Id.* ¶ 191). As for the Hindenburg Report's related-party allegations, Mr. Chidambaran responded that "[t]here is no mutual ownership between [iLE] and Experion." (*Id.* ¶ 192 (first alteration in original)). Plaintiffs allege that Mr. Chidambaran's lack of response to the "claims that [iLE] senior employees and/or their family were directors, shareholders, or owners in Experion is a tacit admission that they were true." (*Id.*). Lastly, Mr. Chidambaran responded to the fake-revenue claims by pointing to the fact that iLE's financials had withstood scrutiny from independent auditors and lenders. (*Id.* ¶ 193). That

14

same day, an analyst from the Benchmark Company published a report deeming Mr. Chidambaran's rebuttal to be credible and dismissing the Hindenburg Report's allegations. (*Id.* ¶¶ 194-95). Plaintiffs allege that the Benchmark report is not credible on the ground that the analyst could not have had enough time to verify the accuracy of the rebuttal. (*Id.* ¶ 195).

A series of further press releases followed. On November 18, 2024, iLE announced that its financial statements since 2020 should "no longer be relied upon," Marcum had withdrawn its prior opinions, iLE had received a subpoena from the SEC, and Mr. Naqvi had been placed on administrative leave from his role as CFO and given the new title of Senior Vice President. (*Id.* ¶ 196). iLE's share price fell 27%. (*Id.* ¶ 202). On December 10, 2024, iLE informed the market that Mr. Chidambaran, Mr. Naqvi, Mr. Arackal, and two iLE Vice Presidents, Ramakrishnan Parameswaran Arackal[4] and Vivek Chary, had been placed on administrative leave and Mr. Olivier had been appointed interim CEO. (*Id.* ¶ 205). iLE's share price fell 14.2%. (*Id.* ¶ 207). On December 23, 2024, iLE reported that it had filed for Chapter 11 bankruptcy.[5] (*Id.* ¶ 208). Its

---

[4] Ramakrishnan Arackal is not a defendant in this action. All references to "Mr. Arackal" are to Balakrishnan Arackal.

[5] iLE's affiliates—iLearningEngines Holdings, iLearningEngines FZ-LLC, and In2vate—all filed for bankruptcy, too. (ECF No. 41 ¶ 210, 212, 213).

share price tumbled 78.5%.  (*Id.* ¶ 209).  That same day, NASDAQ notified iLE that it would be delisted from the stock exchange. (*Id.* ¶ 211).  Finally, iLE announced on December 27, 2024, that Mr. Chidambaran, Mr. Naqvi, Balakrishnan Arackal, Ramakrishnan Arackal, and Mr. Chary had resigned.  (*Id.* ¶ 214).  In the same press release, iLE conveyed that it had "self-reported potential violations of law to the Department of Justice [('DOJ')]" and "was cooperating with both the SEC's and DOJ's investigations."  (*Id.* ¶ 215).

Marcum resigned as iLE's auditor on February 13, 2025.  (*Id.* ¶ 217).  The 8-K reporting Marcum's resignation revealed that Marcum had notified iLE on January 5, 2024, in connection with its audit of iLE's 2023 financial statements, that iLE "had material weaknesses in internal control over financial reporting relating to corporate governance policies, statutory compliance policies, and information technology controls."  (*Id.*).

On March 6, 2025, iLE converted its bankruptcy from Chapter 11 reorganization to Chapter 7 liquidation. (*Id.* ¶ 220).  In iLE's bankruptcy proceedings, the iLE affiliate iLearningEngines Holdings ("iLE Holdings") submitted a Statement of Financial Affairs on April 11, 2025, identifying Experion MEA as an "insider" and a "related party."  (*Id.* ¶¶ 226–27).  The Statement of Financial Affairs also indicated that in the year prior to

16

bankruptcy, iLE Holdings had sent fifty wire transfers totaling over $87 million to Experion MEA.  (*Id.* ¶ 230).  Of that $87 million, iLE Holdings sent a series of transfers totaling $2 million in December 2023, $1.75 million in the first quarter of 2024, and $12.225 million in the first two quarters of 2024.  (*Id.* ¶ 231).  Plaintiffs allege that those numbers do not match the "'[n]et cash transfers between [iLE] and Technology Partner' of $2.213 million, $330,000, and $2.14 million" that iLE reported for those periods, respectively.  (*Id.*).  iLE Holdings sent the remaining $73.2 million in the third and fourth quarters of 2024, $55.7 million of which it sent after the publication of the Hindenburg Report.  (*Id.* ¶¶ 230–31).  Plaintiffs contend that all "[t]hese payments [we]re in addition to the funds Experion kept due to netting."  (*Id.* ¶ 232).[6]

### B.    Procedural Background

On October 7, 2024, Danny Walker filed a securities class action complaint against Harish Chidambaran, Sayyed Farhan Naqvi, and iLE.  (ECF No. 1).  On December 24, 2024, iLE informed the court that it had filed for bankruptcy, and an automatic stay had

---

[6] iLE affiliates also identified Experion Infosystems Private Limited, Vedic Network Experion, Synergy Markets Experion, and Experion MEA each as an "insider" and "related party."  (ECF No. 41 ¶¶ 234–35, 238).  The wire transfers to those entities from iLE affiliates were much smaller, in the range of $6,200 to $216,343.55.  (*Id.* ¶¶ 234, 238).

issued.  (ECF No. 18).  iLE was terminated as a party on December 27.  (ECF No. 19).  Various individuals moved to be appointed Lead Plaintiff, and the court appointed Louis Leveque as Lead Plaintiff on February 27, 2025.  (ECF No. 36).

Mr. Leveque and Mr. Al Hamid filed the 240-page, operative amended complaint on April 28, 2025.  (ECF No. 41).  In Count I, they allege that all defendants are strictly liable under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act").  (ECF No. 41 ¶¶ 437-50).  They assert that the following defendants are liable because they were signatories of the S-1 and S-8 Registration Statements: Mr. Chidambaran, (*Id.* ¶ 31); Mr. Naqvi, (*Id.* ¶ 32); Mr. Arackal,[7] (*Id.* ¶ 34); and Matthew Barger, Ian Davis, Bruce Mehlman, Michael Moe, and Thomas Olivier, (*Id.* ¶¶ 35-39) (collectively, "Individual Defendants").  (*Id.* ¶ 444).  Plaintiffs further seek to hold Marcum strictly liable because it certified the financial statements incorporated into the S-1 and S-8 Registration Statements.  (*Id.* ¶ 445).  Count II

---

[7] Mr. Arackal has not yet been served with the amended complaint.  He lives in India and would likely need to be served pursuant to the Hague Service Convention, which Plaintiffs estimate would take six to twelve months.  (ECF No. 88, at 3). Because "the factual elements and the claims against Mr. Arackal materially overlap with the facts and claims asserted against the other defendants," (*Id.*), the court approved Plaintiffs' request to defer service on Mr. Arackal until the court decides the pending motions to dismiss, (ECF No. 89).  Given the rulings announced in this opinion, there is no reason to proceed to serve Mr. Arackal, and the amended complaint will be dismissed in its entirety.

alleges that Individual Defendants violated Section 15 of the Securities Act because they are "controlling persons" of individuals liable under Section 11. (*Id.* ¶¶ 451–57). Count III asserts violations by Mr. Chidambaran, Mr. Naqvi, and Mr. Arackal of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by making material misrepresentations and omissions that deceived the investing public, artificially inflated and maintained the market price of iLE's common stock, and caused iLE common stock purchasers to pay artificially inflated prices. (ECF No. 41 ¶¶ 549–60; *see also id.* ¶¶ 33, 42). Finally, Count IV alleges violations of Section 20(a) of the Exchange Act by Mr. Chidambaran and Mr. Naqvi because they are "controlling persons" of individuals liable under Section 10(b). (*Id.* ¶¶ 561–64; *see also id.* ¶ 33).

On July 31, 2025, Individual Defendants and Marcum filed motions to dismiss all counts asserted against them for failure to state a claim. (ECF Nos. 80; 82; 83; 84; 85). Plaintiffs responded on September 18. (ECF Nos. 90; 91; 92). Individual Defendants and Marcum replied on October 22. (ECF Nos. 101; 102; 103; 104; 105).[8]

---

[8] Plaintiffs and Marcum also filed notices of supplemental authority on October 17, (ECF No. 97), and November 17, (ECF No. 106), respectively.

Finally, Plaintiffs moved on September 19, 2025, for a partial lift of the discovery stay to conduct discovery regarding the traceability of their shares to the S-1 and S-8 Registration Statements. (ECF No. 93). Marcum responded on October 2, (ECF No. 94), and all other served defendants joined Marcum's response the same day, (ECF No. 95). Plaintiffs replied on October 17. (ECF No. 98).

## II. Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)). Ordinarily, a plaintiff's complaint must only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). A Rule 8(a)(2) "showing" requires

20

"stat[ing] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays v. Sprinkle*, 992 F.3d 295, 299–300 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

Because Plaintiffs' Securities Act and Exchange Act claims sound in fraud, they are subject to a heightened pleading standard under Fed.R.Civ.P. 9(b). *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (holding that Rule 9(b)'s heightened pleading requirements apply to Securities Act claims when "a plaintiff makes an allegation that has the substance of fraud," even when the plaintiff disclaims allegations of fraud).[9] Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." A plaintiff must plead with particularity "the time, place, speaker and contents of the allegedly false statements, as well as the manner in which [the] statements are supposedly false and the specific facts which raise an inference of fraud." *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 960 (D.Md. 1995)

---

[9] When "[t]he complaint treats the allegedly false statements" in the company's Registration Statements "as part of a single, coordinated scheme to defraud investors," the Securities Act allegations are subject to Rule 9(b). *Cozzarelli*, 549 F.3d at 629. Here, the amended complaint does just that.

21

(citing *Gollomp v. MNC Fin. Inc.*, 756 F.Supp. 228, 232 (D.Md. 1991); *Borow v. nView Corp.*, 829 F.Supp. 828, 833 (E.D.Va. 1993)).

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ("PSLRA"), imposes additional pleading requirements on plaintiffs in securities fraud actions. When a plaintiff alleges a misleading statement or omission, he must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). With respect to causes of action requiring a particular state of mind, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" when committing each alleged violation. *Id.* § 78u-4(b)(2)(A). Finally, a plaintiff must "plead . . . with sufficient specificity" that "the defendant's misrepresentations proximately caused the plaintiff's economic loss." *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185–86 (4th Cir. 2007) (citing *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)); *see also* 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)

22

("Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that plaintiffs' complaint here failed adequately to *allege* these requirements.").

## III. Analysis

### A.   Exchange Act

Plaintiffs bring a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Mr. Chidambaran, Mr. Naqvi, and Mr. Arackal, and a derivative claim for violation of Section 20(a) of the Exchange Act against Mr. Chidambaran and Mr. Naqvi.  Both Mr. Chidambaran and Mr. Naqvi move to dismiss these claims.  Their arguments prevail, and Counts III and IV will be dismissed.

### 1.   Section 10(b) and Rule 10b-5 (Count III)

A claim under Section 10(b) and Rule 10b-5 must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017) (quoting *Stoneridge Inv. Partners v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Materiality hinges on whether there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor

23

as having significantly altered the total mix of information made available." *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).   Defendants challenge Plaintiffs' allegations as to material misrepresentations or omissions, scienter, and loss causation.   Plaintiffs' allegations regarding each of these three elements are indeed inadequate.

### a.   Material Misrepresentations or Omissions

To plead a material misrepresentation in a Section 10(b) claim, a plaintiff must plead the falsity of each statement with specificity.   *Cozzarelli*, 549 F.3d at 625.   As for material omissions, a plaintiff must identify an affirmative duty to disclose and a failure to make the requisite disclosure.   *See Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018).   Here, Plaintiffs allege fifteen material misrepresentations or omissions, all of which hinge on Plaintiffs' belief that Experion is an undisclosed related party and/or iLE revenues are "largely fake."   (*See* ECF No. 41 ¶¶ 459-517).   Analysis can, therefore, focus on these cross-cutting assertions rather than on each individual misrepresentation.   Because the related-party allegations rest on a failure to disclose, those allegations are treated as raising a material omission, whereas the fake-revenue assertions are treated as raising a material misrepresentation.

24

Defendants do not appear to contest Plaintiffs' assertion that there is a duty to disclose material related-party relationships. (*See id.* ¶ 287 ("GAAP requires financial statements to include . . . disclosures of material related party transactions[.]")). Accordingly, the issue that the related-party allegations raise is solely whether Defendants failed to meet that duty.  The issue that the fake-revenue allegations raise is the falsity of Defendants' statements regarding iLE's revenues.  Plaintiffs have not adequately pleaded either one.

First, Plaintiffs' related-party allegations, which mirror those in the Hindenburg Report, do not appear to square with GAAP standards.  The relevant standard, Accounting Standards Codification ("ASC") 850-10-20 ("Related Party Disclosures"), defines a related party as follows:

> a. Affiliates of the entity
>
> b. Entities for which investments in their equity securities would be required
>
> c. Trusts for the benefit of employees
>
> d. Principal owners of the entity and members of their immediate families
>
> e. Management of the entity and members of their immediate families
>
> f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be

> prevented from fully pursuing its own separate interests
>
> g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

(*Id.* ¶ 283 (emphasis omitted)).  Plaintiffs focus on the final three categories.  First, they allege that Experion was a related party "due to the existence of [a] familial relationship between the owner of Experion India/Experion MEA and a member of [iLE's] senior management."  (*Id.* ¶ 301).  They are referring to Cherian and Jojo Philip; Jojo Philip evidently owned a 35% stake in Experion India and a 45% stake in Experion MEA while his brother, Cherian Philip, was iLE's "Senior Director Channel Partnerships for Asia, Middle East & Africa."  (*Id.* ¶¶ 129-32).  But as Mr. Chidambaran explains, this fact, at most, only makes *Jojo Philip* a related party, as a member of the immediate family of a member of iLE management.  (ECF No. 83-1, at 18 & n.2).  Plaintiffs do not explain how Jojo Philip's immediate family status is imputed first to the Experion affiliates in which he is a minority shareholder and then to Experion itself.  Plaintiffs' other allegations regarding members of iLE who have held shares or roles

in Experion affiliates fail to make Experion a related party for the same reason.

Second, Plaintiffs contend that "members of [iLE's] senior management team" had the ability "to significantly influence the operations of Experion India and Experion MEA." (ECF No. 41 ¶ 301). Plaintiffs incorporate the following allegations from the Hindenburg Report:

> (i) [Mr.] Chidambaran was listed as the American contact for [the] "Technology Partner" on Experion's website and listed his personal residence as the location of "Experion Americas";
>
> (ii) per Indian corporate records and LinkedIn, iLearningEngines' Senior Project Manager, Tom Thomas and AVP of Sales & Business Development Director, Ratish Nair, were directors and shareholders of Experion's India affiliate, Experion Technologies, FZ LLC [sic, should be Experion Infosystems];
>
> (iii) Experion India and Experion [Middle East & Africa ("MEA")] are partially owned by Jojo Philip, the brother of iLearningEngines' Senior Director Channel Partnerships, Cherian K. Philip; and
>
> (iv) Experion MEA was headed and partially owned by iLearningEngines' President and Chief Business Officer, Arackal, and iLearningEngines' AVP of Sales & Business Development, Ratish Nair.

(*Id.* ¶ 169 (citation modified)). Mr. Chidambaran's listing as Experion Americas' contact person and the inclusion of his residence as Experion Americas' business location are inapposite

27

because that was verifiably true only as recently as February 2020 and January 2022, respectively, (*Id.* ¶¶ 113-14), long before the issuance of any of the alleged omissions.  As for Mr. Thomas and Mr. Nair, records do reflect that as of March 31, 2023, they held two of the three director positions at Experion India while serving as senior employees at iLE.  (*Id.* ¶¶ 119-22).  While it is possible, then, that they controlled Experion India while working for iLE, Plaintiffs do not explain how iLE exerted sufficient influence and control over Mr. Thomas and Mr. Nair to achieve influence and control over Experion India.  And even if Experion India was indeed a related party, it is not remotely clear that that renders Experion itself a related party, or that iLE had a *material* relationship with Experion India such that its duty to disclose would be triggered.  On the latter point, bankruptcy proceedings disclosed $216,343.55 in wire transfers from an iLE affiliate to Experion India in the year preceding bankruptcy, (*Id.* ¶ 234), which pales in comparison to the $87 million sent to Experion MEA, (*Id.* ¶ 231).  The Philip brothers' relationship also does not render Experion a related party because Plaintiffs do not explain why the sibling relationship is sufficient to satisfy the significant influence or control test.  Lastly, Mr. Arackal was CEO of Experion MEA in 2015, (*Id.* ¶ 128), long before the alleged omissions.  He was an Experion MEA board member until 2022 and held an undisclosed

28

share of Experion MEA, (*Id.* ¶¶ 126-27), but neither fact clarifies the extent of his influence or control over Experion MEA.  The allegations regarding Mr. Nair's stake in Experion MEA are insufficient for the same reason.  In short, Plaintiffs succeed in demonstrating considerable overlap in personnel between iLE and Experion entities but fail to spell out beyond conclusory allegations that this overlap constitutes significant influence or control over Experion.  *See In re Qutoutiao, Inc. Sec. Litig.*, No. 20-cv-6707, 2023 WL 4977499, at *10 (S.D.N.Y. Aug. 3, 2023) (explaining that a "close business relationship" alone does not trigger a duty to disclose absent allegations revealing how that closeness manifests in influence and control), *vacated on other grounds sub nom.*, *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491 (2ᵈ Cir. Oct. 28, 2024).

In one last attempt to do so, Plaintiffs point to bankruptcy filings in which iLE affiliates refer to Experion MEA, Experion India, and a few other Experion affiliates as "insiders" under the Bankruptcy Code, as well as "related parties."  (ECF No. 41 ¶¶ 227, 234-35).  Although these observations might seem superficially probative, their weight dissipates under proper analysis.  Plaintiffs do not counter Mr. Chidambaran's contention that the definition of "insider" under the Bankruptcy Code differs meaningfully from that of "related party" under GAAP, and that

"related party" is not a defined term under the Bankruptcy Code. (ECF No. 83-1, at 20).  Moreover, Mr. Chidambaran points to the "Global Notes" included with the "insider" disclosures that state: "Persons listed as 'insiders' have been included *for informational purposes only* and the inclusion of them in the Schedules and Statements[] *shall not constitute an admission* that those persons are insiders for purposes of . . . the Bankruptcy Code." (ECF No. 103, at 9).  Whatever motive iLE affiliates had for making such disclosures (perhaps an abundance of caution), they are not so substantiated and unequivocal that they undercut iLE's previous position regarding the nature of its relationship with those Experion entities.

Plaintiffs fail to allege that iLE had a duty to disclose Experion as a related party, so none of the alleged omissions is actionable on this basis.

The other category of allegations Plaintiffs assert pertains to iLE's misrepresentation of its revenues; to wit, that its reported and discussed revenues were "largely fake."  These allegations fail, however, for the simple reason that they assume their conclusion.  The Hindenburg Report "suspect[ed]" that the revenue and expenses associated with the Technology Partner, Experion, were "largely fake" because "[t]he unusual circular structure makes it easy to inflate both revenue and cost figures

30

while only netting out a minimal difference." (ECF No. 41 ¶¶ 172, 177 (alterations in original)). But the suspicion that the relationship structure *could* facilitate revenue inflation does not mean that iLE *in fact* inflated its revenues. (ECF No. 84-1, at 20). By failing to bridge that gap, Plaintiffs "do not permit the court to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, much less the specificity of misconduct required under Rule 9(b) and the PSLRA.

Plaintiffs argue, in essence, that the relationship with Experion lacked economic substance and instead consisted of round-tripping funds. "A typical 'round-tripping' scheme involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services." *Tchrs.' Ret. Sys.*, 477 F.3d at 178 (citation modified). As the Fourth Circuit explained:

> Such transactions can be improper because the parties book revenues even though the transactions "wash out" without any economic substance. But the basis for alleging "round-tripping" does not exist when either of the transactions have economic substance because those transactions would not wash out. The mere existence of reciprocal dealing does not suggest "round-tripping."

*Id.* Here, Plaintiffs assume without adequate explanation that neither leg of the transaction contained economic substance. Based on iLE's financial statements, it does not appear that iLE and the Technology Partner provided similar services. In some

31

circumstances, the Technology Partner purchased the right to use iLE's platform, to which iLE retained the intellectual property rights, and the Technology Partner would integrate the platform into its own software and provide it to its own customers. (ECF No. 41 ¶¶ 291, 515). In other circumstances, iLE paid the Technology Partner to serve as its agent, and in exchange the Technology Partner would facilitate sales to iLE customers. (*Id.* ¶ 291). iLE would also pay the Technology Partner to perform research and development, sales and marketing, and implementation and support services. (*Id.*). Although iLE and the Technology Partner each facilitated the sales of the other in some way, they appear to have done so in different ways and with different customers. Given the apparent substance to both legs of these transactions, the happenstance that the values of these services roughly coincided does not mean that they washed each other out. Plaintiffs allege nothing more than "the mere existence of reciprocal dealing." *Tchrs.' Ret. Sys.*, 477 F.3d at 178. That is not enough.

Finally, Plaintiffs' allege that the $87 million in wire transfers revealed in the bankruptcy proceedings are not properly accounted for in iLE's financial statements. These wire transfers do not match the "net cash transfers" to the Technology Partner as stated in SEC filings, are in large round amounts, and are

32

described minimally as "outgoing wire transfer[s]."  (ECF No. 41 ¶¶ 310, 331).  Thus, Plaintiffs argue, iLE "revenue and net revenue is overstated by the amount of these payments."  (ECF No. 92, at 19).  How amounts being round and minimally described as outgoing wire transfers lead to a conclusion that they lacked a legitimate business purpose is not explained.  It is doubtful that such attributes constitute indicia of wrongdoing.  And the fact that the outgoing wires do not match *net* cash transfers is perhaps unsurprising given that net cash transfers would also account for incoming transfers from the Technology Partner.  Admittedly, the netting arrangement between iLE and the Technology Partner is somewhat confusing.  It is not clear if, and to what extent, iLE and the Technology Partner *did* net costs and revenues; the amended complaint is somewhat contradictory.  On the one hand, the statement in the S-1 Registration Statement seems to consider the netting arrangement to be optional: "[iLE] determined the services it received from the Technology Partner were distinct and the consideration paid to the Technology Partner was equivalent to an arms-length transaction.  As a result, no costs incurred by [iLE] related to services provided by the Technology Partner have been netted against revenues earned from the Technology Partner."  (ECF No. 41 ¶ 92).  On the other hand, the "Fees" provision of the Master Agreement does not clearly contemplate that netting is

optional, as opposed to mandatory.  For example, it provides that "[o]n or before the fifth (5th) day of each calendar month," the Technology Partner "will promptly report and pay to [iLE] all amounts due and payable for [iLE] Products . . . less any fees due for . . . [s]ervices previously provided" by the Technology Partner.  (*Id.* ¶ 108).  Plaintiffs do not explain how to square iLE's characterization of the netting arrangement in the S-1 Registration Statement with their theory of the netting arrangement.  To the extent iLE and the Technology Partner did not always net, it is hard to see how iLE Holdings' outgoing wire transfers give rise to an inference that iLE misstated revenue.

Plaintiffs fail to allege that iLE made any false representation about its revenue, so none of the alleged statements is actionable on this basis, either.

### b.  Scienter

The next pleading requirement that Defendants raise is scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  In addition to intent, scienter also "encompasses 'severe recklessness,'" meaning "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the

plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 751 (4th Cir. 2021) (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003)) (citing *Tchrs.' Ret. Sys.*, 477 F.3d at 184).

The PSLRA "imposes a heightened pleading standard for scienter, requiring plaintiffs to 'state with particularity facts giving rise to a *strong inference* of scienter.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).  "To qualify as 'strong[,]' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  The scienter inquiry "assess[es] the allegations holistically," rather than "each allegation in isolation." *Id.* at 326 (citation modified).  "[O]missions and ambiguities count against inferring scienter," as does absence of motive, though the latter is not "fatal." *Id.* at 325, 326 (citation modified).

In the amended complaint, Plaintiffs offer various allegations of scienter, all of which Defendants contend are insufficient. Defendants are correct. To begin, Plaintiffs allege that "as the CEO and CFO," Mr. Chidambaran and Mr. Naqvi "would have personal knowledge" of the structure of the relationship with

Experion "and would have known or recklessly disregarded the falsity and misleadingness of the alleged misstatements." (ECF No. 41 ¶ 522). Mr. Chidambaran and Mr. Naqvi's "knowledge of [iLE's] core business," along with "its employees and executive[s'] relationships with Experion," is allegedly "strong evidence" of scienter. (*Id.* ¶ 525). But "'bare allegations' that officers have 'knowledge of key facts' because of their positions or because such knowledge relates to the business's core operations are not enough, standing alone, 'to support a strong inference of scienter.'" *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014)). Defendants' positions at most indicate their *involvement* in any alleged misstatement, but not their knowledge thereof.

On that point, Defendants also argue that the mere fact of a GAAP violation, whether in recording revenue or identifying a related party, is generally insufficient on its own to raise a strong inference of scienter. As another court in this district has explained, "allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Keeney v. Larkin*, 306 F.Supp.2d 522, 541 (D.Md. 2003) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)), *aff'd*, 102 F.App'x 787 (4th

Cir. 2004).  Plaintiffs do not respond on this front in relation to recording revenue, but do contend that as to related parties, the GAAP test is so simple that a violation should give rise to an inference of scienter.  (ECF No. 92, at 26).  They cite ASC 850-10-20(e), which defines as a related party "[m]anagement of the entity and members of their immediate families," and assert that several iLE executives clearly meet this definition.  (*Id.* (alteration in original)).  Fair enough.  But that says nothing about whether *Experion* meets that definition, and it is difficult to see how it does.  If Plaintiffs themselves struggle to apply the test they frame as simple, then they cannot rely on potential misapplication of the test by Mr. Chidambaran and Mr. Naqvi as strong evidence of scienter.  *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F.Supp.3d 155, 161 n.9 (S.D.N.Y. Sep. 29, 2015) ("GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be." (alteration in original) (quoting *In re Worldcom, Inc. Sec. Litig.*, 352 F.Supp.2d 472, 478 (S.D.N.Y. 2005)).

Plaintiffs next point to the Board placing Mr. Chidambaran and Mr. Naqvi on administrative leave during the Special Committee investigation, (ECF No. 41 ¶ 527), and their subsequent resignations while the investigation remained ongoing, (*Id.* ¶ 528), as evidence of scienter.  Again, these allegations on their

37

own are insufficient.  The Fourth Circuit has repeatedly declined to rely on executive departures as strong evidence of scienter. *S.A. Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 244 (4th Cir. 2023) ("[E]xecutive departures are, at best, weak evidence of scienter." (citation modified)); *Triangle Cap.*, 988 F.3d at 754 ("[W]ithout allegations demonstrating Defendants' contemporaneous knowledge [of their misfeasance], we find it difficult to give this regime change any weight toward a scienter inference.").   Plaintiffs respond that the timing of Mr. Chidambaran's and Mr. Naqvi's resignations pending the Special Committee investigation indicate that they resigned to avoid termination for cause.  (ECF No. 92, at 27).  Perhaps, but that in itself is an inference.  And the "strong inference of scienter [must] be supported by facts, not other inferences." *Maguire Fin.*, 876 F.3d at 548.

iLE's self-reporting of potential violations of the law to the Department of Justice is even further evidence of scienter, Plaintiffs contend.  (*Id.* ¶ 530).  Those were *potential* violations of law, however, and Plaintiffs provide no indication that the government has concluded any violations actually occurred, or that the potential violations reported entailed intentional or severely reckless behavior by Mr. Chidambaran and Mr. Naqvi.   Again, a

strong inference of scienter cannot be supported by "other inferences." *Maguire Fin.*, 876 F.3d at 548.

Plaintiffs also allege that as CEO and CFO, Mr. Chidambaran and Mr. Naqvi "would have been aware" of the $87 million in wire transfers to Experion MEA in the year preceding bankruptcy. (*Id.* ¶ 532). This, however, is just another allegation that senior employees had "'knowledge of key facts' because of their positions." *KBC Asset Mgmt.*, 19 F.4th at 612 (quoting *Yates*, 744 F.3d at 890). And as discussed in the previous section, Plaintiffs fail to explain fully why the court should read anything into these wire transfers given the unclear extent of the netting arrangement. The fact that over $55 million of the wire transfers occurred after publication of the Hindenburg Report does not necessarily mean they "rushed to move money out of [iLE]." (ECF No. 92, at 27). Plaintiffs cite this figure from iLE's bankruptcy proceedings but do not indicate that any party to those proceedings has suggested these payments constituted fraudulent conveyances. Without any indication of what iLE's obligations to Experion actually were during this time period, the timing of these payments cannot raise a strong inference of scienter.

Finally, Plaintiffs contend that Mr. Chidambaran and Mr. Naqvi had a motive to defraud because "there [wa]s a clear incentive to maximize the company's perceived value." (ECF No.

39

92, at 27).  But the Fourth Circuit has concluded that "these types of generalized motives—which are shared by *all* companies—a[re] insufficient to plead scienter under the PSLRA."  *Ottmann*, 353 F.3d at 352 (citing, inter alia, *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1269 (10th Cir. 2001)).  A motivation to maximize the company's perceived value and "keep share prices . . . high" is precisely this type of generalized motive.  *Triangle Cap.*, 988 F.3d at 754.

Considering these allegations together, they do not raise an inference of scienter at least as compelling as the innocent alternative.  It remains more likely that Mr. Chidambaran and Mr. Naqvi faced tricky GAAP issues and relied on their independent accountant's opinion of their resolution of those issues.  "Marcum had continual access to internal, confidential, current corporate information concerning [iLE's] most up-to-date operational and financial results and prospects."  (ECF No. 41 ¶ 400).  It certified iLE's financial statements for 2023, 2022, and 2021, and consented to the inclusion of its opinion in the Registration Statements. (*Id.* ¶¶ 245-46, 253).  iLE stated that it incorporated those financial statements "in reliance" on Marcum's opinion. (*Id.* ¶ 145).  Even though Marcum apparently notified iLE in January 2024 while auditing iLE's 2023 financial statement that iLE had certain "material weaknesses," (*Id.* ¶ 217), its April 2024 opinion

stated that iLE's 2023 financial statement "present[ed] fairly, in all material respects, the financial position" of iLE, (*Id.* ¶ 246). It appears, then, that Mr. Chidambaran and Mr. Naqvi could reasonably believe that they were consistently and accurately representing iLE's financials to investors.

### c.   Loss Causation

Finally, a plaintiff must adequately plead loss causation to state a Section 10(b) claim.  15 U.S.C. § 78u-4(b)(4); *Defeo v. IonQ, Inc.*, 134 F.4th 153, 161 (4th Cir. 2025).  Loss causation is "a causal connection between the material misrepresentations and the loss."  *Dura Pharms.*, 544 U.S. at 342 (citation modified). Loss causation allegations are reviewed "for 'sufficient specificity,' a standard 'largely consonant with Fed.R.Civ.P. 9(b)'s' particularity requirement."  *Defeo*, 134 F.4th at 161 (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)).  "To plead loss causation, a plaintiff must plausibly and with sufficient specificity allege . . . '(1) the exposure of the defendant's misrepresentation or omission, i.e., the revelation of *new* facts suggesting the defendant perpetrated a fraud on the market, and [that] (2) such exposure resulted in the decline of the defendant's share price."  *Id.* at 161–62 (emphasis added) (citation modified) (quoting *Singer*, 883 F.3d at 445). There are three ways to plead such exposure: (1) the corrective

disclosure theory, meaning "the defendant company itself made a disclosure that publicly revealed for the first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission"; (2) the materialization of a concealed risk theory, meaning exposure by a third party of the defendant company's fraud; and (3) an "amalgam" of the previous two, "allowing for the reality that the truth of a company's fraud can leak out slowly from a variety of different sources."  *Id.* at 162 (quoting *Singer*, 883 F.3d at 445–47).  "[I]t is not enough to plead that some allegation of fraud hit the market if it is implausible to believe that said allegation revealed any new truth to the market."  *Id.*

Here, Plaintiffs allege loss causation through an amalgam of exposures.  They point to four disclosures.  (ECF No. 41 ¶ 535).  First, and most importantly, they highlight the release of the Hindenburg Report on August 29, 2024, which posited that iLE had fabricated its revenues and failed to disclose its Technology Partner as a related party.  (*Id.* ¶ 159).  iLE's share price fell from a closing price of $3.19 on August 28 to a closing price of $1.49 on August 29, a 53.3% decline.  (*Id.* ¶ 179).  Second, they cite the Form 8-K filing on November 18, 2024 ("Cautionary 8-K"), in which iLE announced that its financial statements since 2020 should "no longer be relied upon," Marcum had withdrawn its prior

42

opinions, iLE had received a subpoena from the SEC, and Mr. Naqvi had been placed on administrative leave from his role as CFO and given the new title of Senior Vice President. (*Id.* ¶ 196). iLE's share price fell again, this time from a closing price of $1.50 the previous trading day to a closing price of $1.095 on November 18, a 27% decline. (*Id.* ¶ 202). Third, they raise the Form 8-K filing on December 10, 2024 ("Executive Leave 8-K"), in which iLE announced that Mr. Chidambaran, Mr. Naqvi, Mr. Arackal, and two iLE Vice Presidents had been placed on administrative leave and Mr. Olivier had been appointed interim CEO. (*Id.* ¶ 205). iLE's share price fell further, from a closing price of $1.20 on December 9 to a closing price of $1.03 on December 10, a 14.2% decline. (*Id.* ¶ 207). Fourth, they point to iLE's press release on December 23, 2024 ("Bankruptcy Press Release"), that it had filed for bankruptcy. (*Id.* ¶ 208). iLE's share price tumbled from a closing price of $0.885 the previous trading day to a closing price of $0.19 on December 23, a 78.5% decline. (*Id.* ¶ 209).

Defendants argue that Plaintiffs have failed to plead loss causation because the Hindenburg Report disclaims its own accuracy and exposed no new facts, and none of the other three alleged disclosures exposed to the market any new facts, either. (ECF Nos. 83-1, at 31-34; 84-1, at 34-37). Plaintiffs respond that the Hindenburg Report did indeed expose new facts to the market, and

that all the alleged "partial" disclosures considered together constituted the requisite exposure.  (ECF No. 92, at 28–35).[10]

Defendants are correct that the Hindenburg Report is not a qualifying disclosure.  It is a "'high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers' when attempting to plead loss causation." *Defeo*, 134 F.4th at 163 (quoting *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022)).  Two circumstances are generally fatal to reliance on a short-seller report.  First, when self-interested and anonymous short-sellers disclaim the accuracy of their report, their report is "rendered . . . inadequate" for pleading loss causation.  *Id.* (quoting *Nektar Therapeutics*, 34 F.4th at 840)).  In *Defeo*, the Fourth Circuit held that a short-seller report did not constitute a qualifying disclosure because its self-interested, anonymous authors included a disclaimer that it "cannot and does not provide any representations or warranties with respect to the accuracy of th[e] [cited] materials." *Id.* at 158–59, 165.  Likewise, the Hindenburg Report's authors were self-interested, possibly anonymous,[11] and included a disclaimer that

---

[10] Plaintiffs disclaim reliance on the Hindenburg Report as a "complete corrective disclosure."  (ECF No. 92, at 35 n.1).

[11] Defendants contend that the Hindenburg Report's authors are anonymous, (ECF No. 83-1, at 11), and Plaintiffs do not contest that assertion.  The Ninth Circuit, however, has described Hindenburg reports as not anonymous because Hindenburg is a "well-

they "make[] no representation, express or implied, as to the accuracy, timeliness, or completeness of any . . . information" in the Report.  (ECF No. 83-2, at 24).  The disclaimer is strikingly similar to the one in *Defeo*.  Accordingly, any "reasonable investor reading the[] [report] would likely have taken [its] contents with a healthy grain of salt," causing "its potential evidentiary value [to] evaporate[]."  *Defeo*, 134 F.4th at 163, 164 (quoting *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794–95 (9th Cir. 2020)).  Therefore, it is "implausible" that the Hindenburg Report, "accompanied by those kinds of disclosures[]" and "published by an activist short seller, would reveal some new truth to the market."  *Id.* at 164.[12]

_____

known short-seller firm[]." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 541 (9th Cir. 2024).  It is not clear whether anonymity is eliminated when an institutional author is named, such as Hindenburg, or whether the Report is still considered anonymous unless individual authors are named.  The court need not resolve the question because the issue is not dispositive. *Id.* (holding that a Hindenburg Report, despite not being anonymous, did not qualify as a corrective disclosure).  Also, the authors of the Report announced that they "stand[] to realize significant gains in the event that the price of the securities move[s]."  (ECF No. 83-2, at 24).  Accordingly, the Hindenburg Report is self-interested, if not also anonymous.

[12] Plaintiffs appear to try to distinguish *Defoe* on the basis that the short-seller report there also relied on anonymous sources that were readily manipulable by the short-seller, whereas the Hindenburg Report did not rely on anonymous sources.  (ECF No. 92, at 30, 33).  A better reading of *Defoe*, however, is that the short-seller's reliance on anonymous sources was an additional, but not necessary, deficiency in the loss causation inquiry.  The rule *Defoe* announces makes no mention of anonymous sources: "[W]hen

Second, when the short-seller report relies exclusively on public information, it generally does not qualify as a corrective disclosure. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 540–42 (9th Cir. 2024). In efficient markets, the stock price is presumed to incorporate all publicly available information, so a report relying exclusively on publicly available information often cannot "reveal *new* information to the market that has not yet been incorporated into the price." *Bofl Holding*, 977 F.3d at 794 (emphasis added); *see also Nektar Therapeutics*, 34 F.4th at 839 (explaining that it "is normally difficult" to infer that a short-seller's report exposed new information to the market if the report "uses publicly available information"). That being said, a short-seller's report that relies exclusively on publicly available information can still qualify as a corrective disclosure if the underlying data is complex and/or required considerable effort to locate and analyze. *Espy*, 99 F.4th at 541. In other words, if synthesizing the public information required "expertise or specialized skills beyond what a typical market participant would possess," then it might qualify as a corrective disclosure. *Id.*

---

authors of a report are 'anonymous and self-interested short-sellers who disavowed any accuracy,' their reports are 'rendered . . . inadequate' for purposes of loss causation." 134 F.4th at 163 (quoting *Nektar Therapeutics*, 34 F.4th at 840). Nor do the Ninth Circuit cases the *Defoe* court relied on as "persuasive" make any mention of anonymous sources. *See Nektar Therapeutics*, 34 F.4th at 838–40; *Bofl Holding*, 977 F.3d at 791–97.

at 542 (quoting *Grigsby v. Bofl Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020)).

Such reliance on publicly available information is fatal to the Hindenburg Report's status as a corrective disclosure. Hindenburg explicitly represented that "[t]o the best of [its] ability and belief, *all* information contained herein . . . has been obtained from *public* sources." (ECF No. 83-2, at 24 (emphasis added)). Plaintiffs argue that the Report also relied on private information obtained from "corporate intelligence firm Diligencia." (ECF No. 92, at 34). Putting aside the fact that this contention contradicts Hindenburg's representations, Defendants note that the only information sourced from Diligencia is that "Jojo Philip, the brother of an iLE employee, held a minority interest in Experion MEA." (ECF No. 103, at 18 (citing ECF No. 41 ¶ 132)). That factual allegation was one small component of Plaintiffs' sweeping related-party argument and thus does not change the overall character of the Report's sourcing. Plaintiffs also argue that preparing the Report required expertise and specialized skills, so synthesizing the publicly available information effectively provided the market with new information. (ECF No. 92, at 33–34). That argument fares no better. No expertise or specialized skills are required for "a careful reading of public documents, including . . . investor presentations, press

47

releases, employees' LinkedIn profiles, board members' resumes, public corporate records, and SEC filings." *Espy*, 99 F.4th at 542. The Hindenburg Report largely relied on a careful reading of precisely the same materials: investor presentations, (ECF No. 83-2, at 3, 9, 17); press releases (*id.* at 11, 18, 19); employees' LinkedIn profiles, (*id.* at 7, 9, 11, 12); public corporate records, (id. at 3, 9-14); and SEC filings (*id.* at 3-27). Contrary to Plaintiffs' assertions, such materials do not take "great effort . . . to locate and analyze," *Espy*, 99 F.4th at 541 (quoting *Bofl Holding*, 977 F.3d at 795), nor do they consist of "complex economic data understandable only through expert analysis," *Pub. Emps. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014). Because Plaintiffs "allege[] no facts plausibly explaining why this [publicly available] information . . . was not yet reflected in [iLE's] stock price," they have "failed to plausibly allege that the Hindenburg [R]eport qualifies as a corrective disclosure." *Espy*, 99 F.4th at 542.

Although the Hindenburg Report itself does not qualify as a corrective disclosure, it is still possible for Plaintiffs to plead a corrective disclosure through "a series of partial disclosures." *Singer*, 883 F.3d at 446 (quoting *Katyle*, 637 F.3d at 472). When partial disclosures tend to corroborate a short-seller report based on public information, those disclosures can lend greater

48

credence to the notion that the short-seller report did reveal something new to the market. *Defeo*, 134 F.4th at 164.

Plaintiffs cite the Cautionary 8-K, Executive Leave 8-K, and Bankruptcy Press Release as additional partial disclosures tending to corroborate the Hindenburg Report.[13]   (ECF No. 41 ¶ 535).   But none of these alleged disclosures acknowledged fake revenues or admitted that the Technology Partner should have been disclosed as a related party.   The Cautionary 8-K provisionally communicated to the market that investors should not rely on iLE's previous financial statements during the pendency of the Special Committee's investigation.   It explicitly stated that iLE "is unable to determine whether it must correct financial statements" and "no conclusions have been reached at this time."   (*Id.* ¶ 200).   Such statements do not "reveal[] any truth about [iLE's] purported fraud."   *Defeo*, 134 F.4th at 164.   Likewise, it is implausible

---

[13] In their opposition, Plaintiffs also point to a few other alleged disclosures, namely various news reports and iLE's December 27, 2024, 8-K filing. (ECF No. 92, at 31–32, 34–35). To begin, neither were included in Plaintiffs' list of potential qualifying disclosures in the amended complaint. (ECF No. 41 ¶ 535). As excerpted, the news articles do no more than report that iLE's stock price fell following the release of the Hindenburg Report. (*Id.* ¶¶ 180-82, 185). The December 27 8-K filing announced that Mr. Chidambaran and Mr. Naqvi had resigned and iLE had self-reported potential violations of law to the Department of Justice. (*Id.* ¶¶ 214-15). But iLE did not link the resignations or self-reported violations to the allegations in the Hindenburg Report. While they suggest something in the company is amiss, they do not "relate back" to the specific misrepresentations of which Plaintiffs complain. *Singer*, 883 F.3d at 446.

that Marcum's withdrawal of its opinions, the receipt of an SEC subpoena, and the placement of Mr. Naqvi on administrative leave (but simultaneously appointing him Senior Vice President) revealed any truth to the purported fraud.  Instead, such actions are consistent with reasonable, ongoing investigation into the Hindenburg Report's allegations, even if they turned out to be entirely false.  Similarly, the Executive Leave 8-K noted that "[t]he [i]nvestigation remains ongoing," (ECF No. 41 ¶ 206), and any inference regarding the reason for placing the iLE executives on administrative leave rests on speculation, nothing more, *see Twombly*, 550 U.S. at 555.  Lastly, the Bankruptcy Press Release reveals little.  Plaintiffs explain in the amended complaint that just prior to the April 2024 merger, iLE "was in a dire financial state, reporting just $800,000 in cash, $22 million in debt, and an accumulated deficit of $47.1 million." (ECF No. 41 ¶ 67).  The fact that iLE had to file for bankruptcy before the end of the year is perhaps unsurprising, especially considering the effect of a short-seller attack, even if entirely unsubstantiated.

In the end, Plaintiffs fall back on perhaps the most logical argument of all, "[t]he immediate and severe stock price reaction to the Hindenburg Report." (ECF No. 92, at 33).  Certainly, the stock price fell severely after the release of the Hindenburg Report and each subsequent alleged disclosure.  But "[t]aken

together or separately," the Hindenburg Report and subsequent alleged disclosures do not reflect a "*revelation* of [iLE's] fraud as contributing to the decline in share price so much as they credit the *allegation* of fraud as a contributing factor." *Defeo*, 134 F.4th at 164.  There are various other explanations for a stock price decline in the immediate wake of a short-seller report besides the report's allegations being meritorious.[14]  Absent any corroborating facts of the fraud alleged in the Hindenburg Report, Plaintiffs' favored explanation is "merely consistent with" Defendants' liability.  *Twombly*, 550 U.S. at 557.  Such "correlation does not equal causation." *Defeo*, 134 F.4th at 164 (citation modified).  The PSLRA requires more.

---

[14] Other observers have noted that allegations in short-seller reports can induce panic selling, detached from the underlying merits of the allegations.  Katherine McGavin, *Short Selling in a Financial Crisis: The Regulation of Short Sales in the United Kingdom and the United States*, 30 Nw. J. Int'l L. & Bus. 201, 223 (2010).  Or the short-seller report might alert formerly disengaged or uninformed investors that they had neglected their due diligence on the company, even if the short-seller's specific allegations are unpersuasive.  *See* Lei Chen, *The Informational Role of Short Sellers: The Evidence from Short Sellers' Reports on US-Listed Chinese Firms*, 43 J. Bus. Fin. & Acct. 1444 (2016) (noting that due diligence can be poorer when companies go public via reverse merger, especially when the bulk of their operations is overseas).  Here, upon closer look, investors may well have disbelieved the Hindenburg Report's fraud allegations but disliked iLE's significant reliance on a single customer/vendor relationship and sold their shares.  Finally, execution of a short sale itself can flood the market with shares and depress the share price.  Merritt B. Fox, Lawrence R. Glosten & Paul C. Tetlock, *Short Selling and the News: A Preliminary Report on an Empirical Study*, 54 N.Y. L. Sch. L. Rev. 645, 652-53 (2009).

## 2. Section 20(a) (Count IV)

Section 20(a) of the Exchange Act imposes liability on anyone who "controls any person liable under" Section 10(b). 15 U.S.C. § 78t(a). Plaintiffs allege that Mr. Chidambaran and Mr. Naqvi are liable under Section 20(a). (ECF No. 41 ¶¶ 33, 564). Mr. Chidambaran and Mr. Naqvi move to dismiss Plaintiffs' Section 20(a) claims against them because Section 20(a) liability is derivative of Section 10(b) liability, and Plaintiffs fail to allege Section 10(b) liability adequately. (ECF Nos. 83-1, at 16; 84-1, at 28 n.4). Plaintiffs do not respond to this argument. Because Plaintiffs fail to state a claim under Section 10(b) against any defendant, their Section 20(a) claims will necessarily be dismissed, too. *Yates*, 744 F.3d at 894 n.8 ("Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail. (citing *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009))).

### B. Securities Act

Plaintiffs also bring a claim for violation of Section 11 of the Securities Act against Individual Defendants and Marcum, and a derivative claim for violation of Section 15 of the Securities Act against Individual Defendants. Individual Defendants all move to dismiss these claims, and Marcum moves to dismiss the Section

52

11 claim asserted against it.  Their arguments succeed, and Counts I and II will be dismissed.

### 1.    Section 11 (Count I)

Section 11 provides a civil cause of action to "any person acquiring [a] security" from a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."   15 U.S.C. § 77k(a).   The standard for assessing materiality is the same as Section 10(b) and Rule 10b-5.  *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F.Supp.2d 614, 633 (D.Md. 2010) (citing *Garber v. Legg Mason*, 537 F.Supp.2d 597, 615 (S.D.N.Y. 2008)). Section 11, however, imposes strict liability and does not require a plaintiff to establish scienter.  *See Yates*, 744 F.3d at 894.

Plaintiffs allege that Individual Defendants and Marcum are liable under Section 11 for the misrepresentations and omissions in the financial statements incorporated into the S-1 and S-8 Registration Statements.   (ECF No. 41 ¶¶ 314–416, 438, 443, 445). Individual Defendants and Marcum contend that Plaintiffs lack statutory standing because the shares they purchased are not traceable to the Registration Statements.   (ECF Nos. 80-1, at 26–30; 82-1, at 9–13; 83-1, at 34–37; 84-1, at 28–34; 85-1, at 12–16).   Alternatively, Mr. Chidambaran argues that Plaintiffs'

53

Section 11 claim is inadequate because it fails to allege any material misstatement, (ECF No. 83-1, at 37), and Marcum argues that Plaintiffs fail to allege its liability under the Section 11 standard for statements of opinion set forth in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), (ECF No. 80-1, at 15-26).  Plaintiffs argue that they do have statutory standing.  (ECF Nos. 90, at 16-29; 91, at 34-37).  They also vigorously contest, in their discussion of the Exchange Act claims, Mr. Chidambaran's argument that there were no material misstatements, (ECF No. 92, at 16-24), as well as Marcum's position that the *Omnicare* standard governs audit opinions, (ECF No. 91, at 20-33).

### a.   Statutory Standing

Plaintiffs allege that their Section 11 claim is asserted "on behalf of Plaintiffs and other members of the Securities Act Classes who, during the Class Period, purchased or acquired [iLE] common stock pursuant and/or traceable to the Form S-8 Registration Form and Form S-1 Registration Form."  (ECF No. 41 ¶ 438).  After the S-8 Registration Statement became effective on June 21, 2024, Mr. Leveque purchased 5,000 shares of iLE common stock on the open market on July 25, just over a month later.  (*Id.* ¶¶ 420, 423).  After the S-1 Registration took effect on August 9, Mr. Al Hamid purchased 500 shares of iLE common stock on the open market on

August 20, 2024, 500 shares on August 23, 1,000 shares on August 27, 1,000 shares on August 30, and 1,500 shares on September 16. (ECF No. 41-1, at 3; *see also* ECF No. 41 ¶ 424). Plaintiffs allege that "[g]iven the substantial increase in the volume of shares being traded" immediately after the Registration Statements took effect, "there is a high probability that the shares Plaintiffs purchased after these dates were traceable to the Offering Documents." (ECF No. 41 ¶ 422). Accordingly, Plaintiffs state that through discovery they "will prove that some or all of the shares [they] purchased on the open market are traceable to the" Registration Statements. (*Id.* ¶¶ 423, 424). They then detail how they plan to trace the chain of title of their shares in discovery. (*Id.* ¶¶ 426–36).

Plaintiffs' allegations are insufficient for statutory standing. A plaintiff bringing a Section 11 claim must "plead and prove that he purchased shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023). Standing allegations are assessed under the pleading requirements of Fed.R.Civ.P. 8(a). *Yates*, 744 F.3d at 899 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)). Plaintiffs cite several cases holding that a plaintiff need only provide the general allegation that the plaintiff purchased stock pursuant to or traceable to the offering

documents.   (ECF No. 90, at 18–19, 23 n.10, 26).   Courts in this circuit have rejected that proposition and instead held that, in light of *Twombly* and *Iqbal*, "the complaint must set forth facts plausibly suggesting that plaintiffs' shares were issued as part of the relevant offering." *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F.Supp.3d 740, 760 (E.D.N.C. 2017); *accord Fanucchi v. Enviva Inc.*, No. 22-cv-2844-DKC, 2024 WL 3302564, at *18 (D.Md. July 3, 2024).[15]   Although the Fourth Circuit has not weighed in on this question in the Section 11 context, the *TransEnterix* court understood the Fourth Circuit's opinion in an analogous case to reject the viability of such general allegations:

> In analyzing standing under Section 12(a)(2), the Fourth Circuit in *Yates* . . . h[eld] that "using the 'pursuant and/or traceable to' language—coupled with sufficient supporting facts—can give rise to a plausible inference of standing in certain circumstances." *Yates*, 744 F.3d at 900.  The Fourth Circuit held that the plaintiffs had not plausibly alleged standing because the complaint lacked "supporting facts sufficient to push the claim into the realm of plausibility." *Id.*  This court concludes that the Fourth Circuit would

---

[15] Plaintiffs rely on a case from this district, *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F.Supp.2d 616 (D.Md. 2012), which concluded that "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement," *id.* at 658 (second alteration in original) (quoting *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 373 (S.D.N.Y. 2011)).  (ECF No. 90, at 26).  That case is "outdated" and therefore unpersuasive. *Fanucchi*, 2024 WL 3302564, at *19.

> subject allegations of standing under Section
> 11 to the same plausibility analysis.[16]

*TransEnterix*, 272 F.Supp.3d at 760-61.  The only two circuit courts to address this question directly since *Twombly* and *Iqbal* have agreed that something more than a barebones allegation is required. *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755-56 (1st Cir. 2016); *Century Aluminum*, 729 F.3d at 1107; *see also Cupat v. Palantir Techs., Inc.*, No. 22-cv-2384, 2025 WL 1141534, at *14 (D.Colo. Apr. 4, 2025) (observing that the United States Courts of Appeals for the First and Ninth Circuits are "the only two circuit courts that appear to have addressed the issue").[17]  Otherwise,

---

[16] Plaintiffs contend that *Yates* is inapposite because Section 12 requires a "heightened showing for standing" compared to Section 11.  (ECF No. 90, at 25 n.12).  While it is true that Section 12's pleading requirement is indeed more rigorous because aftermarket purchasers may not sue, *Yates*, 744 F.3d at 899-900 (describing Section 11 standing requirements as "more relaxed"), that does not render the reasoning of *Yates* inapplicable.  *Yates* properly imported the more general teachings of *Twombly* and *Iqbal* that statutory standing allegations require "factual enhancement" and must be more than "merely consistent with" standing.  *Id.* at 899, 901 (quoting and citing *Iqbal*, 556 U.S. at 678).  The *Yates* court cited *Century Aluminum*'s conclusion that supporting facts are not always sufficient, even in the less restrictive Section 11 context. *Id.* at 900 (citing *Century Aluminum*, 729 F.3d at 1107-08). Plaintiffs' efforts to distinguish *Yates* are unavailing.

[17] Plaintiffs point to *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006), as a circuit court upholding general allegations as sufficient at the motion-to-dismiss stage. (ECF No. 90, at 18-19).  Indeed, the Third Circuit held that the "plaintiffs' assertions of purchases 'in' and 'traceable to' the Suprema stock offerings were sufficient at the pleading stage," and the question of traceability would be resolved in discovery.

plaintiffs offer "nothing more than a 'formulaic recitation' of [the traceability] element" of a Section 11 claim. *Ariad Pharms.*, 842 F.3d at 756 (quoting *Twombly*, 550 U.S. at 555).

Where, as here, "[a] company has issued shares in multiple offerings under more than one registration statement, 'a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering.'" *TransEnterix*, 272 F.Supp.3d at 761 (quoting *Century Aluminum*, 729 F.3d at 1107). "In that case, 'the plaintiff must prove that his or her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement.'" *Id.* (quoting *Ariad Pharms.*, 842 F.3d at 755) (citing *Century Aluminum*, 729 F.3d at 1106). "To do so, a plaintiff may either prove that the shares at issue were purchased directly in the secondary offering or, if the shares were purchases in the aftermarket, prove that the chain-of-title for the shares can be traced back to the secondary offering, starting with the plaintiff's purchase and ending with someone who purchased directly in the secondary offering." *Fanucchi*, 2024 WL 3302564, at *18 (citing *TransEnterix*, 272 F.Supp.3d at 761). In many instances, the "obvious alternative

---

*Suprema Specialties*, 438 F.3d at 274 n.7. That case, however, was decided before *Twombly* and *Iqbal* and is therefore unpersuasive.

explanation" to traceability is that the purchased shares "could instead have come from the pool of previously issued shares." *Century Aluminum*, 729 F.3d at 1108 (quoting *Twombly*, 550 U.S. at 567). When that is the case, "plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Rather, they must provide something more, "such as facts tending to exclude the possibility that the alternative explanation is true." *Id.* (citing *Twombly*, 550 U.S. at 554).

Here, Plaintiffs admit in the amended complaint that they purchased their shares on the open market. So, they must plead facts that the shares they purchased are traceable to either the S-1 or S-8 Registration Statement and that tend to exclude the alternative explanation that their shares instead trace back to the pool of shares that existed prior to and was unaffected by the Registration Statements. Beyond the general allegation that their shares are traceable, Plaintiffs allege that there is a "high probability" their shares are traceable based on certain figures related to the number of total shares outstanding and the number of shares registered in the Registration Statements, and that they will prove that their shares are in fact traceable through discovery. (ECF No. 41 ¶¶ 422, 425).

59

Defendants argue that Plaintiffs impermissibly rely on the probability that they purchased shares traceable to the Registration Statements, rather than the fact that their purchased shares are so traceable.  They echo the conclusion of a district court that recently considered the statistical tracing theory: "[A] plaintiff must plead facts supporting a plausible inference that its shares *are* traceable, not simply facts supporting a plausible inference that its shares are *probably* traceable to the challenged registration statement."  *Cupat*, 2025 WL 1141534, at *16.  The only circuit courts to have considered the statistical tracing theory at the pleading stage both rejected it.  *Century Aluminum*, 729 F.3d at 1108 (allegations regarding purchase dates and prices and the trading volume around those dates were insufficient); *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1190 (9th Cir. 2025) (explaining that *Century Aluminum* rejected the statistical tracing theory and finding no standing where the plaintiff raised a "statistical inference" based on "the number of shares he purchased and the fraction of shares on the exchange that were registered"); *Ariad Pharms.*, 842 F.3d at 756 (finding statutory standing implausible where 15 million registered shares were issued when 166 million were already outstanding).[18]

---

[18] The Fifth Circuit addressed the statistical tracing theory on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and therefore could consider evidence outside the

Plaintiffs attempt to distinguish these cases on the ground that in all of them, either the plaintiffs did not allege, or the courts did not believe, that it was possible to *prove* traceability. (*See* ECF No. 90, at 17 (distinguishing *Pirani*), 24–25 (distinguishing *Cupat*), 27 (distinguishing *Century Aluminum*), 28 (distinguishing *Ariad Pharms.*)). In other words, Plaintiffs believe their complaint is different because they do not allege that the best they will *ever* be able to do is give the court a high probability of traceability; rather, they allege they can provide certainty. To begin, that distinction of Defendants' authorities is questionable. *See, e.g.*, Second Amended Class Action Complaint ¶ 237, *Cupat*, No. 22-cv-2384 (D.Colo. Apr. 4, 2025), ECF No. 92 ("With discovery, a reliable chain of title can be constructed that will allow Plaintiffs *to prove* they purchased shares traceable to the Registration Statement[.]" (emphasis added)). And even assuming traceability for aftermarket

---

pleadings. *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494–97 (5th Cir. 2005). Accordingly, its discussion did not focus on how the statistical tracing theory relates to pleading requirements. Assuming that chain-of-title tracing was impossible, the court rejected the proposition that a plaintiff could have standing simply because there was a greater than 90% chance that his shares are traceable to the offering. *Id.* at 496. The court concluded that this theory would confer standing on *all* aftermarket purchasers, despite Section 11's restriction of standing to those purchasers who actually acquired the registered stock. *Id.* at 496–97.

purchasers is possible in the modern marketplace,[19] Plaintiffs do not explain why their belief that future proof is certain rests on anything other than their probabilistic assessment at this time. Indeed, if they had other reasons for such a belief, they would have included them in their amended complaint.  Plaintiffs' attempt to mask the central role of probabilities in their theory through unsubstantiated promises of certainty is nothing more than artful pleading.

Plaintiffs next argue that even if the court construes their theory as one of probabilities, their allegations are sufficient because registered shares constituted 87.1% of outstanding shares and 100% of the "public float."[20]  (*See, e.g.*, ECF No. 90, at 21).

---

[19] Elsewhere, Plaintiffs include the following quotation from a recent paper by two securities law scholars: "Many judges, academics, plaintiffs' and defense attorneys still subscribe to the myth that it is impossible to trace chain of title for commingled securities in order to establish standing under Section 11.  Unfortunately, this is a misguided, out-of-date assumption because enhanced data-reporting requirements and modern computing power can realistically solve this problem."  (ECF No. 98, at 17–18 (quoting John C. Coffee, Jr. & Joshua Mitts, Slack v. Pirani *and the Future of Section 11 Claims*, at 1 (Dec. 1, 2023), https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4650838_code180 6223.pdf?abstractid=4644888&mirid=1&type=2     [https://perma.cc/ ZU84-G4QP])).

[20] Plaintiffs (and iLE in the S-1 Registration Statement) do not explain their understanding of the term "public float."  The SEC defines "public float" as the product of a company's total shares in the "float" and the market price of a share of said company.  17 C.F.R. § 229.10(f)(2).  Plaintiffs do their math based on iLE's representation in the S-1 Registration Statement that the 100,774,669 shares registered constituted 90.9% of iLE's public

They point to various courts that have held that relatively high probabilities are sufficient at the motion-to-dismiss stage. (*Id.* at 21-22); *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F.Supp.3d 1107, 1119 (N.D.Cal. 2014) (finding traceability plausible where only 26,000 of 87 million unregistered shares were freely tradable), *aff'd in part*, *rev'd in part on other grounds*, 669 F.App'x 878 (9th Cir. 2016); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F.Supp.3d 837, 866 (S.D.Ohio 2016) (finding traceability where 46.4% of outstanding shares were registered and plaintiff purchased 15% of the shares traded on the day of the offering), *aff'd sub nom.*, *IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017); *In re Coinbase Glob., Inc. Sec. Litig.*, No. 22-cv-04915, 2024 WL 4053009, at *19 (D.N.J. Sep. 5, 2024) (finding traceability plausible where 74% of

---

float.    (ECF Nos. 90-2, at 74; 91, at 34).    Because the S-1 Registration Statement speaks in terms of the number of shares rather than their aggregate value, (ECF No. 90-2, at 74), iLE and Plaintiffs do not appear to be using the SEC's definition of *public* float.    Other courts have defined "float" as "the percentage of shares held by the public, rather than insiders."    *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D.Tex. 2001); *see also, e.g.*, *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 410 (E.D.Va. 2015) (citing *Krogman*, 202 F.R.D. at 478).    In that sense, then, the word "public" is redundant.    Regarding iLE's float, for the S-1 and S-8 Registration Statements to have registered 100% of the float, Plaintiffs must allege facts that the two Registration Statements registered every share not owned by an insider at the time of Plaintiffs' purchases.    They do not put together the numbers, or even account for insider ownership, in a way that permits such a conclusion.    Therefore, the float argument is unintelligible.

outstanding shares were registered).  Furthermore, they contend that those courts that have held otherwise dealt with far lower probabilities than are present here.  (ECF No. 90, at 24, 27–28); *see Cupat*, 2025 WL 1141534, at *17 (52.6% of outstanding shares registered); *Century Aluminum*, 729 F.3d at 1106 (33.3% of outstanding shares registered); *Ariad Pharms.*, 842 F.3d at 756 (8.4% of outstanding shares registered); *TransEnterix*, 272 F.Supp.3d at 761 (8% of outstanding shares registered).

Off the bat, Plaintiffs' numbers appear incomplete, if not incorrect.  Plaintiffs do not assess Mr. Leveque's standing separately from that of Mr. Al Hamid, but it is essential to do so.  *Cf. Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (holding, in the Article III standing context, that "when there are multiple plaintiffs[,] [a]t least one plaintiff must have standing").  Mr. Leveque purchased before the S-1 Registration Statement took effect, so his shares can be traceable, if at all, only to the S-8 Registration Statement.  As of May 14, 2024, Plaintiffs allege that "[iLE] had 134,313,494 shares of common stock outstanding." (ECF No. 41 ¶ 46).  Defendants argue the proper number is at least 157,595,089 shares, which includes 22,624,975 shares issuable upon private and public warrants but not yet issued as of July 22.  (ECF No. 105, at 11; *see also* ECF No. 90-2, at 2,

19).[21]    The lock-up provisions related to the merger restricted roughly 103,770,120 shares, or "over 76.9% of [iLE] outstanding shares,"[22] using Plaintiffs' preferred total figure.  (ECF No. 41 ¶ 419).  Those restrictions were likely to last until April 2025. (*See id.* ¶ 417).  Reading between the lines, then, at least 30,543,374 shares were unrestricted and thus freely tradable.  On June 21, 2024, the S-8 Registration Statement "registered up to 16,208,318 shares of iLearningEngines common stock."  (*Id.* ¶ 139). Mr. Leveque purchased shares on July 25, 2024.  (*Id.* ¶ 423).  From here, at least four assumptions need to be made: (1) whether Plaintiffs' total outstanding shares figure is correct; (2) whether all the registered shares were issued; (3) whether all the registered shares had been issued by May 14 to be included in the outstanding shares figure; and (4) whether all the registered shares were freely tradable.  Drawing all these assumptions in Plaintiffs' favor, there were still roughly 30,543,374 shares

---

[21] The court may consider the Form S-1 Registration Statement filed at ECF No. 90-2 on a motion to dismiss because it is a public record.  Moreover, it was filed on June 3 (ECF No. 90, at 12), and amended for the second time on July 22, (ECF No. 90-2, at 2), so the figures therein are relevant to Mr. Leveque's July 25 purchases.

[22] The S-1 Registration Statement sets forth a slightly different figure of 134,970,114 outstanding shares as of April 16, 2024, roughly one month earlier.  (ECF No. 90-2, at 19). Plaintiffs appear to use this total to calculate the 76.9% figure.

freely tradable on July 25 when Mr. Leveque purchased his 5,000 shares, of which 16,208,318 shares were registered.[23]  The highest possible percentage of freely tradable shares that were registered, then, was 53.1%, nearly identical to the percentage in *Cupat* that Plaintiffs seek to distinguish.  Although the 46.4% figure in *EveryWare* was lower, the plaintiff there purchased 15% of the total shares traded the day the registered shares came available, whereas Mr. Leveque purchased an unspecified portion of the total shares traded on a day over a month after the S-8 Registration Statement took effect.  In other words, Mr. Leveque's traceability odds appear remarkably lower than Plaintiffs suggest and lack any factual enhancements.

Plaintiffs' numbers remain unsettled when it comes to Mr. Al Hamid.  On August 9, 2024, the S-1 Registration Statement

---

[23] These assumptions matter.  First, Plaintiffs' outstanding shares figure is several months out of date.  If it is too low, then the denominator should be larger.  Second, iLE's S-8 Registration Statement identifies the registered shares as "issued *or issuable*" pursuant to various equity incentive plans.  (ECF No. 41 ¶ 137).  If not all the registered shares were issued, then fewer than 16,208,318 registered shares were available for purchase by Mr. Leveque, and therefore the numerator should be smaller.  Third, if some or all the registered shares were issued after June 21 but before July 25, then they were not accounted for in the total outstanding shares figure of 134,313,494 shares, and therefore the denominator should be larger.  On this point, it is notable that there was a large jump in trading volume on June 21 after the registration, suggestive of new shares being issued and then sold.  (*Id.* ¶ 420).  Fourth, if some of the registered shares were subject to the merger lock-up provisions, then they were not freely tradable, and the numerator should be smaller.

registered "up to 100,774,669 shares of [iLE] common [stock]."
(*Id.* ¶ 247).  On top of the (up to) 16,208,318 S-8 shares, there
was a maximum total of 116,982,987 registered shares at the time
Mr. Al Hamid began purchasing iLE common stock on August 20.
Dividing this figure by the May 14 total outstanding shares figure
of 134,313,494 shares yields the percentage Plaintiffs rely on:
87.1%.  (ECF No. 90, at 14).  While the court can draw the first
three assumptions listed above, it cannot draw the fourth
assumption because it is not possible that all 100,774,669 shares
were freely tradable given the alleged lock-up provisions.  It is
possible that a favorable percentage exists for Mr. Al Hamid,
whether it is below or above 87.1%, but the court will not do the
math for him.

Even if a favorable percentage exists, however, "[s]imply
alleging that stock is traceable because of a favorable percentage
does 'not give rise to a reasonable inference that plaintiffs'
shares are traceable.'  Plaintiff[s'] shares could have come from
the offering[s], or alternatively, could not have." *Doherty v.
Pivotal Software, Inc.*, No. 19-cv-3589, 2019 WL 5864581, at *10
(N.D.Cal. Nov. 8, 2019) (quoting and citing *Century Aluminum*, 729
F.3d at 1108).  Plaintiffs' allegations are "'merely consistent
with' their favored explanation." *Century Aluminum*, 729 F.3d at
1108 (quoting *Iqbal*, 556 U.S. at 678).  Rather, "[s]omething more

is needed," *id.*, such as purchase of the shares within a day of offering, *Coinbase*, 2024 WL 4053009, at *19; *EveryWare*, 175 F.Supp.3d at 864; *Mun. Mortg.*, 876 F.Supp.2d at 657, 658. Plaintiffs purchased their shares weeks to months after the Registration Statements.  They allege no additional facts that would nudge traceability into the realm of plausibility.

###### b.    Material Misrepresentations or Omissions

Mr. Chidambaran also moves to dismiss Plaintiffs' Section 11 claims because they fail to allege any material misrepresentation. (ECF No. 83-1, at 37).  Because the court has already concluded above that Plaintiffs have not adequately alleged any material misrepresentation or omission, this deficiency serves as an additional basis of dismissal of the Section 11 claims against all defendants.[24]

##### 2.    Section 15 (Count II)

Section 15 of the Securities Act imposes liability on anyone who "controls any person liable under" Section 11.  15 U.S.C. § 77o(a).  Plaintiffs allege that Individual Defendants are liable under Section 15.  (ECF No. 41 ¶¶ 40, 457).  Individual Defendants all move to dismiss Plaintiffs' Section 15 claims against them

---

[24] Given that lack of traceability and material misrepresentation serve as two separate grounds for dismissal, the court need not reach Marcum's additional argument that Plaintiffs have not stated a claim against it under *Omnicare*.

because Section 15 liability is derivative of Section 11 liability, and Plaintiffs fail to allege Section 11 liability adequately. (ECF Nos. 82-1, at 13; 83-1, at 35; 84-1, at 34; 85-1, at 17). Plaintiffs do not contest that Section 15 liability attaches only if there is an underlying violation of Section 11.  (ECF No. 90, at 29).  Because Plaintiffs fail to state a claim under Section 11 against any defendant, their Section 15 claims will necessarily be dismissed, too.  *Emps.' Ret. Sys. v. Macrogenics, Inc.*, 61 F.4th 369, 393–94 (4th Cir. 2023); *Cozzarelli*, 549 F.3d at 630.

### C.    Motion to Lift the Stay on Discovery

While the motions to dismiss were still in the briefing stage, Plaintiffs moved for a partial lift of the discovery stay that the PSLRA imposes, perhaps anticipating that their traceability allegations were insufficient. (ECF No. 93).  The PSLRA mandates that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).  Through particularized discovery, Plaintiffs planned to try to reconstruct the chain of title of their shares by issuing subpoenas to the Depository Trust Company, Continental Stock Transfer & Trust Company (iLE's transfer agent), and, if necessary, a limited number of broker-dealers and the

company that ultimately purchased iLE out of bankruptcy.[25]   (ECF No. 93-1, at 9-10).   Defendants characterize Plaintiffs' proposed discovery as an impermissible "fishing expedition."  (ECF Nos. 94, at 6; 95, at 1).   Although Defendants' characterization of Plaintiffs' proposed discovery is dubious, Plaintiffs' motion is futile because they fail to allege a material misrepresentation adequately.   The motion is moot and will be denied.

## IV.  Conclusion

For the foregoing reasons, all five motions to dismiss will be granted and the motion to lift the stay on discovery will be denied.   A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[25] Discovery would not necessarily involve so many parties. A recent paper, mentioned previously, notes that the Financial Industry Regulatory Authority (FINRA) maintains a Consolidated Audit Trail of all stock trades.  Coffee & Mitts, *supra* note 19, at 21.  The paper asserts that plaintiffs thus need only subpoena FINRA, "remov[ing] the need for [p]laintiffs to subpoena every individual broker-dealer whose accounts at one time held the securities in question."  *Id.*